817 F.2d 762
 260 U.S.App.D.C. 39, 55 USLW 2503, 13
Media L. Rep. 2377
 William P. TAVOULAREAS, Appellant,
Peter Tavoulareas
v.
Philip PIRO.
William P. TAVOULAREAS, Appellant,
Peter Tavoulareas
v.
The WASHINGTON POST COMPANY, d/b/a The Washington Post, a
Delaware Corporation, et al.
 Nos. 83-1604, 83-1605.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued En Banc Oct. 3, 1985.
Decided March 13, 1987.
As Amended March 24 and May 22, 1987.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Actions Nos. 80-2387 & 80-3032).
 John J. Walsh, New York City, of the bar of the Court of Appeals of N.Y., pro hac vice, by special leave of court, with whom Charles Alan Wright, Austin, Tex., was on the brief, for appellant. Abel J. Mattos, Washington, D.C., entered an appearance, for appellant.
 Edward Bennett Williams, with whom David E. Kendall and Kevin T. Baine, Washington, D.C., were on the brief, for appellees The Washington Post Company et al.
 David Machanic and Robert A. Feitel, Washington, D.C., were on the brief for appellee Philip Piro.
 Judah Best and Loren Kieve, Washington, D.C., entered appearances for appellee-intervenors Mobil Corp. and Mobil Oil Corp.
 J. Laurent Scharff, Jane E. Kirtley, James P. Mercurio and Rodney F. Page were on the brief for amici curiae Reporters Committee for Freedom of the Press et al. David Machanic, Jack C. Landau, Robert B. Bruce and Anthony C. Epstein, Washington, D.C., entered appearances for these amici in support of appellees.
 Michael P. McDonald was on the brief for amicus curiae The American Legal Foundation in support of appellant.
 Floyd Abrams, Dean Ringel, George Freeman, New York City, W. Terry Maguire, Richard M. Schmidt, Jr., Washington, D.C., R. Bruce Rich, Lauren W. Field, New York City, and Steven A. Bookshester, Washington, D.C., were on the brief for amici curiae American Broadcasting Companies, Inc. et al. in support of appellees.
 R. Bruce Rich, New York City, entered an appearance for amici curiae American Publishers, Inc. et al. in support of appellees.
 Before WALD, Chief Judge, ROBINSON, MIKVA, EDWARDS, RUTH BADER GINSBURG, SCALIA*, and STARR, Circuit Judges**, and WRIGHT and MacKINNON, Senior Circuit Judges.
 
 
 1
 Opinion for the court filed by Circuit Judge STARR and Senior Circuit Judge J. SKELLY WRIGHT.
 
 
 2
 Opinion concurring in the judgment filed by Chief Judge WALD.
 
 
 3
 Concurring opinion filed by Circuit Judge RUTH BADER GINSBURG.
 
 
 4
 Dissenting opinion filed by Senior Circuit Judge MacKINNON.
 
 
 5
 STARR, Circuit Judge and J. SKELLY WRIGHT, Senior Circuit Judge:
 
 
 6
 William Tavoulareas and his son Peter brought suit for injury to reputation after The Washington Post published a story that said, among other things, that Tavoulareas had used his influence as president of Mobil Corporation to "set up" Peter as a partner in a shipping firm whose business included a multi-million dollar management services contract with Mobil. After a jury trial in the United States District Court for the District of Columbia, Judge Oliver Gasch awarded judgment notwithstanding the verdict to the Post defendants. 567 F.Supp. 651 (D.D.C.1983). A divided panel of this court reinstated the jury's verdict, 759 F.2d 90 (D.C.Cir.1985), but the full court vacated that portion of the panel opinion and set the case for rehearing en banc, 763 F.2d 1472, 1481 (D.C.Cir.1985).
 
 
 7
 After a careful review of the entire record in the light most favorable to plaintiff, we are convinced that the only reasonable inference to be drawn is that the "set up" allegation was substantially true. We further hold that Tavoulareas is a limited purpose public figure who can recover for defamation only upon clear and convincing proof that defendants acted with actual malice. Because insufficient evidence exists in the record to support a finding of constitutional malice with respect to any of the defendants, we affirm entirely the District Court's decision.
 
 I. BACKGROUND
 
 8
 At trial, the parties presented conflicting evidence concerning Mobil's and Tavoulareas' involvement with Peter's shipping firm. The following account adopts the undisputed facts and Tavoulareas' version of disputed events.
 
 A. Mobil-Samarco-Atlas
 
 9
 William Tavoulareas was at all relevant times president and chief operating officer of Mobil Corporation, the Nation's second largest oil company and its third largest industrial corporation. In his position at Mobil, Tavoulareas took an active role in the public debate during the 1970's over the manner in which the United States should respond to the rise of OPEC and the ensuing energy crisis. In particular, Tavoulareas vigorously defended the performance of the oil industry against critics who called for sweeping reforms in the structure and management of the industry, and he publicly advocated less governmental regulation of the industry as the solution to the energy shortage. In addition, he was an important proponent of Mobil's "Saudi strategy" of dependence on Arab oil supplies at a time when increasing American energy independence became a significant public policy objective.
 
 
 10
 In 1973, a group of influential Saudis approached Mobil with a plan for a jointly owned shipping company. The group included the Alirezas, a prominent merchant family in Saudi Arabia that had other business relationships with Mobil.[1] The plan called for Mobil to furnish the capital for the proposed company, which would transport Saudi crude in its ships. At that time, it was widely anticipated that Saudi Arabia would soon establish a preference system requiring that Saudi crude be shipped in Saudi vessels. If Mobil, which depended heavily on Saudi supplies, were forced to use Saudi-owned ships, much of Mobil's own large fleet would then be idled. Mobil initially rejected the offer, whereupon the Saudis found another partner, Fairfield-Maxwell. The resulting venture was called Samarco--the Saudi Maritime Company. Mobil reassesed its situation in early 1974, reversed its field, and decided to join the Saudi venture.
 
 
 11
 Under the Samarco arrangement, ships owned by Mobil would be "bareboat-chartered" to Samarco--that is, leased without crews or provisions. Samarco would then "time-charter" the ships back to Mobil with full crews, supplies, and fuel.
 
 
 12
 Mobil decided that Samarco's ships should be operated by an independent management company, Atlas Maritime Company. Mobil believed that Atlas could operate the ships at less cost than Mobil[2] and that this arrangement would avoid a conflict of interest among the Samarco partners.
 
 
 13
 Atlas was established by George Comnas in 1974. Comnas met with Tavoulareas in January 1974 and explained that he had just started his own business after leaving his position as managing director of C.M. Lemos & Co., one of the largest Greek shipping concerns. One of Comnas' assistants at Lemos was Tavoluareas' son Peter. Peter, 24 and fresh from business school, was working at his first job in the shipping business as a $14,000 per year employee.[3] Comnas informed Tavoulareas at the January meeting that he, Comnas, wanted Peter to join his new venture as a principal and that Comnas would like to explore the possibility of doing business with Mobil. Tavoulareas then informed Rawleigh Warner, chairman of Mobil's board of directors, and George Birrell, chairman of Mobil's Conflicts of Interest Committee, that Peter might join Comnas in performing services for Samarco. Soon thereafter, sometime in the spring of 1974, Tavoulareas personally recruited Comnas to manage Samarco's ships through Atlas.
 
 
 14
 In August 1974, Peter left Lemos to become an equity partner at Atlas. Ares Emmanuel, a more experienced but similarly youthful co-worker from Lemos, had also joined Atlas but was provided with a much smaller equity interest in the firm.[4] When Peter joined Atlas, Tavoulareas sent a memorandum to Paul Wolfe, executive vice-president of Mobil, stating that he "would no longer be involved with anything as to Atlas and Samarco." Record Excepts (RE) at 2440; see RE at 2339. Mobil later told the Post that "[f]rom the date Peter Tavoulareas joined Atlas, Mr. Tavoulareas divorced himself from involvement in matters involving business transactions between Mobil and/or SAMARCO with Atlas" and that "[t]his is what Mr. Warner reported to [Mobil's] Board." RE at 2344.[5] The undisputed record, however, reveals that Tavoulareas involved himself in Samarco-Atlas matters on numerous occasions after Peter joined Atlas. For example, at trial Tavoulareas admitted that he attended and participated in meetings in Geneva in August 1974 and Saudi Arabia in November 1974 at which substantive discussions took place that helped produce the final agreement between Atlas and Samarco. Tavoulareas conceded that in these meetings he was "representing George Comnas' [and hence Peter's] position," Transcript (Tr.) at 1712, urging the Saudis to accept terms sought by Atlas.
 
 
 15
 As its inaugural project, Atlas began operating two Mobil-owned ships under contract with Samarco at an annual fee of more than $600,000, with the prospect of additional ships in the future. No other bids were solicited or received for the ship-management contract. By the time the Post published its story, Atlas had received more than $4.5 million in management fees from Samarco.
 
 
 16
 Shortly after Atlas began operations, Mobil grew disenchanted with Comnas, although there is disagreement among Tavoulareas' witnesses about whether the dissatisfaction arose from Comnas' business performance or some alleged misconduct on his part. What is undisputed is that Tavoulareas participated in a meeting, held in Tavoulareas' office, at which senior Mobil executives decided to seek Comnas' removal from Atlas. It is also undisputed that Tavoulareas and two other Mobil shipping executives flew to London to notify Comnas of this decision. Comnas was offered and accepted a $30,000 a year, three-year consultancy arrangement with Mobil in return for his resignation from Atlas.
 
 
 17
 When notified by Mobil of Comnas' resignation, the Saudi partners in Samarco, who had never been enthusiastic about using an independent management company, expressed promptly their view that the Samarco-Atlas management contract was terminated. Tavoulareas personally urged the Samarco partners to retain Atlas and successfully resisted the Saudi partners' attempts to take over some of the departed Comnas' equity interest. Most of that equity soon went to Peter.
 
 
 18
 After Comnas resigned, Atlas was left without an experienced hand at the helm. Harmon Hoffmann, a senior and highly respected Mobil executive, took over management of Atlas for the next six months, assisting Peter and the latter's fellow Lemos alumnus, Ares Emmanuel. Peter, whose share of Atlas increased from 40 to 75 percent in the wake of Comnas' departure, then assumed the management duties along with Emmanuel at what had become Peter's shipping firm.[6]
 
 
 19
 In November 1976, more than two years after Peter joined Atlas and over a year after Peter became its principal owner, Tavoulareas and Warner decided to send a letter to Mobil's quarter-million stockholders informing them that Tavoulareas had not been "actively involved in the planning, negotiation and direction" of Atlas and did "not participate in any decisions regarding the [Samarco-Atlas] relationship because his son, Peter, [was] one of the principals of that marine management firm." RE at 2650. Although Tavoulareas had formally recused himself from such matters, several of Mobil's outside directors raised objections to Peter's involvement in Atlas. Tavoulareas' potential conflict of interest also attracted the attention of the Securities and Exchange Commission, which conducted an investigation into the Mobil-Samarco-Atlas arrangements but took no enforcement action. The House Subcommittee on Energy and Power and several well-known journalists also investigated the matter.
 
 B. The Post
 
 20
 On November 30, 1979, the Post published a frontpage story stating that
 
 
 21
 Mobil Oil Corp. president William P. Tavoulareas set up his son five years ago as a partner in a London-based shipping management firm that has since done millions of dollars in business operating Mobil-owned ships under exclusive, no-bid contracts.
 
 
 22
 The story, which is set forth in full in the Appendix, went on for eighty-five paragraphs to describe the Mobil-Samarco-Atlas arrangements in detail. The article stated, among other things, that Mobil's board of directors had been assured that Tavoulareas "was not involved in his son's venture in any way," but that unidentified sources said that Tavoulareas had nonetheless (1) recruited the shipping executive who set up Atlas; (2) helped negotiate the Samarco-Atlas contract; (3) "personally urged" Comnas to accept Peter as a partner; (4) "played a personal role" in Comnas' resignation; and (5) "dispatched one of his senior shipping executives, Herman [sic] F. Hoffmann, to London to help run Atlas" after Comnas' departure. At key points, the story quoted Tavoulareas' own account of the incidents and included his denials of disputed assertions; in all, more than thirty paragraphs of the article reported Mobil's version of the events in question.
 
 
 23
 The Post first became aware of the connection between Atlas and Mobil in 1976 when reporter Robert Woodward received an anonymous note describing the Samarco arrangement. Woodward made some preliminary inquiries, but for a variety of reasons put the matter aside. In 1979, during a period of rising fuel prices, gasoline lines, and increased interest in the Nation's energy situation, Woodward, by then metropolitan editor of the Post, revived the Atlas matter. He assigned it to Patrick Tyler, a relatively new reporter on the metropolitan staff who had written a few months earlier about the oil shortage (and in a manner which prompted Mobil's disapprobation).
 
 
 24
 A short time later, Sandy Golden, a reporter for a suburban newspaper who was ambitious for a job on the Post, telephoned Woodward to offer a lead he hoped to develop into a story about how the president of Mobil set up his son to be an "overnight millionaire." Upon returning Golden's call on Woodward's behalf, Tyler learned that Golden had encountered Dr. Philip Piro, a young Johns Hopkins physician and estranged son-in-law of Tavoulareas, and that Piro had offered to discuss Tavoulareas' involvement with Peter's rise in the business world. Tyler and Golden met with Piro at The Owl restaurant in Baltimore and interviewed him for several hours. Tyler concluded that Piro had little direct knowledge of Mobil's business affairs, and that he obviously harbored a grudge against the Tavoulareas family. In view of Piro's perceived limited value as a source, Tyler informed Golden that he would continue to pursue the story on his own; Golden said he would do likewise.[7]
 
 
 25
 Tyler's research led him to George Comnas, who told the reporter that Tavoulareas recruited him to help establish Samarco and Atlas. Comnas also stated that Tavoulareas requested him to bring Peter into Atlas. Comnas described the Samarco-Atlas arrangements in detail and discussed Tavoulareas' role in persuading the Saudi partners to accept Atlas as Samarco's management company. Tavoulareas, according to Comnas, personally asked him to resign from Atlas. Following his own interviews, Tyler learned that Comnas had related substantially the same account to investigators from the House Subcommittee on Energy and Power, who had questioned Comnas in detail and concluded that his story was accurate.
 
 
 26
 Tyler also interviewed John Kousi, a New York lawyer who served as Fairfield-Maxwell's representative on the Samarco board of directors. Kousi told Tyler that Peter had limited experience and ability, and that, in Kousi's opinion, Peter's partnership in Atlas was "a nepotistic act" on the part of Tavoulareas. Kousi also said that Tavoulareas personally negotiated on Atlas' behalf to obtain the agreement of Samarco's Saudi partners to the Atlas arrangement. Kousi further stated that Mobil was the moving force in both hiring and firing Comnas.
 
 
 27
 In preparing the article, Tyler sought repeatedly but unsuccessfully to interview Tavoulareas and other Mobil officials. At trial, Mobil officials explained the company's refusal to cooperate with Tyler on the ground that in his story earlier in 1979 Tyler had misrepresented statements by Mobil executives. Eventually, however, at Woodward's urging, Mobil agreed to answer written questions from Tyler. Those answers confirmed the basic outlines of the Samarco arrangement. The responses further stated that, although Mobil's Board of Directors was told that "Tavoulareas divorced himself from involvement in matters involving business transactions between Mobil and/or SAMARCO with Atlas," he had in fact been involved in hiring Comnas and played what Mobil called "a minor role" in firing him. RE at 2344-45. Moreover, Mobil confirmed that Tavoulareas had participated in setting up Atlas as an independent management firm, but stated that he had not initiated Peter's association with Atlas.
 
 
 28
 Tyler also obtained a transcript of Tavoulareas' sworn testimony before the SEC's Enforcement Division in 1977. In that testimony, Tavoulareas acknowledged his key role in the creation of Atlas. He admitted that he knew that Comnas and Peter had discussed going into business together when he, Tavoulareas, recruited Comnas. This transcript, together with the interviews of Comnas and Kousi, the report of the Congressional investigators, and the written responses from Mobil, comprised the Post's principal sources for its story of November 30, 1979.
 
 
 29
 Tyler spent one month working on the story, tracking down leads, confirming information, and writing the final article. The story underwent scrutiny from senior editors, including Woodward and national news editor William Greider. The editors questioned Tyler about his sources. Counsel for the Post conducted a line-by-line review. Managing editor Howard Simons and executive editor Benjamin Bradlee examined the story before it was cleared for publication. When a copy editor, Christine Peterson, raised questions about the story, Tyler responded with a detailed memorandum that satisfied the Post's editors that the story was accurate. The Post vigorously contends to this day that it published the story in the belief that it was truthful; at oral argument on rehearing en banc, the Post reaffirmed its continued belief in the story's accuracy.
 
 
 30
 William and Peter Tavoulareas brought libel actions against the Washington Post Company, Benjamin Bradlee, Robert Woodward, Patrick Tyler, and Sandy Golden.[8] Plaintiffs claimed they were falsely defamed both by the November 30 article and by a follow-up Post story on December 1. The suit against the Post was consolidated with a separately filed action brought against Dr. Piro for slander. The District Court subsequently determined that William Tavoulareas was a limited public figure for purposes for the case but that Peter was not. RE at 696-97, 709-29.
 
 
 31
 On July 30, 1982, a jury found that Bradlee and Woodward were not liable to either of the plaintiffs and that the Post, Tyler, and Golden were not liable to William Tavoulareas for the December 1 article and not liable to Peter for either article. The jury did, however, return a general verdict against the Post, Tyler, and Golden for the November 30 article, awarding William Tavoulareas $250,000 in compensatory and $1.8 million in punitive damages. The jury also found Piro liable to both Tavoulareases for slander.
 
 
 32
 The District Court subsequently entered judgment notwithstanding the verdict (j.n.o.v.) for Piro and for the Post defendants against William Tavoulareas. Appeals were then brought to this court challenging the judgments n.o.v. and attacking the trial court's determination that William Tavoulareas was a limited public figure.
 
 II. PUBLIC FIGURE
 
 33
 In New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court first recognized that traditional actions for defamation might interfere with First Amendment rights of free expression. Discerning in the First Amendment a demand that writers and speakers enjoy enough "breathing space" to avoid self-censorship and encourage "debate on public issues [that is] uninhibited, robust, and wide open," id. at 270, 84 S.Ct. at 721, the Court held that a public official could recover damages for libel only by showing that the allegedly defamatory statement was made with " 'actual malice'--that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 279-80, 84 S.Ct. at 726. In Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), this constitutional protection was applied to speech concerning "public figures" who were not government officials, but who nonetheless "often play an influential role in ordering society." Id. at 164, 87 S.Ct. at 1996 (Warren, C.J., concurring). But in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court declined to extend the actual malice rule to speech about private individuals.
 
 
 34
 Gertz held that the extent of the constitutional privilege varies with the strength of the government's legitimate interest in protecting individual reputation. This interest is strongest when the state protects private citizens whose actions reflect a decision to shield their lives from public scrutiny. Such persons are typically "more vulnerable to injury than public officials and public figures [and] more deserving of recovery." Id. at 345, 94 S.Ct. at 3010. The state's interest is correspondingly weaker with respect to government officials and others who "assume[ ] [a] role of especial prominence in the affairs of society ... [that] invite[s] attention and comment." Id. This is true partly because public figures "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." Id. at 344, 94 S.Ct. at 3009. More important, "by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention," id at 342, 94 S.Ct. at 3008, public figures voluntarily "run[ ] the risk of closer public scrutiny than might otherwise be the case." Id. at 344, 94 S.Ct. at 3009. Moreover, "[o]ur citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' " Butts, 388 U.S. at 164, 87 S.Ct. at 1996. (Warren, C.J., concurring).
 
 
 35
 The Supreme Court has identified two classes of public figures in addition to government officials: general purpose and limited purpose public figures. "In some instances, an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Gertz, 418 U.S. at 351, 94 S.Ct. at 3013. The extent of the individual's participation in public affairs and assumption of the risk of adverse publicity determines the weight of the government's interest in protecting his or her reputation.
 
 
 36
 Whether (and to what extent) a person is a public figure is a matter of law for the court to decide. Rosenblatt v. Baer, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966); Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1293 n. 12 (D.C.Cir.), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). This is a difficult and sensitive exercise unsusceptible to the application of rigid or mechanical rules. See, e.g., Rosanova v. Playboy Enterprises, Inc., 411 F.Supp. 440, 443 (S.D.Ga.1976) ("Defining public figures is much like trying to nail a jellyfish to the wall."), aff'd, 580 F.2d 859 (5th Cir.1978). In this circuit, our determination is guided by Waldbaum.
 
 
 37
 A person becomes a general purpose public figure only if he or she is "a well-known 'celebrity,' his name a 'household word.' " Waldbaum, 627 F.2d at 1294. Such persons have knowingly relinquished their anonymity in return for fame, fortune, or influence. They are frequently so famous that they "may be able to transfer their recognition and influence from one field to another." Id. at 1294 n. 15. Thus, it is reasonable to attribute a public character to all aspects of their lives. William Tavoulareas is a highly prominent individual, especially in business circles, but his celebrity in society at large does not approach that of a well-known athlete or entertainer--apparently the archetypes of the general purpose public figure. See, e.g., [Johnny] Carson v. Allied News Co., 529 F.2d 206 (7th Cir.1976); Chuy v. Philadelphia Eagles Football Club, 431 F.Supp. 254 (D.C.Pa.1977), aff'd, 595 F.2d 1265 (3d Cir.1979) (en banc). The standard as generally applied is a strict one; the Supreme Court has not found anyone to be a general public figure since Butts. In view of the stringent standards applicable to this category of public figure, we have no difficulty in upholding the District Court's conclusion that the plaintiff was not a general purpose public figure.
 
 
 38
 Although few persons attain the level of notoriety to be public figures in all contexts, many individuals may be public figures for the more limited purpose of certain issues or situations. Waldbaum sets out a three-step inquiry to identify these limited-purpose public figures. First, we isolate the controversy at issue, because the scope of the controversy in which the plaintiff involves himself defines the scope of the public personality. The controversy must be public both in the sense that "persons actually were discussing" it, 627 F.2d at 1297, and that "persons beyond the immediate participants in the dispute [are likely] to feel the impact of its resolution." Id. Second, we examine the plaintiff's role in the controversy, to be sure that it is more than "trivial or tangential." Id. An individual does not forfeit the full protection of the libel laws merely by stating a position on a controversial issue if he or she is not a principal participant in the debate or is unlikely to have much effect on its resolution. See Gertz, 418 U.S. at 351-52, 94 S.Ct. at 3012-13. Finally, we determine if the alleged defamation was germane to the plaintiff's participation in the controversy. Waldbaum, 627 F.2d at 1298.
 
 
 39
 The Waldbaum inquiry provides a uniform approach to identifying those individuals whose voluntary participation in public life and whose access to the media have reduced the state's interest in protecting them from the risk of defamation. Waldbaum thus provides us with useful analytic tools; nevertheless, the touchstone remains whether an individual has "assumed [a] role[ ] of especial prominence in the affairs of society ... [that] invite[s] attention and comment." Gertz, 418 U.S. at 345, 94 S.Ct. at 3009.
 
 
 40
 Applying these principles to the case at hand, we first consider the possibility that Tavoulareas was a limited public figure for the purpose of the controversy over whether the management and structure of the United States' private oil industry was in need of alteration or reform. Examining the oil shortages of the 1970's, numerous public officials, pundits, and commentators criticized both the performance and integrity of the major, integrated oil companies. Many reform proposals were publicly advanced and considered, including measures to break up or divest the large oil companies, increase their taxes, install government representatives on their boards of directors, and subject them to more intensive federal regulation.
 
 
 41
 We have held in Waldbaum that "[b]eing an executive within a prominent and influential company does not by itself make one a [limited purpose] public figure." 627 F.2d at 1299. We reaffirm that principle today. But that is not to say that an individual's position as president and chief operating officer of one of the world's largest multinational corporations, with a quarter-million stockholders, is irrelevant to whether that person has "invite[d] attention and comment" with respect to public issues affecting his business dealings. This is especially true when that industry--and the company itself--is at the center of a vigorous public debate touching on a vital national interest.
 
 
 42
 More specifically, Tavoulareas avowedly attempted to "thrust [Mobil and himself] to the forefront" of the national controversy over the state of the oil industry. In November 1979, for example, Tavoulareas made the following telling observations in a speech:
 
 
 43
 As you know, Mobil has gotten the reputation of being probably the most outspoken company on public issues, through our newspaper advocacy advertising and other public statements. It's not always comfortable being in the limelight, particularly when the President of the U.S. calls us perhaps the most irresponsible company in the country. But we think the effort has been worth making and we're going to go on with it. We see positive results in the press and in our meetings with elected officials.
 
 
 44
 RE at 302; cf. RE at 470. Even more than Eric Waldbaum (whom this court, speaking through Judge Tamm, found to be a limited public figure with respect to his business dealings), Tavoulareas was not "merely a boardroom president whose vision was limited to the balance sheet. He became an activist, projecting his own image and that of [Mobil] far beyond the dollars and cents aspects of marketing." 627 F.2d at 1300.
 
 
 45
 Mobil and Tavoulareas played substantial roles in spearheading a public counterattack on the movement for reform of the oil industry. The 500-page "Public Figure Index"--a collection of news clippings and the like, submitted by the Post--attests to the undisputed fact that Tavoulareas was outspoken in defending the oil industry's performance, see, e.g., RE at 455, in blaming the oil crisis on government regulation and interference with the free market, and in advocating rejection of efforts to further regulate or alter the oil industry. He made speeches, testified before Congress, RE at 304-67, published articles, RE at 378-97, and through Mobil's publicity apparatus enjoyed continuing access to the media, RE at 419-63. Even more than his counterparts in the industry, Tavoulareas sought and received public attention on the management and operations of the Nation's oil companies.[9] Having "stepp[ed] into the public spotlight ... he must take the good with the bad." Waldbaum, 627 F.2d at 1294-95.
 
 
 46
 Public policy toward the oil industry was clearly a controversial subject that "was being debated publicly and ... had foreseeable and substantial ramifications for non-participants." Id. at 1297. Although only a "few [participants] can have the necessary impact," id. at 1297 n. 27, on such a broadly-defined controversy, Tavoulareas' widely-reported, influential public role in the debate as president of Mobil eminently qualified him as a public figure.
 
 
 47
 Waldbaum 's final requirement, namely germaneness of the publication to the controversy, was also satisfied by the Post article. The story of Mobil's president and his junior-executive son, who achieved great business success early in life, sought to provide the public with "a rare glimpse into corporate behavior at the top of one of the largest publicly held international oil companies." p 12. The alleged nepotism by Tavoulareas was not "wholly unrelated" to a public controversy where the credibility and integrity of representatives of the oil industry had become an issue. 627 F.2d at 1298; see, e.g., RE at 570. In our view, the Waldbaum criteria are abundantly satisfied here.
 
 
 48
 In addition, Judge Gasch found Tavoulareas to be a public figure for purposes of a more narrowly defined controversy concerning the Mobil-Samarco-Atlas arrangement. Tavoulareas acknowledges that the Post article was germane to that arrangement, but disputes whether it was a "public" controversy within the meaning of Gertz, Waldbaum, and Firestone.[10] Like the District Court, we conclude that it was.
 
 
 49
 The involvement of Mobil, Tavoulareas, and Peter in the Samarco-Atlas arrangement attracted the attention of journalists and government officials long before the November 30, 1979 article appeared. Mobil publicly announced the Samarco-Atlas deal in 1974, albeit without mentioning Peter's involvement. RE at 629. After consultation with Tavoulareas, Mobil officials subsequently decided to publicize Peter's involvement in the arrangement by releasing the information to a "widely read oil industry periodical." Tr. at 1880-81. Thereafter, a number of journalists, including reporters from The New York Times and Jack Anderson's office, contacted Mobil about Samarco and Atlas. RE at 1420-22; see also RE at 2464; Tr. at 2435.[11]
 
 
 50
 In light of various inquiries, Tavoulareas, along with Mobil's Chairman Rawleigh Warner, decided to disclose in a letter to Mobil's shareholders that Peter was a principal in Atlas and that, as a result, Tavoulareas had formally recused himself from Samarco-Atlas matters. RE at 2440-42, 2650.[12] In presenting his side of the story to Mobil's shareholders, Tavoulareas reached an audience of more than a quarter-million people, a group larger than the circulation of most daily newspapers.
 
 
 51
 Shortly after the Mobil shareholder letter, the SEC launched an investigation into Tavoulareas' relationship to Samarco and Atlas. Tavoulareas vigorously defended his conduct in sworn testimony before the SEC staff in March of 1977. RE at 2399-2460. Ten days prior to publication of the Post article, Congressman John Dingell, Chairman of the House Subcommittee on Energy and Power, wrote the Chairman of the SEC requesting the Commission to reopen its investigation on the basis of information unearthed by Congressional investigators indicating that "Tavoulareas may have been actively involved in the formation and operation of both Samarco and Atlas, notwithstanding the potential conflict of interest and his denials of participation." RE at 2466.
 
 
 52
 Not only were "persons actually ... discussing" the extent and propriety of Tavoulareas involvement in Samarco-Atlas matters prior to the Post article, Waldbaum, 627 F.2d at 1297, but "a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution," id. (footnote omitted). Highly respected outside members of Mobil's board of directors--including Ambassador George McGhee, Fred Borch, chairman of General Electric, and Albert Williams, president of IBM--specifically objected to the arrangements Mobil's management had made with respect to Peter, and had raised their concerns directly with Mr. Warner. Tr. at 3585-86; see also Tr. at 1814-15. Mobil's outside directors were worried that the appearance of a conflict of interest would hurt Mobil's public image and thereby have an adverse impact on Mobil's shareholders. GE's Borch, for example, "urged [Warner] to urge Tavoulareas Sr. to get out of his relationship with his son and put him in a different business. If he wanted to put him in a business, put him in one that does not affect Mobil...." Tr. at 3551. Ambassador McGhee opposed Peter's involvement in Atlas from the outset, expressing the view that the arrangement was "bad policy and precedent for the company" and would "expose [Tavoulareas and his son] to the risks of possible adverse criticism, even investigations by Congressional committees." Tr. at 1795-96 (emphasis added); see also RE at 2670. Having opened these matters for public scrutiny by going forward in the face of considered objections by leading businessmen serving on his own board, and then publicizing the affair to the press and to Mobil's shareholders, Tavoulareas could scarcely expect all ensuing commentary on these arrangements to be favorable.[13]
 
 
 53
 In sum, we find abundant evidence of the already "public" nature of this subject in the activities of both government and corporate officials. When, in Judge Tamm's words, we "look at the facts, taken as a whole, through the eyes of a reasonable person," Waldbaum, 627 F.2d at 1293, we conclude that Tavoulareas was a public figure for purposes of this publication, and that the Post was therefore "entitled to act on the assumption that [he] voluntarily exposed [himself] to increased risk" of critical comment and publicity. Gertz, 418 U.S. at 345, 94 S.Ct. at 3010.
 
 III. Post DEFENDANTS
 
 54
 It is now well settled that, in the face of the countervailing demands of the First Amendment, a public figure such as Tavoulareas may recover for injury to reputation "only on clear and convincing proof" that the defamatory falsehood was made with "actual malice." Gertz, 418 U.S. at 342, 94 S.Ct. at 3008. It is equally well established that the standard of actual malice requires proof not merely that the defamatory publication was false, but that the defendant either knew the statement to be false or that the defendant "in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); see also Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 1567, 89 L.Ed.2d 783 (1986) (Stevens, J., dissenting) ("For [the actual malice] standard to be met, the publisher must come close to wilfully blinding itself to the falsity of its utterance.") (footnote omitted). Moreover, the burden of proof imposed on public figures is significantly more onerous than the usual preponderance of the evidence standard. See, e.g., Long v. Arcell, 618 F.2d 1145, 1148 (5th Cir.1980), cert. denied, 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981); Nader v. De Toledano, 408 A.2d 31, 49 (D.C.1979), cert. denied, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). The requirement of "clear and convincing" proof of actual malice, initially articulated by the Supreme Court in Sullivan, "administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander." Gertz, 418 U.S. at 342, 94 S.Ct. at 3008.
 
 
 55
 On the basis of its careful review of the entire record, the District Court concluded that there was not "sufficient evidence in the record from which a jury could reasonably find, by clear and convincing proof, that the [Post] defendants published the November 30 article with actual malice." 567 F.Supp. at 653-64 (footnote omitted). In reaching this decision, Judge Gasch applied the traditional standard for overturning a jury verdict: "A trial court may grant [j.n.o.v.] only when 'the evidence, together with all inferences that can reasonably be drawn therefrom[,] is so one-sided [in favor of the moving party] that reasonable men could not disagree on the verdict.' " Id. at 652 (quoting Vander Zee v. Karabatsos, 589 F.2d 723, 726 (D.C.Cir.1978), cert. denied, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979)).[14] The District Court considered all the evidence in the light most favorable to Tavoulareas and abstained from assessing the credibility of witnesses or weighing the evidence. We follow the same course. Based upon our review of the entire record in this case, we agree with Judge Gasch's dispositive conclusion.
 
 
 56
 In reaching this conclusion, we apply a standard of review that all the parties, amici, and the District Court have agreed is correct. Specifically, by virtue of the First Amendment nature of this litigation, the jury verdict must be measured, on the basis of an independent examination, against the heavy burden of proof imposed on a plaintiff who is a public figure:
 
 
 57
 In reviewing a defamation verdict, courts must exercise particularly careful review. They "must 'make an independent examination of the whole record,' ... so as to assure [themselves] that the judgment does not constitute a forbidden intrusion on the field of free expression." New York Times v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964) (quoting Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)).
 
 
 58
 Supplemental Brief for Appellant at 9; see also Supplemental Brief for Appellees at 6-7; Brief Amicus Curiae of the American Legal Foundation in Support of Appellant at 7; Brief of the Reporters Committee for Freedom of the Press and Radio Television News Directors Association as Amici Curiae in Support of Appellees at 22-23; 567 F.Supp. at 653-54.
 
 
 59
 The parties, at our instance, have devoted enormous effort to the difficult enterprise of discerning the precise meaning of Bose Corp. v. Consumers Union, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (mandating independent judicial review of evidence of actual malice, but leaving unresolved the extent of that review). The District Court was, of course, not faced with this inquiry; the decision granting j.n.o.v. antedated Bose by almost exactly one year. From Bose, the parties have argued sharply divergent positions. Under one view, Bose 's mandate of de novo review means precisely that, with no deference at all to be accorded any jury finding germane to actual malice. See Supplemental Brief for Appellees at 6-16. Under the contrary view, Bose does not alter the traditional rules governing the review of jury verdicts and thus judicial deference is constitutionally mandated to presumed jury findings of underlying facts, evaluations of credibility, and the drawing of inferences. See Supplemental Brief for Appellant at 9-19. Notwithstanding these divergent positions, however, it is undisputed that Bose at least reaffirmed Sullivan 's mandated duty of independent review. See, e.g., Supplemental Brief for Appellant at 9 ("In Bose ... the Court reaffirmed that 'Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice." ' ") (quoting Bose, 466 U.S. at 511, 104 S.Ct. at 1965).
 
 
 60
 The somewhat murky dispute that has consumed this litigation in its later phases is whether Bose went further and sanctioned independent review as to findings of underlying facts, evaluations of credibility, and the drawing of inferences. It is this issue--the existence and application of this possible additional aspect of Bose --that we believe, upon reflection, we need not decide. We have concluded that sailing into these uncharted waters is unnecessary to the proper and principled disposition of this case. Bearing in mind the exacting standard of clear and convincing proof of actual malice, we are persuaded that, when we faithfully apply the traditional j.n.o.v. standards in this First Amendment context, Judge Gasch was manifestly correct.
 
 
 61
 The dissent complains that we have evaded this complex constitutional issue only by "reject[ing] entirely plausible (if not inevitable) interpretations of the article." Dissent at 810. But in determining what defamatory meaning the article is capable of bearing, we perform the quintessential function of the court in defamation actions, as the dissent forthrightly acknowledges. See Dissent at 817 ("It is for the court to determine whether a particular communication is capable of bearing a defamatory meaning.") (emphasis in original).
 
 
 62
 The dissent vehemently insists that we abandon the role of the court and invade the jury's function in upholding the District Court's grant of j.n.o.v. The dissent accuses us of "discard[ing] those traditional [j.n.o.v.] standards," by "proceed[ing] to make [our] own assessment of witness credibility" and "disregard[ing] controlling reasonable inferences in favor of the verdict." Dissent at 810-11. These accusations are repeated sporadically throughout our dissenting colleague's opinion. But they are ultimately without foundation. We are satisfied that the District Court did not trench on the jury's function, and we have been mindful ourselves to avoid any such usurpation.
 
 
 63
 The only example that the dissent presents of our alleged "reassessment" of witness credibility is in our determination that the "set up" allegation is substantially true. See infra pp. 783-86. But this allegation fails to recognize that the fact that Tavoulareas "set up" Peter in Atlas--the defamatory sense that we attribute to the article as a matter of law--is clear beyond reasonable dispute. Indeed, as will become evident, we rely on Tavoulareas' own testimony and on facts undisputed by him to make this finding.
 
 
 64
 The dissent's final grievance--that we disregard reasonable inferences drawn by the jury--is also echoed in Chief Judge Wald's concurrence, which notes that "throughout its opinion [the majority] scrutinizes the inferences to be drawn from evidence of actual malice far more rigorously than [the] ordinary judgment n.o.v. standard would permit." Concurring Opinion at 804. Chief Judge Wald suggests that we tackle the knotty constitutional issue regarding what constitutes independent review under Bose, so we could properly reach the conclusion as to the absence of actual malice. Both the dissent and the concurrence, with all respect, misapprehend the inquiry we undertake. We consistently grant to Tavoulareas all reasonable inferences that could be drawn from the evidence, including all issues of witness credibility. As all agree, long before Bose and without the benefit of any construction of its unelaborated standard, reviewing courts carefully and independently reviewed findings of fact and rejected jury verdicts when all favorable inferences did not constitute clear and convincing evidence of actual malice. See Edwards, 372 U.S. at 235, 83 S.Ct. at 683 (court must "make an independent examination of the whole record" in First Amendment cases); Sullivan, 376 U.S. at 285, 84 S.Ct. at 728-29 (same, citing Edwards ); St. Amant, 390 U.S. 727, 88 S.Ct. 1323 (finding insufficient evidence of actual malice to support jury verdict). That traditional undertaking in defamation jurisprudence is precisely the task before us today.
 
 
 65
 Accordingly, we have at every turn accepted only undisputed facts or Tavoulareas' version of disputed facts, avoided any evaluations of credibility, and credited all permissible inferences the jury may have drawn favorably to Tavoulareas. Having done so, we nonetheless are constrained to conclude that the evidence is insufficient to constitute clear and convincing evidence of actual malice.
 
 A. Defamation and Falsity
 1. Interpretation of the Article
 
 66
 The theme of the November 30, 1979 article was set forth in its headline and lead sentence: that William Tavoulareas "set up" Peter as a partner in a business managing Mobil-owned ships. Peter, the article reported, had in 1974 been a 24-year-old, $14,000 per year shipping clerk with the Lemos firm, but "with the help of Mobil" five years later owned 45 percent of a newly formed shipping management firm, Atlas Maritime Co. "[T]he overall thrust of the article was that William Tavoulareas improperly set up his son in business and made sure the business would prosper." Reply Brief for Appellant at 21-22; see Brief for Appellant at 70; 567 F.Supp. at 660.
 
 
 67
 Tavoulareas advances several possible defamatory interpretations of this "set up" allegation.[15] His primary contention, and one adopted by the dissent, Dissent at 820-21, is that "[t]he November 30 article was reasonably understood to mean that plaintiff misused Mobil assets by engineering the entire Mobil-Samarco-Atlas arrangement for the benefit of his son, to the detriment of Mobil shareholders."[16] Brief for Appellant at 26 (emphasis added). The District Court squarely rejected as untenable that construction of the article. 567 F.Supp. at 660. We agree.[17]
 
 
 68
 In a libel case, it is the role of the court to determine whether the challenged statement is "capable of bearing a particular meaning" and whether "that meaning is defamatory." Restatement (Second) Of Torts Sec. 614(i), at 311 (1977); see McBride v. Merrell Dow and Pharmaceuticals, Inc., 717 F.2d 1460, 1463 (D.C.Cir.1983). In making this determination, a court is to consider both the words themselves and the entire context in which the statement occurs. See Ollman v. Evans, 750 F.2d 970, 982-83 (D.C.Cir.1984) (en banc), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). The jury's proper function, in turn, is to determine whether a statement, held by the court to be capable of a defamatory meaning, was in fact attributed such a meaning by its readers. Restatement (Second) Of Torts Sec. 614(2).
 
 
 69
 The statement that "a father set up his son in business" would ordinarily mean to a reasonable reader that the father provided the son with the means or opportunity by which the latter could assume a position of responsibility in a business venture or commercial firm. See Webster's Third New International Dictionary 2079 (unabridged ed. 1981). In our view, when the term "set up" is employed in a familial context, it implies that one family member provided an opportunity to another family member on the basis of kinship, not merit. Accordingly, we hold that the article, as a matter of law, can reasonably be interpreted as capable of bearing a defamatory meaning, namely that Tavoulareas, as president of Mobil, made it possible for Peter to become a partner in Atlas and then helped to ensure that the business would prosper because Peter was his son. This, in our view, is the normal, everyday reading of the article. The headline and lead sentence, generally reliable indicators of an article's content, clearly convey this meaning.[18] This meaning is defamatory in that it accuses Tavoulareas of nepotism--furthering his son's business career--which might "tend[ ] to injure [him] in his trade, profession or community standing, or lower him in the estimation of the community." Afro-American Publishing Co. v. Jaffe, 366 F.2d 649, 654 (D.C.Cir.1966) (footnote omitted).
 
 
 70
 As we have observed, Tavoulareas' proffered interpretation is much broader. He (and the dissent) contend that the article is capable of bearing the interpretation that Tavoulareas "set up" the entire Mobil-Sarmarco-Atlas relationship to benefit Peter. Thus, before passing to a consideration of the falsity vel non of the "set up" allegation, we first consider this asserted, much different, broader reading. For the reasons that follow, we reject Tavoulareas' construction and interpret the language according to its common usage. As did Judge Gasch, we hold as a matter of law that the article is incapable of bearing the interpretation Tavoulareas advances.[19]
 
 
 71
 As the District Court correctly observed, the Post 's allegation that Tavoulareas "set up" his son in Atlas is entirely different from the claim that the Post asserted that the creation of the entire Mobil-Samarco-Atlas relationship was a nepotistic act. 567 F.Supp. at 660 & n. 16. The article clearly says the former, not the latter. The article simply will not reasonably bear Tavoulareas' interpretation, as evidenced by his failure to cite anything in the article itself to support this reading. See Brief for Appellant at 25-29; Reply Brief for Appellant at 16.[20] Indeed, the article discussed at length Mobil's legitimate business reasons for participating in Samarco, namely its anticipation of Saudi flag preference requirements and favorable Saudi financing. paragraphs 38-44, 51.
 
 
 72
 The dissent ignores the specifics of the article, complaining instead that "[t]he entire discussion of the legitimate business reasons in the Post article is perjorative." Dissent at 821. In our view, the dissent's reliance on the "tone" of the article is entirely misplaced. The article expressly buttressed the credibility of Mobil's stated business reasons for joining Samarco. The story specifically reports that the other non-Saudi partner in Samarco, Fairfield-Maxwell, joined on the basis of the same "anticipated benefits." p 43. Needless to say, Fairfield-Maxwell had no interest in participating in Samarco to benefit Peter. Rather, as the article itself reported, Fairfield-Maxwell was of the view that Peter's involvement in Atlas, although nepotistic, would not preclude the successful and profitable operation of Samarco. p 27. We cannot accept the dissent's tortured attempt to discern some dark, hidden meaning in the article when the plain words of the piece explicitly rebut that meaning.[21]
 
 
 73
 Tavoulareas relies heavily on internal unpublished Post memoranda to establish the meaning of the article. This will not do. Nothing in law or common sense supports saddling a libel defendant with civil liability for a defamatory implication nowhere to be found in the published article itself.[22] In addition to the internal memoranda, the dissent cites two other items of extrinsic evidence as relevant to a determination of the article's meaning.[23] First, much is made of the "public interpretation" of the Post article. Dissent at 819 n. 25. Assuming arguendo that such evidence bears on our legal determination, the items earmarked by the dissent are utterly incapable of supporting Tavoulareas' interpretation; if anything, these items support our interpretation of the article.[24] Second, the dissent pounces upon a single passage from the Post 's closing argument at trial and attempts by that maneuver to characterize the Post as in fact accepting Tavoulareas' interpretation of the article. See Dissent at 822-23.[25] This is grasping at straws. From the time the article was published to its appearance before this court en banc, the Post has steadfastly interpreted the article as saying that Peter was "set up" in Atlas, not that the entire Mobil-Samarco-Atlas arrangement was set up for Peter.[26] This is hardly surprising, for as we have held as a matter of law, the article is incapable of bearing Tavoulareas' and the dissent's distorted interpretation. Because the piece is capable, however, of bearing the narrower but nonetheless defamatory meaning that Tavoulareas "set up" his son in Atlas, we proceed to consider the truth or falsity of this allegation.
 
 
 74
 Tavoulareas, it should be noted, would pretermit entirely our consideration of truth or falsity, maintaining that the court should not consider the question in reviewing the jury verdict in his favor. Brief for Appellant at 17a-17b. We emphatically disagree.[27] Tavoulareas was required to prove falsity at trial in order to prevail. Philadelphia Newspapers, 106 S.Ct. at 1563; Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215-16, 13 L.Ed.2d 125 (1964). Moreover, the defendants never conceded this bedrock element of plaintiff's case; quite to the contrary, they have adamantly maintained throughout these proceedings that the evidence of the story's truth (or substantial truth) precludes any reasonable inference of actual malice. See 567 F.Supp. at 654 n. 9; Brief for Appellees at 18. In turn, Tavoulareas himself has relied on evidence of falsity in his effort on appeal to establish actual malice, see, e.g., Brief for Appellant at 54, and the District Court found the evidence of the story's truth highly relevant to its decision to grant j.n.o.v. on the issue of actual malice. See 567 F.Supp. at 659-61. More fundamentally, the truth or falsity of allegedly defamatory speech must be considered if we are properly to balance the individual interest "in vindicating a reputation that is wrongly sullied," Brief for Appellant at 17c (emphasis added), against the community's interest in free speech. See Philadelphia Newspapers, 106 S.Ct. 1558. We reject the extravagant suggestion that we ignore evidence of truth in reviewing the reasonableness of the jury's finding that the Post article was unprotected by the First Amendment.
 
 2. The Undisputed Evidence of Truth
 
 75
 The undisputed evidence at trial, including plaintiff's own testimony, precludes any reasonable inference that the central allegation of the challenged article--that Tavoulareas "set up" Peter in Atlas--was false. Tavoulareas repeatedly testified at trial that by December 1973 he knew that Peter's supervisor at Lemos, Comnas, was planning to leave Lemos and form a joint venture company. Tr. at 1275-76, 1293, 1433, 1635, 1647. According to his own testimony, Tavoulareas also knew by late 1973 that Comnas had offered Peter a partnership position in that venture. Tr. at 1293; see also Tr. at 1278, 1455.[28] What is more, Tavoulareas testified that he thought it likely that Comnas made the offer to Peter not because of Peter's modest qualifications as a young and inexperienced junior executive but in order "to make sure he got business from Mobil." Tr. at 1648; see also Tr. at 1295-96, 1455, 1516; cf. Tr. at 1656 (testimony of Tavoulareas that as of 1974 Peter was young and needed more training in shipping business); Tr. at 3080 (uncontradicted testimony of Kousi, a Samarco director, to same effect).
 
 
 76
 In the spring of 1974, with Tavoulareas fully aware that Comnas was trying to "curry favor" with him by offering Peter a share of Comnas' venture, Tr. at 1516, Tavoulareas flew to London to ask Comnas "if [Comnas] was interested in taking over the management" of Samarco's ships. RE at 2443-46; see also RE at 2344-45, Tr. at 1534 ("I [Tavoulareas] more than anybody else was responsible for bringing [Comnas] into [the management of Samarco's ships] ..."); Tr. at 1289-91, 3423, 3349. But cf. Dissent at 826-27 (recounting evidence that Comnas was recruited by Mobil as a corporate entity, including actions of its chairman, Rawleigh Warner, rather than by Tavoulareas, notwithstanding Tavoulareas' own uncontradicted testimony).[29] Thereupon, Comnas created Atlas to manage Samarco's ships, and Peter--until then an assistant at Lemos--joined Atlas as a part owner. RE at 2421-22, 2426-28; 3141. By itself, the undisputed fact that Tavoulareas personally recruited Comnas to manage Samarco's ships (ultimately through the vehicle of Atlas Maritime) shortly after learning that Peter had an outstanding offer from Comnas goes far toward justifying the charge that Tavoulareas "set up" his son in Atlas. See 567 F.Supp. at 659 (finding that Tavoulareas' 1977 SEC testimony, describing this sequence of events, "provided Tyler with a sufficient basis for [his set up] allegation").
 
 
 77
 But that is not all. The record abounds with uncontradicted evidence of nepotism in favor of Peter. The record unmistakably reveals that Tavoulareas remained personally involved in the Samarco-Atlas arrangement after Peter left Lemos and took on his partnership position at Atlas. In August 1974, only days after Peter joined Atlas as a partner, Tavoulareas took Peter--without Comnas--to Geneva to meet the Alirezas. Tr. at 1305-06. This father-and-son trip to Geneva commenced after Tavoulareas "sent a memorandum to Paul Wolf[e] to tell him [Tavoulareas] would no longer be involved with anything as to Atlas and Samarco" and thus to bypass him on all Atlas matters beyond Wolfe's authority in favor of Rawleigh Warner, Mobil's chairman. RE at 2440; see RE at 2339; see also Tr. at 1332-33, 1464-65; cf. RE at 2344 (Mobil's pre-publication letter sent to Tyler claiming that "[f]rom the date Peter Tavoulareas joined Atlas, Mr. Tavoulareas divorced himself from involvement in matters involving business transactions between Mobil and/or SAMARCO with Atlas.") At a luncheon gathering in Geneva, Tavoulareas and a Mobil subordinate engaged in substantive discussions with the Alirezas regarding the tentative Samarco-Atlas contract. During that conversation, Tavoulareas and his Mobil colleague argued in favor of Atlas' position that Atlas should be independent of Samarco and that its compensation should include both a minimum fee and an equity interest in the ships it managed. Tr. at 1712. See generally RE at 2587-2590 (Peter's written summary of the meeting). Although the Alirezas were of the view that Samarco should have "clean cut control of the management group[,] ... [t]his course of action was opposed by ... Mobil" and Mobil's pro-Atlas position on this fundamental issue prevailed. RE at 2587.
 
 
 78
 Thereafter, Tavoulareas' personal involvement in building up Atlas, with Peter then an equity partner in the firm, continued unabated. In November 1974, at a social gathering in Saudi Arabia, Tavoulareas attempted to convince Ahmed Alireza to accept Atlas' position on the final sticking point between Samarco and Atlas over the terms of the latter's compensation. Tr. at 1312-13, 1725-27. Based on his conversation with Alireza, Tavoulareas recommended to Comnas and Peter that they accept Alireza's counter-offer. Tr. at 1312-13, 1725-27. Atlas accepted Tavoulareas' advice, and the Samarco-Atlas deal was subsequently consummated.
 
 
 79
 Having helped Atlas secure its management agreement with Samarco, Tavoulareas then--by his own testimony--personally participated in the series of events whereby Comnas in short order resigned from Atlas, with Peter becoming its 75 percent owner. According to uncontradicted testimony, the decision to discharge Comnas was made in April 1975[30] at a meeting of high-level Mobil officials in Tavoulareas' own office at Mobil headquarters. Not only was Tavoulareas present for this meeting, but he participated fully in the discussion leading directly to Comnas' removal. Indeed, the meeting commenced with Tavoulareas as the highest ranking Mobil officer present, without Mobil's chairman, Mr. Warner, who only later joined the ongoing conclave. Tr. at 1185-87, 1331-33, 1534.[31] Far from divorcing himself from this matter, Tavoulareas, according to Mr. Warner's uncontradicted testimony, stated in that critical meeting:
 
 
 80
 I more than anybody else was responsible for bringing [Comnas] into this and I think that I should be involved in helping to handle the situation.
 
 
 81
 Tr. at 1534.
 
 
 82
 A few days later, Tavoulareas flew to London from New York with two Mobil subordinates to explain to Comnas that "we weren't satisfied with [his] services." Tr. at 1333. After one of Tavoulareas' subordinates met with Comnas "to find out what terms he would agree to for leaving," Tr. at 1195, Comnas asked to meet with Tavoulareas. Tr. at 1336-37; see also Tr. at 3349. Tavoulareas reviewed a draft agreement of terms for Comnas' departure and then met with Comnas. Tr. at 1336-37. At Mobil's unilateral insistence, made without even notifying or consulting its other partners in Samarco, Comnas left Atlas immediately thereafter. Tr. at 1190.
 
 
 83
 In addition to the trial testimony of Tavoulareas and his witnesses, Mobil's own answers to Tyler's written questions prior to the article's publication expressly conceded that Tavoulareas personally participated "in the arrangements made when G. Comnas departed from Atlas ... to the extent of assuring a settlement that was fair and equitable." RE at 2345. It is also beyond dispute that as part of the settlement resulting in Comnas' resignation Mobil agreed to put Comnas on its payroll as a consultant.[32]
 
 
 84
 Tavoulareas also played a pivotal role in helping Atlas not only to survive but to prosper after Comnas left, when Atlas thereby became the firm of Peter and his youthful colleague from Lemos, Ares Emmanuel. Tr. at 1835; see also RE at 2053, 2435. Tavoulareas personally participated in Mobil's internal deliberations that resulted in the decision to make Harmon Hoffmann, a senior and highly respected Mobil executive, available to Atlas as an interim manager. See Tr. at 1193, 2848-49; cf. RE at 2345. Furthermore, Tavoulareas was personally and directly involved in persuading the Alirezas to retain Atlas as Samarco's independent management firm upon Comnas' departure. Tavoulareas flew to Saudi Arabia and personally informed the Alirezas of Mobil's discharge of Comnas, Tr. at 3286-88. Subsequently, the Alirezas took the position that the Samarco-Atlas contract was terminated by virtue of Comnas' departure, Tr. at 3292, and that to continue collaboration, Atlas would have to assign partial control of its stock and management to Samarco. Tr. at 3292-93; see also Tr. at 1867, 2602, 3441. The Alirezas later withdrew these demands antithetical to Atlas (and Peter) only after Tavoulareas and one of his subordinates flew once again to Jeddah and assured Ahmed Alireza that the Samarco-Atlas contract remained valid, Tr. at 3294, 3298-99, 3302, and that Mobil "would support the needs of [Atlas]." Tr. at 3304.
 
 
 85
 Given this plentiful, undisputed evidence of Tavoulareas' personal involvement in the establishment and operation of Atlas to Peter's manifest benefit, we conclude that no reasonable jury could, on this record, find that the "set up" allegation was false.[33]
 
 3. Other Allegedly Libelous Statements
 
 86
 Although the central thrust of the story was not proven false at trial, it is still possible that the story contains defamatory falsehoods. Cf. Afro-American Publishing, 366 F.2d at 655 ("[T]he defamer may be [all] the more successful when he baits the hook with truth."). But cf. Restatement (Second) Of Torts Sec. 581A comment f, at 237 ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."). We must, in consequence, carefully consider both the veracity and defamatory character of the three challenged statements in the Post article besides the fundamental "set up" charge.[34]
 
 
 87
 Tavoulareas first seeks to premise liability on statements in the article creating the impression that there was a "direct link between Mobil and Atlas." Brief for Appellant at 25. Given the overwhelming proof at trial of precisely such a link, this argument collapses at the outset. To recap briefly, it is undisputed that Mobil recruited Comnas to form Atlas; that Mobil argued--successfully--in favor of Atlas' position with the other Samarco partners on several critical occasions; that Mobil removed Comnas as head of Atlas without consulting its Samarco partners; and that Mobil made a senior Mobil executive available to Atlas as an interim replacement for Comnas. Furthermore, it is beyond cavil that Mobil provided office space and direct financial assistance to Atlas and that Atlas managed the ships that Mobil bareboat chartered to Samarco. See, e.g., Tr. at 1142-48. Thus, even if the Post article failed to make clear the formal, corporate relationship between Mobil, Samarco, and Atlas, but see paragraphs 6, 58-59, 74, the defendants cannot in reason and in law be held liable for accurately reporting the direct link that undisputedly did exist between Mobil and Atlas.
 
 
 88
 Tavoulareas also challenges the allegation at the end of the article that when Comnas left Atlas, Tavoulareas "dispatched one of his senior shipping executives, Herman [sic] F. Hoffmann, to London to help run Atlas." p 82. Tavoulareas does not contest the fact that Mobil indeed sent Hoffmann to London on that very mission. Rather, he contends that the Post published a defamatory falsehood by suggesting that he "personally ordered a Mobil executive to London to bail out his son's company." Reply Brief for Appellant at 14 (emphasis added). As we have seen, Tavoulareas does not and could not dispute the Post 's allegation that he played a personal role in arranging Comnas' departure from Atlas. Moreover, the article was also undisputedly correct in reporting that Comnas' removal made it " 'natural for Mobil to step forward' ... 'to maintain quality management of [Samarco's] operations.' " paragraphs 83-84 (quoting Kousi as well as Mobil's own statement). Nor is it contested, as noted above, that Tavoulareas personally participated in the Mobil discussions in which it was decided that Hoffmann would replace Comnas. Tr. at 1193. Nevertheless, Tavoulareas asserts that the jury could reasonably have found the "dispatch" allegation to be actionable.
 
 
 89
 Testimony was presented at trial that Paul Wolfe, Tavoulareas' subordinate at Mobil, actually made the decision to dispatch Hoffmann to Atlas. Tr. at 1098, 1440. Thus, viewing as we do the evidence most favorably to plaintiff, the "dispatch" allegation was false to the extent it overstated Tavoulareas' role in Mobil's sending Hoffmann to replace Comnas. The potentially defamatory inference that could be drawn from this falsehood is that Tavoulareas had not recused himself from Atlas matters despite a possible conflict of interest. But we have already held this implication not to be actionable in light of the overwhelming, undisputed evidence of Tavoulareas' personal, continual, and active involvement in Atlas' matters in ways that uncontestably redounded directly to Peter's benefit. Since the only derogatory implication of the dispatch statement is undisputedly correct, it is not actionable. See, e.g., Herbert v. Lando, 781 F.2d 298, 312 (2d Cir.) (To hold actionable a "statement whose ultimate defamatory implications are themselves not actionable, we believe, would be a classic case of the tail wagging the dog."), cert. denied, --- U.S. ----, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986); Skrocki v. Stahl, 14 Cal.App. 1, 6, 110 P. 957 (1910) ("It was sufficient if the gist or sting of the libelous charge was justified, and immaterial variances and defects of proof upon minor matters are to be disregarded if the substance of the charge be justified"); Restatement (Second) Of Torts Sec. 581A comment f, at 237.[35]
 
 
 90
 Third, and finally, plaintiff vigorously contests the article's assertion that he "personally urged" Comnas to accept Peter as a partner in Atlas. paragraphs 23, 52. The jury reasonably could have concluded that this charge, communicated to Tyler by Comnas, was false. See Tr. at 1293-94, 1296-97, 1425, 1433. And, because the "personally urged" allegation goes beyond the general charge that Tavoulareas "set up" his son and suggests that Tavoulareas actively pressured Comnas to hire Peter rather than merely rewarded Comnas for doing Peter a favor, see supra note 17, the jury may reasonably have found that this specific allegation carries with it an independent defamatory implication capable of causing a separate harm to plaintiff's reputation. We thus turn to the issue of actual malice.
 
 B. Actual Malice
 
 91
 In this branch of our inquiry, the issue is whether the Post defendants published the "personally urged" statement with actual malice--that is, with knowledge of falsity or reckless disregard for its truth. This, in particular, calls upon us to determine whether there is clear and convincing evidence "to permit the conclusion that the defendant[s] in fact entertained serious doubt as to the truth of [their] publication." St. Amant, 390 U.S. at 731, 88 S.Ct. at 1325.[36] The "serious doubt" inquiry enunciated by the Supreme Court is too fact-bound to be resolved on the basis of any single factor or mechanical test. Id. at 730, 88 S.Ct. at 1325. Nevertheless, as the Supreme Court has clearly stated, courts may not abdicate to triers of fact the responsibility for developing the contours of the actual malice rule. Instead, courts are obligated to conduct "an independent examination of the whole record." Edwards, 372 U.S. at 235, 83 S.Ct. at 683; see also Sullivan, 376 U.S. at 285, 84 S.Ct. at 729. Thus, a substantial body of law has developed over the past two decades applying and delimiting the "serious doubt" standard first articulated by the Court, speaking through Justice White, in St. Amant. The jury verdict must be squared not only with the literal formulation of the actual malice rule but examined in the light of case law that has "marked out" the outer limits of constitutionally permissible libel verdicts for public figures. St. Amant, 390 U.S. at 730, 88 S.Ct. at 1325.
 
 1. Legal Standards
 
 92
 It is well established that the "serious doubt" standard requires a showing of subjective doubts by the defendant. It does not turn on whether a reasonably prudent person would have published under the circumstances. Id. at 731, 88 S.Ct. at 1325-26. The rejection of an objective standard of care, however, does not mean that libel defendants can defame with impunity merely by testifying that they published the challenged statements with the belief that they were true. Id. at 732, 88 S.Ct. at 1326. To the contrary, a plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence. See, e.g., Herbert v. Lando, 441 U.S. 153, 160, 99 S.Ct. 1635, 1640-41, 60 L.Ed.2d 115 (1979); Washington Post Co. v. Keogh, 365 F.2d 965, 968 (D.C.Cir.1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).
 
 
 93
 At the same time, actual malice does not automatically become a question for the jury whenever the plaintiff introduces pieces of circumstantial evidence tending to show that the defendant published in bad faith. Such an approach would be inadequate to ensure correct application of both the actual malice standard and the requirement of clear and convincing evidence. Thus, as all parties and amici agree, the Supreme Court has directed us to "exercise particularly careful review," Supplemental Brief for Appellant at 9, and to "make an independent examination of the whole record." Edwards, 372 U.S. at 235, 83 S.Ct. at 683, quoted in Sullivan, 376 U.S. at 285, 84 S.Ct. at 729.[37]
 
 
 94
 This constitutionally mandated duty of independent review has been applied unflinchingly. The Supreme Court and other courts have more often than not concluded that public figure libel plaintiffs failed to adduce evidence of sufficient clarity to convincingly support a jury finding of actual malice. For example, in the leading case of St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, the Supreme Court reversed a jury finding of liability in a public official's defamation action. Because of St. Amant 's importance in actual malice analysis, we pause to recall the facts of that case. Briefly stated, Deputy Sheriff Thompson sued St. Amant, a candidate for public office, for repeating in the course of a televised speech the false allegation that Sheriff Thompson had taken bribes from a local Teamsters Union president. The record showed that St. Amant had based his allegation exclusively on information provided by an active member of a dissident faction within the Teamsters. At the time, the dissident faction was locked in a struggle for control against the faction led by the Teamsters' official alleged to have paid bribes to the Sheriff. Although he had no knowledge of the source's reputation for veracity, St. Amant failed to investigate independently the obviously serious charge of bribery and failed to seek confirmation of the information from others who might have known the facts. Notwithstanding this evidence, the Supreme Court found the record insufficient to support a finding of actual malice.
 
 
 95
 Before evaluating the specific record before it, the St. Amant Court provided examples of the kind of proof that would likely support a finding of actual malice. The examples fell into three general categories: evidence establishing that the story was (1) "fabricated"; (2) "so inherently improbable that only a reckless man would have put [it] in circulation"; or (3) "based wholly on an unverified anonymous telephone call" or some other source that the defendant had "obvious reasons to doubt." 390 U.S. at 732, 88 S.Ct. at 1326. After setting forth these illustrative examples, the Court held that the evidence before it, by comparison, was clearly inadequate. St. Amant's failure to investigate was deemed not indicative of actual malice, inasmuch as the plaintiff had not proven "a low community assessment of [the source's] trustworthiness or unsatisfactory experience with him by St. Amant." Id. at 733, 88 S.Ct. at 1326. The Court also found support for its decision in evidence tending to show that St. Amant published the charge in good faith, including St. Amant's testimony that he had verified other aspects of his source's information and evidence that the source had sworn to his answers in the presence of newsmen.
 
 2. Application of the Legal Standards
 
 96
 As the District Court correctly observed in the case at hand, the Supreme Court's reasoning and result in St. Amant are instructive for inferior tribunals in attempting faithfully to apply the "serious doubt" test. 567 F.Supp. at 656. The examples provided there of when a jury may reasonably infer actual malice from circumstantial evidence are by no means exhaustive, but, as numerous courts have recognized, constitute useful benchmarks for lower courts to employ in determining whether a record is sufficient to sustain a finding of constitutional malice. See, e.g., Marcone v. Penthouse International Magazine For Men, 754 F.2d 1072, 1089-90 (3d Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985); Hunt v. Liberty Lobby, 720 F.2d 631, 643-46 (11th Cir.1983). When the entire record in this case is scrutinized in light of St. Amant and other governing precedents, it is clear beyond cavil that Judge Gasch's decision to grant j.n.o.v. was fully justified.
 
 
 97
 Tavoulareas seeks to support the jury finding of actual malice on the basis of both evidence generic to the entire article, such as managerial pressure to produce stories, and evidence relating more specifically to various statements in the article. We turn first to the evidence of actual malice relating to the single remaining statement in the article that may be actionable.
 
 
 98
 a. Personally Urged." It is undisputed that Comnas was the sole source for the Post 's allegation that Tavoulareas "personally urged" that Peter be included as an equity partner in Atlas. Plaintiff contends that reliance on Comnas was evidence of the Post defendants' actual malice inasmuch as the record supports the conclusion that Comnas was an obviously unreliable source. Our examination of the record, however, leads us to agree completely with the District Court's contrary conclusion that "reliance upon George Comnas as a primary source does not come close to approaching the level of recklessness required by the Supreme Court." 567 F.Supp. at 656.
 
 
 99
 As did the District Court, we find it highly significant that "much of Comnas' information was independently verified by other sources whose credibility even the plaintiff does not now challenge." 567 F.Supp. at 656. For instance, Comnas told Tyler that Tavoulareas had participated on Atlas' behalf in key negotiations with the Saudi partners of Samarco after Peter had joined Atlas. Tr. at 3688, 3778-84. Mobil denied this critical contention in its pre-publication letter to the Post, claiming (erroneously, as Tavoulareas conceded at trial, Tr. at 4161-62) that "[f]rom the date Peter Tavoulareas joined Atlas, Mr. Tavoulareas divorced himself from involvement in matters involving business transactions between Mobil and/or SAMARCO with Atlas." RE at 2344. Tyler published Comnas' charge only after receiving independent confirmation from Kousi, Tr. at 3083-3100, a highly respected, knowledgeable member of the Samarco board with firsthand knowledge of Atlas' formation and engagement as Samarco's management firm. The only reasonable inference is that Tyler was justified in considering Kousi's confirmation of Comnas' statements important evidence of the latter's reliability. Tr. at 785-86, 3689, 3792.
 
 
 100
 But this was by no means all the information in Tyler's hands that buttressed Comnas' statements. Tavoulareas' own testimony before the SEC staff admitted his recruitment of Comnas to head Atlas and his knowledge of Comnas' business relationship with Peter. RE at 2443-46, 2424-25. On behalf of Mobil, Paul Wolfe confirmed Comnas' statement to Tyler that Tavoulareas was personally involved in Comnas' departure from Atlas, RE at 2345, a significant admission in light of the understanding communicated by Mobil to Tyler and outside members of the board of directors that Tavoulareas was not involved in Atlas matters after Peter's entry into the firm. Tr. at 3550, 3588-89; RE at 2344. Moreover, Kousi confirmed Comnas' general charge that Peter obtained his position with Atlas on the basis of kinship, not merit. Tr. at 3079-80 ("[T]he employment of Peter Tavoulareas in Atlas was a nepotistic act."). In sum, the undisputed evidence of record shows conclusively that Tyler corroborated much of the information provided by Comnas. Cf. St. Amant, 390 U.S. at 733, 88 S.Ct. at 1326-27, (verification of part of source's information probative of St. Amant's lack of actual malice in relying on source for other, uncorroborated information).
 
 
 101
 Besides independent, reliable corroboration of most of Comnas' story, Tyler had other, substantial reasons to believe Comnas. Of these, the most important was Tyler's uncontroverted knowledge that "Comnas provided virtually the same information to Tyler as he gave to investigators for the House Subcommittee," 567 F.Supp. at 656, including the substance of the "personally urged" allegation. RE at 2471; cf. St. Amant, 390 U.S. at 733, 88 S.Ct. at 1326-27 (St. Amant's knowledge that source repeated information to others in manner bespeaking earnestness indicative of good-faith belief in source's credibility). It is undisputed that an experienced House Subcommittee investigator, Peter Stockton, accompanied by a Subcommittee lawyer, traveled from Washington to Comnas' home in Osterville, Massachusetts. Tr. at 2770; RE at 2467. There, they conducted a formal three-hour interview, complete with elaborate notetaking; it is undisputed, moreover, that the two Subcommittee staff members were interviewing Comnas in their official capacities. This was a Congressional investigation, not an idle conversation between a passerby and a disgruntled executive.
 
 
 102
 After interviewing Comnas, Stockton confirmed Tyler's judgment that Comnas was credible, that he spoke reluctantly and carefully for fear of reprisal, and that his information was consistent with that provided by other sources. Tr. at 2816-17; cf. Tr. at 2792-93. Tyler was justifiably impressed with Comnas' "consistency" as a source, especially since, as Tyler reasonably concluded, Comnas was on "a higher level of notice" that "he better be truthful in his story" when speaking to the Subcommittee staff. Tr. at 3823-24.[38]
 
 
 103
 Tyler also knew that Comnas had enjoyed a long and successful career at Exxon where he eventually became president of Esso Mediterranean and Esso Africa.[39] Tyler was further aware that, after leaving Exxon, Comnas had been entrusted to run the principal office of one of the largest Greek shippers (Lemos) and had been recruited by Mobil in early 1974 based upon Mobil officials' "long personal acquaintances with G. Comnas." RE at 2345; see also RE at 2446. As the District Court observed, Comnas "obviously had a substantial business career and reputation that could be damaged if he lied." 567 F.Supp. at 656; see Tr. at 637-38, 3690, 3825.[40] Moreover, it is undisputed that no Mobil representatives ever gave Tyler the slightest indication that Mobil questioned Comnas' credibility or ethics.
 
 
 104
 Despite the abundant, undisputed evidence in the record supporting Tyler's decision to credit Comnas' story, Tavoulareas nevertheless argues that the jury could reasonably have concluded that "Comnas' patent lack of credibility" was apparent to Tyler. Brief for Appellant at 20. To support this contention, Tavoulareas relies heavily on the undisputed fact that Dr. Piro told Tyler that "Comnas had been caught in some fraud involving Atlas" and that the Tavoulareases had threatened to report Comnas to the tax authorities if Comnas ever started any trouble for Peter and Atlas. Tr. at 2908-09. What Piro related, of course, was his understanding from the Tavoulareases. Tr. at 2958, 2965.[41]
 
 
 105
 Tyler, as we have seen, tried to talk with both William and Peter Tavoulareas. William refused to talk at all with Tyler, but his sworn SEC testimony indicated that Comnas' withdrawal from Atlas had nothing whatever to do with unethical conduct. RE at 2435. Peter hung up the phone when Tyler called, having chosen, as he was free to do, not to enlighten Tyler as to the reasons for Comnas' departure from Atlas or to correct any misinformation Tyler had concerning Comnas' trustworthiness. Tr. at 2437. Mobil, of course, steadfastly refused Tyler's requests for interviews, as it was likewise free to do. Faced with Mobil's silence, Tyler checked with Kousi, who told him that it was the "dissatisfaction of Mobil," not any of the other parties, that led to Comnas' removal. Tr. at 3082-83; cf. Tr. at 2099-2100 (testimony of Harmon Hoffmann that the sole reason for Comnas' removal was dissatisfaction with his performance, not any ethical considerations). Thus, the undisputed record comports entirely with the District Court's conclusion that "it is not at all clear that Comnas left Atlas under circumstances that should have aroused Tyler's suspicions as to his motivation for speaking unfavorably about the [Tavoulareases]." 567 F.Supp. at 657 (footnote omitted).
 
 
 106
 We also agree with the District Court that the evidence of personal animus between Comnas and Tavoulareas was not indicative of the defendants' actual malice in view of their independent corroboration of Comnas' information and the other evidence in the hands of the Post defendants of Comnas' knowledge and credibility. Cf. St. Amant, 390 U.S. at 733, 88 S.Ct. at 1326-27 (reliance on a source locked in a fierce struggle with union officials closely allied to Sheriff Thompson did not permit an inference of actual malice when St. Amant had "verified other aspects" of the source's information and had other indicia of the source's credibility).
 
 
 107
 Finally, we reject the suggestion that the Post 's failure to introduce any of Comnas' deposition testimony at trial was probative of actual malice. Even assuming that Tavoulareas can advance this assertion in the first instance,[42] Comnas was deposed for four days by both sides, yet neither side ultimately elected to introduce his testimony into the trial record. Since Comnas' deposition transcript was "equally available," the decision of both sides not to use it cannot serve as the basis for an adverse inference against the Post. Brown v. United States, 414 F.2d 1165, 1166-67 (D.C.Cir.1969); see also United States v. Young, 463 F.2d 934, 939-40 (D.C.Cir.1972); Tr. at 3817.
 
 
 108
 b. General Evidence of Actual Malice. Last, we consider the more general evidence in the record that, as Tavoulareas sees it, supports a determination that the Post defendants published the November 30 article with actual malice. At the outset, we observe that our examination of this evidence cannot be divorced from our earlier conclusion that the record before us cannot reasonably support a finding that the central theme of the article was false. For example, Tavoulareas argues that the Post 's refusal to retract the article or to concede its falsity at trial was evidence of actual malice in view of "the overwhelming proof of the article's falsity at trial." Brief for Appellant at 27. But this broadside cannot stand in light of our earlier analysis and conclusions with respect to the issue of falsity vel non. We therefore need only address briefly to what extent, if any, this evidence could reasonably have supported the jury finding of actual malice.
 
 
 109
 (i) The Christine Peterson Memorandum. Christine Peterson had the task of performing the final edit on the November 30 article. During Peterson's brief testimony at trial, it was established that her duties included editing the story for "style, punctuation, [and] grammar," confirming facts that could be checked with source material at hand, and writing the headlines. Tr. at 2827. The record is also clear that in editing the article at issue, she performed a "fresh read," that is, she had no knowledge of the sources or research underlying the article beyond what she read in the article itself. See Tr. at 2829; RE at 2486-87; 567 F.Supp. at 655. After editing the copy, and prior to publication, she sent a memorandum to assignment editor Peter Milius. The memorandum stated in part:
 
 
 110
 I've read the Mobil story several times, and while I'm impressed with the amount of work the reporter obviously did, I'm still left with an overwhelming sense of So What? Is there any way to give this story of high-level nepotism a dollars-and-cents angle? Did Mobil's shareholders lose anything? Mobil's customers? Parts of Tyler's case against Tavoulareas seem tenuous, and the whole--a $680,000-a-year plaything for an indulged son, at worst--just seems like a withered peanut in an 84"' gilded shell. A far more interesting angle, it seems to me, is Mobil's concern about Saudi preference shipping--a concern so profound that it led to the formation of an entire dummy corporation. It's impossible to believe that Tavoulareas alone could put together such a scheme for the sake of his son's business career, or that he would want to.
 
 
 111
 RE at 2486.
 
 
 112
 At trial, Peterson testified that "my point in the memorandum was that I thought the formation of Samarco was a more interesting angle in the story." Tr. at 2833. It was, as she put it, the seemingly unusual corporate arrangements that provided "a more important angle for the story to have as a lead." Tr. at 2834. In order to credit all permissible inferences that the jury may have drawn, we reject Peterson's trial testimony and accept Tavoulareas' proffered inference. Tavoulareas contends that the Peterson memorandum entitled the jury "to find that an editor of the Post charged with the final review of the story before publication had indeed found ... the story's theme impossible to believe" and brought home this doubt to those responsible for the article's publication. Brief for Appellant at 35. We accept this view--that the Peterson memorandum is evidence of "serious doubt" or actual malice. But defamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice in conjunction with a false defamatory statement. Upon closer examination, the Peterson memorandum does not qualify as such a showing and thus fails to constitute acceptable evidence of actual malice. It certainly falls short of clear and convincing evidence.[43]
 
 
 113
 The Peterson document is subject to two reasonable interpretations when construed against the Post, both of which fail to connect Peterson's disbelief to a false and defamatory meaning present in the article. First, Peterson's memorandum might plausibly be understood to state that she found the story impossible to believe because the story states or suggests that Tavoulareas' primary motivation in establishing the entire Mobil-Samarco-Atlas arrangement was to benefit his son. But we have held as a matter of law that the article cannot bear this interpretation. As we have previously recounted, the article neither stated nor implied that Tavoulareas engineered Mobil's participation in the Samarco venture for the sake of his son's business career. Far from it, the article made it clear that Mobil officials decided to join Samarco in anticipation of Saudi preference shipping requirements and favorable Saudi financing. See supra p. 781. Thus, this possible understanding of Peterson's "impossible to believe" language, while demonstrating malice, has no connection to a defamatory meaning that the article will bear as a matter of law.
 
 
 114
 Second, the memorandum could be interpreted more narrowly to express disbelief that Tavoulareas "set up" Peter in Atlas. Yet, in light of the overwhelming evidence supporting that very charge in the hands of those at the Post responsible for the article's publication (and undisputed at trial), any such view held by Peterson was obviously wrong. Indeed, we have held that no reasonable jury, on this record, could have found the "set up" charge to be false. See supra p. 786. In this sense, the Peterson memorandum has no connection to any false statement.[44] We are persuaded, as was the District Court, that "no matter how this memorandum is construed," it provides no evidence that the Post acted with actual malice with respect to the publication of any false defamatory statement. Cf. 567 F.Supp. at 655.
 
 
 115
 (ii) Defendants' Ill Will or Bad Motives. It is settled that ill will toward the plaintiff or bad motives are not elements of actual malice and that such evidence is insufficient by itself to support a finding of actual malice. See, e.g., Old Dominion Branch No. 496 v. Austin, 418 U.S. 264, 281-82, 94 S.Ct. 2770, 2779-80, 41 L.Ed.2d 745 (1974). The rationale for this rule is that speech "honestly believed," whatever the speaker's motivation, "contribute[s] to the free interchange of ideas and the ascertainment of truth." Garrison v. Louisiana, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). To recover, plaintiffs cannot ground their claim "on a showing of intent to inflict harm," but must, instead, show an "intent to inflict harm through falsehood." Henry v. Collins, 380 U.S. 356, 357, 85 S.Ct. 992, 993, 13 L.Ed.2d 892 (1965). Nevertheless, reason and the weight of precedent suggest that, under some circumstances, the probative value of ill-will evidence in establishing "intent to inflict harm through falsehood" outweighs the risk that admitting such evidence will chill honestly believed speech.[45] See, e.g., Cochran v. Indianapolis Newspapers, Inc., 175 Ind.App. 548, 560, 372 N.E.2d 1211, 1221 (1978) (holding that evidence of ill will creates jury question on actual malice where "[t]here are no facts or statements of record which even remotely support" the defamatory implication at issue); Restatement (Second) Of Torts Sec. 580A comment d, at 218; cf. Herbert v. Lando, 441 U.S. at 160-63 & n. 6, 99 S.Ct. at 1640-42 & n. 6. See generally Bloom, Proof of Fault in Media Defamation Litigation, 38 Vand.L.Rev. 247, 260-64 (1985). The appropriateness of such evidence must be determined on a case-by-case basis, bearing in mind that evidence of ill will or bad motives will support a finding of actual malice only when combined with other, more substantial evidence of a defendant's bad faith.
 
 
 116
 The ill-will or bad-motive evidence in this record, however, is lacking in probative value. The contention is that "Tyler's motive to hurt plaintiff flowed from his embarrassment when Mobil exposed his false description of an interview he had had with a Mobil executive earlier in 1979." Supplemental Brief for Appellant at 25. Four statements by Tyler are relied upon to establish his asserted plan to "get" Tavoulareas. We find none to be indicative of a willingness to publish falsehoods.
 
 
 117
 Toward the beginning of his investigation, Tyler remarked to Golden that "[i]t is not every day you knock off one of the seven sisters,"[46] Tr. at 172; he later referred to his article in part as a "case against Tavoulareas," RE at 2489; and after the article appeared, he characterized a session between Tavoulareas and Post editors as one in which the Post "blew [Tavoulareas] out of the water," and sent him home with his "tail between his legs." Tr. at 253-54. These statements, not unknown to the vernacular of litigators, seem to us well within the everyday parlance of an investigative reporter. They may reasonably be interpreted as revealing that Tyler had adopted an adversarial stance toward Tavoulareas. But, as in other professions, an adversarial stance is fully consistent with professional, investigative reporting. It would be sadly ironic for judges in our adversarial system to conclude, as the dissent urges us to do, see Dissent at 833-34, that the mere taking of an adversarial stance is antithetical to the truthful presentation of facts. We decline to take such a remarkable step in First Amendment jurisprudence. An adversarial stance is certainly not indicative of actual malice under the circumstances where, as here, the reporter conducted a detailed investigation and wrote a story that is substantially true. See Westmoreland v. CBS, Inc., 596 F.Supp. 1170, 1174 (S.D.N.Y.1984).
 
 
 118
 The fourth statement--that Tyler asked Piro whether "he knew of a family member who would rifle [Tavoulareas'] safe and [x]erox documents," Tr. at 180--is obviously beyond the pale, exceeding the bounds of acceptable professional conduct. As Tyler conceded at trial, the statement, even if intended as a joke, was utterly inappropriate. As noted in Judge Wright's dissent to the original panel opinion, however, we do not sit "as some kind of journalism review seminar offering our observations on contemporary journalism and journalists." 759 F.2d at 145.[47] Neither do juries. Tyler's avowed interest in obtaining documentary evidence from Tavoulareas' safe, no matter how contemptible the means to be employed, does not indicate a willingness to publish unsupported allegations.
 
 
 119
 In a similar vein, plaintiff argues that the jury's finding of actual malice is supported by evidence that "pressure [was] placed upon Post reporter Tyler to create sensationalistic stories." Supplemental Brief for Appellant at 20. Tavoulareas contends that evidence of such pressure is to be found in the testimony of Woodward, who was found not liable by the jury.[48] As the panel majority noted, the jury may reasonably have inferred that "Woodward, as editor, wanted from his reporters the same kind of stories on which he built his own reputation: high-impact investigative stories of wrongdoing." 759 F.2d at 121 (footnote omitted).
 
 
 120
 In our view, however, managerial pressure to produce such stories cannot, as a matter of law, constitute evidence of actual malice.[49] We agree with the Post that the First Amendment forbids penalizing the press for encouraging its reporters to expose wrongdoing by public corporations and public figures.[50] Rather, such managerial pressure is designed to produce stories that serve, as the panel majority rightly stated, "one of the highest functions of the press in our society." Id. at 121 n. 39.
 
 
 121
 We, of course, accept the tautological proposition that evidence of managerial pressure to produce sensationalistic or high-impact stories with little or no regard for their accuracy would be probative of actual malice. But Woodward's comments cannot reasonably be categorized as exhibiting such a distortive pressure, particularly in the context of a challenge, as here, to a thoroughly researched and largely accurate story. As far as this record shows, Woodward said nothing whatever to suggest or intimate that he was unconcerned with the truth of stories. Cf. Tr. at 3903. Even the dissent concedes that his comments do not indicate that the "Post subjectively desired false stories." Dissent at 834. Moreover, the record in this case in no wise suggests that Tyler and his colleagues understood the Post's policy of encouraging aggressive investigative reporting to mean that their journalistic careers could be advanced by reckless charges of wrongdoing laid at the feet of the rich and powerful. Cf. Butts, 388 U.S. at 158, 87 S.Ct. at 1993 (Opinion of Harlan, J.) (finding actionable "grossly inadequate" investigation of published charges); id. at 169, 87 S.Ct. at 1999 (Warren, C.J., concurring) (finding actionable charges of corruption based on "slipshod and sketchy investigatory techniques"). Unlike the dissent, we reject the proposition that a jury question of actual malice is created whenever a libel plaintiff introduces evidence that the newspaper vigorously pursues high-impact stories of alleged wrongdoing.
 
 
 122
 The remainder of the proffered evidence of actual malice merits little discussion in light of the overwhelming record evidence that the Post defendants published the article in good faith. The contention that the Post engaged in this instance in a pattern of "slanted reporting" indicative of actual malice is utterly without merit. As Judge Gasch observed, Tyler included most of the information furnished by Mobil in the article (with no substantial omissions) and suppressed no information that would have proved the article incorrect. See 567 F.Supp. at 654, 657-59.[51] Contrary to Tavoulareas' assertions, "[t]he seriousness of a [defamatory] charge, in itself, is not probative of recklessness," since "there is no basis ... for the proposition that 'more serious' charges are less likely to be true than 'less serious' charges." Washington Post Co. v. Keogh, 365 F.2d at 970. Similarly, the absence of deadline pressure is probative of nothing.[52] Finally, although the dissent suggests that Tyler may have been negligent in recording certain interview notes or in failing to investigate further, see Dissent at 835-36, 838, we are satisfied that his investigation taken as a whole, the nature and scope of which is undisputed, was sufficiently thorough and professional when held up to the daunting standards of actual malice. Moreover, even were we persuaded to accept the dissent's rigorous second-guessing of reporting techniques, the Supreme Court has flatly held that insufficient investigation alone may not support a libel verdict in the absence of evidence that the defendant subjectively held "serious doubts" about the truth of its statements. St. Amant, 390 U.S. at 731, 88 S.Ct. at 1325. This circuit, too, has recognized that "a rule requiring verification [of facts before publishing] in the absence of evidence that the publisher had good reason to suspect falsity would curtail substantially a protected form of speech." Washington Post Co. v. Keogh, 365 F.2d at 972-73. In light of these clear holdings, we cannot agree that an allegation of insufficient investigation may itself constitute the very proof of the "serious doubts" that is separately required.
 
 IV. PIRO
 
 123
 On appeal, Tavoulareas asserts that Philip Piro[53] published the following statements with actual malice: (1) that Tavoulareas set Peter up in Atlas; (2) that Tavoulareas personally dispatched Harmon Hoffman to run Atlas after Comnas was fired; and (3) that Tavoulareas arranged for Peter's first job with the Lemos firm.
 
 
 124
 We have already discussed our finding that the "set up" statement is substantially true. We have also concluded that the allegation that Tavoulareas dispatched Hoffmann to Atlas is at worst an exaggeration of Tavoulareas' undisputed role, and adds no further defamatory implication to the substantially true charge that Tavoulareas set Peter up in business. Moreover, there is no evidence that Piro entertained serious doubt as to the truth of the dispatch statement.[54]
 
 
 125
 As for Peter's initial job with Lemos, Piro told Tyler and Golden that he "had no direct knowledge" but "knew that Lemos was a friend of the family and [was] sure that that assisted in obtaining a job for Peter." Tr. at 331; see also Tr. at 347. The District Court held that this statement was not defamatory. RE at 766 n. 1. Tavoulareas challenges that holding on appeal, arguing that Piro made the remark to the reporters in order to buttress his primary and clearly defamatory accusation that Tavoulareas set up Peter in Atlas. Brief for Appellant at 30. The "set up" allegation, however, was not false, and we thus conclude that Piro's allegation about Peter's employment with Lemos had no false, defamatory implication.[55]
 
 V. CONCLUSION
 
 126
 This case has consumed the attention and energy of a courthouse beseiged by impatient litigants. We have nonetheless examined this record with the care and detail that the Constitution commands. After completing our task, we are firmly persuaded that the decision of the able and distinguished trial judge was correct. This verdict cannot stand.
 
 
 127
 Affirmed.
 
 APPENDIX
 
 128
 Washington Post, November 30, 1979, Page A-1
 
 MOBILE CHIEF SETS UP SON IN VENTURE
 
 129
 Management Firm Is Used to Operate Oil Company Ships
 
 By Patrick Tyler
 Washington Post Staff Writer
 
 130
 Mobil Oil Corp. president William P. Tavoulareas set up his son five years ago as a partner in a London-based shipping management firm that has since done millions of dollars in business operating Mobil-owned ships under exclusive, no-bid contracts.
 
 
 131
 Tavoulareas' son, Peter, was a 24-year-old shipping clerk in 1974, making $14,000 a year. Today, with the help of Mobil, he owns 45 percent of Atlas Maritime Co., which operates 17 ships worldwide.
 
 
 132
 Mobil, the second largest oil company, provided Atlas with some of these ships--among them Mobil-owned supertankers--under management agreements that allowed Atlas to go into business with a minimal amount of capital.
 
 
 133
 Mobil also initially provided Atlas with office space in Mobil's corporate offices in London and loaned Atlas a Mobil shipping vice president when Atlas' own top shipping executive resigned in 1975.
 
 
 134
 Mobil leased back the ships it provided Atlas, thus creating work for Atlas at a time when the shipping industry was severely depressed.
 
 
 135
 The leasing was handled through an intermediary company, Samarco, of which Mobil owns 45 percent.
 
 
 136
 According to one source, Peter Tavoulareas put up no investment capital for his initial 25 percent share of Atlas. Moreover, the lucrative Mobil contracts, along with other managerial assistance, provided by Mobil, helped make Atlas an overnight success. Peter Tavoulareas, now 30, maintains a highly affluent life style, including a home in one of London's most fashionable districts, a Rolls Royce and a summer home on Long Island.
 
 
 137
 The creation of Atlas was a marked departure from Mobil's historical practice of managing its own fleet of crude oil tankers through its shipping and transportation division.
 
 
 138
 Atlas was created to handle the day-to-day management work for Samarco, a complex shipping partnership that Mobil negotiated in 1974. The other partners included a prominent Saudi Arabian merchant family and a member of the Saudi royal family.
 
 
 139
 Samarco--Saudi Maritime Co.--was set up as a way to share shipping revenues among the partners, but the company existed largely on paper, according to one of its original directors, John D. Kousi.
 
 
 140
 The complicated transactions between Mobil and Atlas and Samarco are not especially unusual in the intricate world of international oil--except perhaps for the presence of father and son. That relationship is not illegal, but securities law requires that Mobil officials report it fully to their stockholders. Mobil claims it did, but that is in dispute.
 
 
 141
 Beyond the legal questions, however, the story of Mobil's president and his son offers a rare glimpse into corporate behavior at the top of one of the largest publicly held international oil companies.
 
 
 142
 The Mobil board of directors was told from the outset about the Atlas arrangement but was assured that company president Tavoulareas was not involved in his son's venture in any way.
 
 
 143
 Mobil officials did not tell their stockholders about the son's involvement in Atlas until two years later.
 
 
 144
 After initial press inquiries in the fall of 1976, Mobil board chairman Rawleigh Warner, Jr., disclosed in a special letter to stockholders that Peter Tavoulareas "is one of the principals" of Atlas.
 
 
 145
 That disclosure prompted an investigation by the Securities and Exchange Commission (SEC) in early 1977, but the inquiry was dropped after confidential sworn testimony was taken from the elder Tavoulareas.
 
 
 146
 U.S. securities law requires that corporate officials disclose the details of business transactions between companies and relatives of the companies' executives. The law was designed to protect shareholders from business decisions based on favoritism.
 
 
 147
 In recent days, the SEC has reopened its investigation into the role Mobil's president played in his son's partnership in Atlas.
 
 
 148
 Mobil chairman Warner says he assured directors in board meetings that Tavoulareas "does not participate in any decisions" relating to Mobil's business with Atlas.
 
 
 149
 But a source close to the Tavoulareas family and those familiar with the formation of Atlas said Mobil's president was involved personally in several key decisions and actions relating to Atlas, among them:
 
 
 150
 . Tavoulareas personally recruited two shipping executives, one an outside consultant and the other a Mobil vice president, for Atlas. One of them set up and ran Atlas for more than a year. The other managed it for a time.
 
 
 151
 . The Mobil president helped negotiate the arrangement whereby the Saudi shipping partnership, Samarco, would turn over all of its management business to Atlas. Mobil officials acknowledged this in a statement last week to The Post.
 
 
 152
 . As the formation of Atlas was being planned in April 1974, Tavoulareas personally urged that his son be included as an equity partner in Atlas. However, in the Mobil statement, Tavoulareas denies this. "Mr. Tavoulareas asserts that he did not initiate this arrangement," the statement said.
 
 
 153
 . The elder Tavoulareas played a personal role in forcing the resignation in 1975 of Greek shipping executive George D. Comnas, who had been recruited a year earlier by Tavoulareas to set up Atlas. The resignation followed several personal disputes between Comnas and Tavoulareas' son. Mobil's statement said "Mr. Tavoulareas played a minor role ... in the arrangements made when Comnas departed from Atlas. Since it was on Mobil's recommendation--including Mr. Tavoulareas' ... [that Comnas set up Atlas], it was logical that Mr. Tavoulareas participate."
 
 
 154
 The elder Tavoulareas was not available for an interview, but through a spokesman acknowledged that the basic idea to set up Atlas was his and that he recommended Comnas set it up. But he denied that he urged that his son be accepted as a partner and stated that he divorced himself from Mobil's business with Atlas after his son joined the company.
 
 
 155
 Comnas, according to Marquis Who's Who, completed a 30-year career with Exxon in 1968 and was president of Mediterranean and African subsidiaries for Exxon during his last years there. In the five years before he formed Atlas, Comnas, 66, was managing director and chairman of the board of C.M. Lemos & Co. Ltd. of London, reportedly the largest of the Greek shipping firms.
 
 
 156
 One of Mobil's partners in Samarco said that the involvement of Peter Tavoulareas was accepted without objection because it was assumed that other Atlas managers were competent to run the business.
 
 
 157
 "Clearly it was a nepotistic act," said Kousi, one of the original directors of Samarco. "At his age [Peter was 24 in 1974] he wasn't a genius, nor was he terribly experienced in shipping. You couldn't expect a lot from someone with that level of experience."
 
 
 158
 Philip Piro, a Baltimore eye surgeon and former son-in-law to the elder Tavoulareas, who is now estranged from the family, said Tavoulareas expressed his interest at the time as "giving Peter a little nudge to get him along." Tavoulareas, through a spokesman, said he does not recall making the remark.
 
 
 159
 In 1973, a year before young Tavoulareas became a partner in Atlas, he was making $14,000 a year as a clerk in the London office of Greek shipping magnate Lemos. Sources said that job also was arranged by his father.
 
 
 160
 Before that, the Mobil president's son was graduated from St. Johns University in New York, where his father sits on the board of trustees, and later received a master's in business administration from Columbia University.
 
 
 161
 In an early interview, Peter Tavoulareas said that his partnership in Atlas did not represent "overt favoritism" and that his responsibilities in the company revolved around "financing." Peter Tavoulareas said that he was asked by Comnas to join Atlas and was offered an equity interest.
 
 
 162
 In a later interview, Peter Tavoulareas would not comment further. "I've answered all of the questions you're going to get from me. Atlas has nothing to do with Mobil [in some early editions "Saudis"], it has nothing to do with Samarco and it has nothing to do with the Saudis. Atlas is none of your damn business." He then hung up.
 
 
 163
 In recent weeks, Mobil has not responded to Washington Post requests for interviews with company officials familiar with Atlas and its operations. The first such request was made Nov. 8. Mobil's vice president for public affairs, Herbert Schmertz, said Nov. 16. "We're not saying no and we're not saying yes." Still later, Schmertz said the request was "under consideration." In a letter to The Post Nov. 12, another Mobil spokesman, John Flint, said, "We understand that you have been advised that this matter has been examined by several reporters for The Washington Post and New York Times, and apparently they found no basis to do a story."
 
 
 164
 The Post did make a brief inquiry into Atlas in 1976, but received assurances from Mobil executives that Mobil's president had maintained a completely "hands off" attitude toward Atlas. The Post began a new inquiry two months ago, based on new information about Atlas.
 
 
 165
 Mobil's Schmertz eventually requested that questions be dictated so that Mobil could respond in writing. This was done and Mobil responded to these questions Nov. 20.
 
 
 166
 Several sources who agreed to discuss the details of this episode if their identities were protected were intimately familiar either with Mobil's shipping operations or with the attempts by Mobil's president to secure a position for his son in the upper strata of the business world.
 
 
 167
 The story of international finance, shipping and oil politics begins with the 1973 Arab oil embargo.
 
 
 168
 In the wake of the oil cutoff, Mobil officials learned that a prominent Saudi merchant company, Haji Abdullah Alireza & Co., was interested in extending Saudi influence from the production of oil to its transportation.
 
 
 169
 Mobil officials believed at the time that a shipping partnership with the Saudis might yield preferential treatment in the loading of crude oil at Saudi ports.
 
 
 170
 In his 1976 message to stockholders, Mobil's Warner said, "Samarco was formed in anticipation ... of [Saudi] flag preference regulations applicable to exports of petroleum from that country and, also, in anticipation of ... favorable financing from Saudi Arabian sources."
 
 
 171
 Mobil and its partners in the venture acknowledge now that neither the preference laws nor the financing for ships materialized.
 
 
 172
 "The business reasons were wrong, they didn't prove out," says Kousi, whose company sold out its interest in Samarco to Mobil two years ago. "We just didn't see the anticipated benefits," he said.
 
 
 173
 But at the time Samarco was formed, Mobil officials felt "preference shipping was much more a threat," according to the Mobil statement. Samarco, however, in which Mobil initially held a 30 percent interest and now holds a 45 percent interest, existed mostly on paper. The real work of the partnership would be performed by the management company, Atlas.
 
 
 174
 "There was no staff or offices for Samarco," said Kousi. "It needed no real offices."
 
 
 175
 The negotiations between Mobil executives and the Saudi partners in Samarco took all of 1974. After the partnership agreement was struck in December, Mobil issued a brief press release saying, "Samarco has engaged the services of Atlas Maritime ... to manage the operation of Samarco's fleet."
 
 
 176
 In its statement last week, Mobil acknowledged that "Atlas was created in anticipation of managing Samarco's business." Atlas was created in July 1974.
 
 
 177
 Mobil president Tavoulareas, the statement continues was involved in the "policy aspects of participating in Samarco and the concept of Atlas" during those negotiations.
 
 
 178
 Mobil's first goal when it entered the talks in January 1974 was to steer the Saudis away from a partnership they had formed with a New York-based shipping concern, Fairfield-Maxwell Ltd. The Saudis had approached Fairfield-Maxwell after Mobil initially rejected the joint venture idea.
 
 
 179
 "The initial invitation from the Saudis was turned down ... consistent with our normal policy of providing our own transportation and not permitting preference shipping," Mobil said last week.
 
 
 180
 But Mobil officials said they subsequently perceived a greater threat from preference shipping. Sources said Mobil then dispatched two negotiators to Jeddah in Saudi Arabia to push Mobil as a partner. One of the negotiators was Mobil's Mideast agent, W. Jack Butler, and the other was the Greek shipping executive, Comnas, who was recruited personally by Tavoulareas to advise Mobil on how to set up an independent shipping concern.
 
 
 181
 By April, the talks on Samarco had progressed far enough that the management arm of the partnership was being planned by Tavoulareas, who recommended to the partners that Comnas be tapped for the job. Late in April, according to one knowledgable source, Tavoulareas personally urged that his son become a partner in Atlas. Sources said that shortly thereafter, the issue of young Peter's involvement was raised with Mobil chairman Warner, who said he raised the issue with the directors and won their approval.
 
 
 182
 In its statement, Mobil said, "It was George Comnas who asserted that he would like Peter Tavoulareas and one other associate at Lemos, a major shipping company, to join him in the management of Atlas. Mr. Tavoulareas asserts that he did not initiate this arrangement."
 
 
 183
 Nevertheless, the other Lemos employe who came to Atlas with young Tavoulareas, an experienced insurance clerk named Ares D. Emmanuel, was given only employe status while Peter Tavoulareas was made a 25 percent partner. Within a year, Tavoulareas would become a 45 percent partner.
 
 
 184
 After Atlas became fully operable in late 1974, the time came for Samarco to begin acquiring ships for Atlas to manage. However, contrary to Mobil's hopes when it formed the partnership, the Saudis were unwilling to provide any investment funds or financing for ships.
 
 
 185
 Mobil said in its statement that an unspecified amount of "capital contribution" was made by each partner when Samarco was formed. One of the partners, the son of Crown Prince Fahd, heir to the Saudi throne, apparently had a special arrangement. Said Mobil: "The prince's share was financed by loan, which he must repay before he receives any financial benefits in the company."
 
 
 186
 As a result, in early 1975, Mobil provided Samarco's first vessel from its own fleet. The ship, a supertanker, had been launched as the Mobil Mariner, but was renamed the Saudi Glory, presumably to reflect the interests of the Saudi partnership.
 
 
 187
 The Saudi Glory was turned over to Atlas by Mobil under a "bareboat" lease through Samarco, meaning the structure of the tanker, without crew, fuel or stores, was rented to the Saudi partnership and its management arm. However, because Samarco and Atlas had no funds with which to pay such a rental fee, the ship was leased back to Mobil simultaneously.
 
 
 188
 Under this arrangement, Atlas agreed to operate the vessel for Mobil, hire crews, arrange for fueling and handle small maintenance chores. All major repairs were Mobil's responsibility. Thus Mobil paid Atlas the cost of operating the ship plus an unspecified margin of profit.
 
 
 189
 Mobil's executive vice president for Mideast transportation, Paul J. Wolfe, said in an early interview that Atlas' basic management fee was $600,000 a year and included an escalation clause. Other sources said the fee would escalate with the cost-of-living index and also after Atlas acquired more than 10 ships.
 
 
 190
 Peter Tavoulareas said the management fee was $680,000 for 1976, when Atlas was operating six ships.
 
 
 191
 The firm's income for subsequent years is not known, but one knowledgeable source said that Atlas was structured so that profits would increase dramatically as more ships were acquired, because overhead costs for staff and office space were relatively fixed.
 
 
 192
 Because Mobil operates its own ship management arm within the Mobil organization, it could have managed the Samarco fleet itself, company officials acknowledged.
 
 
 193
 But Mobil officials claim that there could have been a conflict of interest for any one of the Samarco partners to manage the ships owned by all of the partners. Mobil's statement said:
 
 
 194
 "Mobil did not want to manage Samarco or to set up a Samarco management company, as there could be a conflict of interest between Mobil and Samarco when chartering ships in or out for either company. Neither of the Saudi partners had experience to qualify them to manage. Fairfield-Maxwell could have had a similar conflict. Accordingly, it was prudent to have an independent third-party managing company."
 
 
 195
 Mobil officials said a study was done of management fees in the shipping industry as a guide to setting Atlas' fees. But the company acknowledged that there were no bids.
 
 
 196
 "Ship management arrangements are difficult to assess on a bid basis ... From Mobil's experience, the overriding selection criteria for such operations is the prospect of good, safe performance and access to low-cost dependable crews," the company's statement said.
 
 
 197
 (Atlas has lost one ship, the Atlas Titan, which exploded and burned last May at Setubal, Portugal, during a tank-cleaning operation, according to Lloyd's of London. The ship was sold for scrap in July.)
 
 
 198
 According to Mobil's statement, one advantage derived from using Atlas as a management company came from Atlas' "ability to use low-cost Greek crews unavailable to Mobil or to other, similar non-Greek companies."
 
 
 199
 Kousi, Mobil's partner at the time, reacted to that statement by saying, "Who didn't [have access to low-cost Greek crews]? That's a phony argument." Kousi said that virtually all companies who have international subsidiaries, such as Mobil, have access to low-cost crews of Greek and other nationalities.
 
 
 200
 It is not clear from maritime records how many ships Mobil supplied to Atlas under the contract arrangement. The records show that in March 1978, Mobil was the registered owner of an oil tanker named the Yanbu that was under Atlas' control. And, last October, Mobil supplied to Atlas another tanker named the Solon, records show.
 
 
 201
 The second of the ships that were turned over to Atlas in 1975 was also a Mobil ship. The 250,000-ton supertanker, launched as the Mobil Supplier, according to Federal Maritime Commission records, was renamed the Al Haramain.
 
 
 202
 The third ship, also Mobil's was launched as the Elena and became the Al Rowdah.
 
 
 203
 Presently, Mobil officials said in their statement that they have chartered "certain tankers" to Samarco "and chartered most of these back from Samarco on a time charter basis."
 
 
 204
 Of the 17 ships Atlas reportedly operates worldwide, Mobil said seven are run for Samarco and four of those ships are owned by Mobil.
 
 
 205
 Less than a year after this corporation was set up to manage the fleet assembled by Mobil with the Saudis, Atlas underwent an internal struggle in which Peter Tavoulareas and one of his employees, Emmanuel, took over control of the company.
 
 
 206
 Comnas, who had been recruited by Mobil to set up Atlas and run it, resigned in mid-1975. Mobil's Wolfe explained the Greek shipping executive's departure by saying that Samarco's directors had grown dissatisfied with his performance.
 
 
 207
 Kousi, who was on the Samarco board at the time, declined to discuss Comnas' departure in detail. He did say that it was not Samarco's board that was dissatisfied, but rather, "Mobil basically was dissatisfied."
 
 
 208
 Sources familiar with the situation said that Peter Tavoulareas had several personal disputes with Comnas and shortly thereafter, his father, William Tavoulareas, intervened. Mobil acknowledged that Tavoulareas played a minor role by "assuring a settlement that was fair and equitable to both parties."
 
 
 209
 That settlement reportedly included Mobil paying Comnas a substantial retainer as an independent marine consultant for several years.
 
 
 210
 The relationship between the Mobil president and Atlas also was exemplified by his response when Atlas was left without a seasoned shipping executive in control after Comnas departed.
 
 
 211
 Almost immediately, according to Piro and other sources, the elder Tavoulareas dispatched one of his senior shipping executives, Herman F. Hoffmann, to London to help run Atlas.
 
 
 212
 Said Kousi: "Mobil had suggested Comnas so it was natural for Mobil to step forward and to feel an obligation to meet whatever vacuum they thought existed."
 
 
 213
 Mobil gave this account in its statement: "Since Mobil had originally recommended G. Comnas to Samarco, we felt an obligation to Samarco to maintain quality management of their operations. We made Hoffmann ... available as an interim manager of Atlas."
 
 
 214
 During this period, Hoffmann was given the opportunity to take over Atlas permanently, but he declined. While he remained at Atlas, Mobil officials said, Hoffmann's salary "was pro-rated in proportion to his time. Atlas reimbursed Mobil for that portion relating to Atlas duties, plus all related expenses."
 
 
 215
 Special correspondent Sandy Golden contributed to this report.
 
 
 216
 WALD, Chief Judge, concurring in the judgment:
 
 
 217
 I concur in the judgment of the majority that the jury verdict for the plaintiffs should be overturned. I write separately, however, because I believe that such a result can be justified only if this court reviews the verdict under the special independent review standard set out in Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).
 
 
 218
 Both the majority and dissenting opinions leave the distinct impression that neither opinion adheres to the standard of review it claims to be employing. The majority purports to apply the traditional standard for overturning a jury verdict, i.e., the reviewing court must accept all "permissible" inferences the jury might draw from the objective facts it finds. See maj. op. at 777-78. Nonetheless, throughout its opinion it scrutinizes the inferences to be drawn from evidence of actual malice far more rigorously than that ordinary judgment n.o.v. standard would permit. The dissent, on the other hand, accepts the independent review principle of Bose as applicable, but then proceeds to interpret it as requiring that an appellate court give complete deference not only to the jury's presumed factual findings but also to any reasonable inferences from those findings that might support the verdict. The court's independent review is to be restricted to the "ultimate constitutional issue." See diss. op. at 816-17, 830.
 
 
 219
 Because I believe that this highly publicized and controversial case should be reviewed according to an articulated standard that comports with what the court actually does, I will set out the standard I think should apply here. I find this necessary not only because I do not think an ordinary judgment n.o.v. standard, or even the pre-Bose independent review standard the majority claims to apply[1], would permit us to overturn the verdict, but also because the majority's refusal to admit it is applying Bose's special independent review standard here will confuse the law for all judgments n.o.v., not just libel cases.
 
 
 220
 At a minimum, I believe Bose requires an appellate court independently to apply the legal standard of actual malice to the facts established by the evidence; this independent review is "a constitutional responsibility that cannot be delegated to the trier of fact." Bose, 446 U.S. at 501, 104 S.Ct. at 1959.[2] Contrary to the position taken by the dissent, this responsibility requires us to independently review inferences that the jury may be presumed to have drawn, even though those inferences are "permissible" ones under the traditional judgment n.o.v. standard. We need not subject all of the jury's inferences to this closer scrutiny, however, but only those in which the jury apparently inferred, on the basis of its preliminary factual determinations, that the defendants acted with reckless disregard for the truth.[3] But we must reexamine these inferences to determine for ourselves whether the facts on which the jury relied constitute clear and convincing evidence of actual malice.[4]
 
 
 221
 Were we to follow the dissenting opinion's interpretation of Bose, I fear it would prove impossible in virtually all libel cases for a reviewing court to defer to all permissible inferences the jury may be presumed to have drawn, and then to conduct a truly independent review of the jury's ultimate determination that the defendant acted with actual malice. The human mind is just not that agile, and indeed that is why judgments n.o.v. are so unusual; something must be very wrong before a reviewing court can give the jury the benefit of every reasonable inference and still find evidence lacking for their verdict, even under the preponderance standard. For example, in this case, once the dissent accepts the jury's "reasonable" inferences that the Peterson memorandum "raise[d] in [the defendants'] minds subjective doubts as to the accuracy of the story," that "the defendants knew that Comnas was not trustworthy," that the Post's "extreme pressure for sensationalistic stories [led] to distortion of the truth," and so on through each of the allegations made by the plaintiffs, see diss. op. at 829-39, there is nothing left for an appellate court to review: the conclusion that the defendants acted with actual malice follows inevitably. Independent review of the jury's inferences concerning the existence of actual malice is necessary if we are to fulfill our responsibility to decide "independently ... whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' " Bose, 466 U.S. at 511, 104 S.Ct. at 1965.[5]
 
 
 222
 The majority, on the other hand, while stating that it need not apply any special post-Bose "independent review" standard to arrive at the determination that the defendants did not act with actual malice, in fact does reexamine and reject "permissible" inferences which the jury might have drawn to support their verdict. For example, the majority acknowledges that the jury could find that copy editor Christine Peterson had conveyed to the defendants that she found "the story's theme impossible to believe," and it recognizes that "the Peterson memorandum is evidence of ... actual malice." Maj. op at 794. Nevertheless, the majority concludes that this evidence will not support an inference of actual malice with respect to the allegation that Tavoulareas "personally urged" Comnas to accept Peter as a partner, the one statement in the article which the majority holds to be both false and defamatory. See id. at 794 n. 44. Similarly, the majority concedes that there was evidence casting doubt on the reliability of Comnas as a source for the article, including "evidence of personal animus between Comnas and Tavoulareas," but rejects the inference that reliance on Comnas could be viewed as indicative of actual malice. See maj. op. at 790-93. I could go on, but suffice it to say my own review of the record convinces me that the majority does in fact subject the evidence of actual malice to independent review of inferences to be drawn from it, as indeed it should under Bose, in order to assure that malice has been proven by "clear and convincing" evidence, and as I believe it must in order to arrive at its ultimate judgment, with which I agree. What I find disturbing, though, is its reluctance to acknowledge what it is doing or to grapple with the articulation of what is a proper application of Bose to the record. For future cases we badly need to clarify the appropriate role of a reviewing court in this volatile area of the law, and in this case, regrettably, we have lost a valuable opportunity to do so.
 
 
 223
 RUTH BADER GINSBURG, Circuit Judge, concurring:
 
 
 224
 I concur in the court's opinion holding that the evidence in this case was insufficient to warrant submission to a jury's judgment. That decision, however, is more securely made at a distance from the trial itself. Immediately at the close of a hard-fought trial, the presiding judge, who must rule at once upon a motion for a directed verdict, is in a less advantageous position. He or she may prefer to abide the jury's report and, if necessary, thereafter consider, with some space for reflection, whether to grant a requested judgment n.o.v. Despite our decision today, therefore, hotly contested cases of this genre are likely to reach juries again. With that prospect in view, I write separately to suggest what a trial judge might do to enhance the jurors' capacity to comprehend and impartially apply the governing law.[1]
 
 
 225
 Keeping the jury on track poses a formidable challenge for the judge in a libel case governed by the "actual malice" standard of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). As Justices Black and Goldberg anticipated, the risk is considerable that jurors will not comprehend the difference between reckless disregard and mere neglect or carelessness, or will confuse or blend the separate issues of falsity and actual malice. See id. at 293, 84 S.Ct. at 733 (Black, J., concurring) (malice "is an elusive, abstract concept, hard to prove and hard to disprove"); id. at 298 n. 2, 84 S.Ct. at 736 n. 2 (Goldberg, J., concurring) ("The requirement of proving actual malice or reckless disregard may, in the mind of the jury, add little to the requirement of proving falsity, a requirement which the court recognizes not to be an adequate safeguard."). The challenge for the trial judge demands attention throughout the proceedings. It is not met by allowing the jurors to listen, without education, as the evidence unfolds and then submitting the case for their general verdict after "dous[ing] [them] with a kettleful of law during the charge that would make a third-year law-student blanch." See Skidmore v. Baltimore & O.R.R., 167 F.2d 54, 64 (2d Cir.) (Frank, J.) (quoting BOK, I, TOO, NICODEMUS (1946)), cert. denied, 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371 (1948). See generally Schwarzer, Communicating with Juries: Problems and Remedies, 69 CALIF.L.REV. 731 (1981).
 
 
 226
 Instead, the judge should act to reduce the risk that "the protective benefits of the Sullivan rule [will become] mythical." Lewis, New York Times v. Sullivan Reconsidered: Time to Return to "The Central Meaning of the First Amendment," 83 COLUM.L.REV. 603, 617 (1983). The trial judge can explain, instruct, or clarify continuously, from the commencement of the trial through to the jury's deliberations. The means at hand include: instructing the jury, in plain English, at the opening of the case and at appropriate times during trial,[2] as well as at the close of the case; allowing the jury to retain during deliberations a copy of the charge or key portions of it; and requesting the jury to return a special verdict or a general verdict accompanied by answers to interrogatories. See Fed.R.Civ.P. 49.
 
 I.
 
 227
 Experience supports the intuition that jurors have considerable trouble "distinguishing actual malice from mere negligence." Note, Punitive Damages and Libel Law, 85 HARV.L.REV. 847, 860 (1985); see Lewis, supra, at 613-14. As Judge Bork has observed, "[t]he evidence is mounting that juries do not give adequate attention to limits imposed by the first amendment and are much more likely than judges to find for the plaintiff in a defamation case." Ollman v. Evans, 750 F.2d 970, 1006 (D.C.Cir.1984) (concurring opinion); see Kaufman, Libel 1980-85: Promises and Realities, 90 Dickinson L.Rev. 542, 552 (1986) (citing studies by Libel Defense Resource Center documenting jury verdicts against media defendants at rates of between 60 and 90 percent); Franklin, Suing Media for Libel: A Litigation Study, 1981 AM.B.FOUND.RES.J. 797, 804, Table 7, nn. 19, 20 (contrasting decisions for libel plaintiffs in only two of five cases tried without a jury, with jury verdicts for plaintiffs in 20 of 24 cases).
 
 
 228
 In the libel area particularly, it is not a large exaggeration to suggest that jurors "can easily misunderstand more law in a minute than the judge can explain in an hour." Sunderland, Verdicts, General and Special, 29 YALE L.J. 253, 259 (1920); see Charrow & Charrow, Making Legal Language Understandable: A Psycholinguistic Study of Jury Instructions, 79 COLUM.L.REV. 1306, 1316 (1979) (jurors were able to paraphrase correctly only 54% of their instructions); see also Severance & Loftus, Improving the Ability of Jurors to Comprehend and Apply Criminal Jury Instructions, 17 L. & SOC.REV. 153, 179-80, Table 2 (1982) (overall rate of incorrect responses for jurors with standard instructions was 29.6%); Note, Jury Instructions v. Jury Charges, 82 W. VA.L.REV. 555, 558 (1980) (citing O'Mara & von Eckartsberg, Proposed Standard Jury Instructions--Evaluation of Usage and Understanding, 48 PA.B.A.Q. 542, 550 (1977)) (in 1976 Pennsylvania study, only 68% of jurors could demonstrate actual comprehension of some standard instructions).
 
 II.
 
 229
 To arm the jury with the information needed for the intelligent performance of its task, the judge might first endeavor to speak the language of the jurors, and avoid the jargon of the legal profession. Terms familiar to a lay audience, and shorter, less complex, more active sentences, increase the chance that the jurors will understand and recall the judge's instructions. In addition, in lieu of a laundry list of law without discernible structure, a logically-ordered set of directions for consideration and decision of the separate issues should aid the jury to start out and remain on track. See Charrow & Charrow, supra, at 1326-27, 1338-39; Note, Jury Instructions, supra, at 558-59 & n. 17.
 
 
 230
 Second, instructions should not be reserved exclusively for the trial's finale. Enlightenment from the judge at the outset fosters "intentional" learning; by informing the jurors initially of the inquiries they are ultimately to undertake, early instructions may stimulate or facilitate the mental process involved in connecting up issues and key items of evidence. See Note, Jury Instructions, supra, at 562 & n. 37. Mid-stream instructions may be useful as well. They can serve as definers of difficult-to-grasp law at the moment that law bears on evidence produced. See id. at 565-67. The very repetition of instructions on elusive concepts should lessen the jury's sense of insecurity or discomfort in dealing with those concepts.
 
 
 231
 In addition, "[t]here is a clear suggestion in the available research that access to written instructions in the jury room improves the quality of deliberations. This may be due in part to the optimal effects of presenting material in both visual and auditory modes." Severance & Loftus, supra, at 155 n. 4 (citing Forston, Sense and Non-Sense: Jury Trial Communication, 1975 B.Y.U.L. REV. 601 (1975)); see Cunningham, Should Instructions Go Into the Jury Room?, 33 CALIF.ST.B.J. 278 (1958); Katz, Reinstructing the Jury by Tape Recording, 41 J.AM.JUD.SOC'Y 148 (1958). Detailed instructions delivered from the bench on the actual malice issue, for example, might accompany the jurors in written form as they proceed to deliberations.
 
 
 232
 Finally, the special verdict or its cousin, the general verdict accompanied by answers to interrogatories, see Fed.R.Civ.P. 49, may be a particularly useful check against jury misconstruction or misapplication of a standard as uncommon as actual malice.[3] No recent invention, the special verdict originated in early days when jurors were subject to severe punishment if a court determined that they had returned an "unjust verdict." By electing to deliver a special verdict, thereby limiting their function to fact finding, jurors obtained a measure of protection against such an indictment. See generally Morgan, A Brief History of Special Verdicts and Special Interrogatories, 32 YALEL.J. 575 (1923).
 
 
 233
 The modern rule places the form of verdict in the hands of the judge and permits broad discretion in designing special verdicts, or general verdicts with interrogatories. In a case governed by the Sullivan standard, separate questions on the issues of defamatory meaning, falsity, and actual malice would impel the jurors to advert to the framework within which the judge has instructed them to consider the case and could assist them to hold the distinct legal questions in clear and separate view.[4] The inquiries thus may promote both comprehension and actual application of the governing first amendment law.[5]
 
 
 234
 New York Times v. Sullivan presents a standard that may slip from the grasp of lay triers unfamiliar with legal concepts and perhaps unsympathetic to publishers who print statements shown to be false. Careful efforts by judges to make the legal rules genuinely accessible to jurors may reduce some of the turbulence in this unsettling area of the law.
 
 
 235
 MacKINNON, Senior Circuit Judge (dissenting).
 
 
 236
 Rehearing en banc* was granted in these cases to provide an opportunity for the full court to consider "issues of exceptional importance to the courts and to the public." The Washington Post Petition for Rehearing and Suggestion for Rehearing En Banc at 1. In particular, the petition suggested that, by viewing the underlying evidence of actual malice in the light most favorable to the verdict reached by the jury in this libel action, the panel opinion, reported at 759 F.2d 90 (D.C.Cir.1985), failed to review independently the evidence of actual malice. Post 's Petition at 7-10. To give the court the opportunity en banc to consider this question, the parties were ordered to file supplemental briefs addressing, inter alia, "[w]hether, in determining the existence of clear and convincing evidence to support a jury finding of actual malice, an appellate court must view the evidence in the light most favorable to the plaintiff[.]"Effectively conceding this issue, Post counsel at oral argument retreated from its position that an appellate court's independent review of the evidence of actual malice is "not dependent on anything below." Transcript of Oral Argument at 25 (October 3, 1985). Post counsel admitted that an appellate court's independent review of the evidence of actual malice must "pay some obeisance" to the jury's assessment of witness credibility. Id. at 26.
 
 
 237
 The en banc majority opinion, presumably because of Post counsel's admissions at oral argument, refuses to address the important First Amendment issue ordered for briefing in this case--that is, the extent to which judicial deference to jury determinations of contested facts and credibility is called for under New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and Bose Corp. v. Consumers Union of United States, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). See Maj.Op. at 776-77. Reducing the conflict between the parties to a primarily factual dispute, the en banc majority fails to heed the principle that "appellate review serves a dual purpose: the correction of legal error and the establishment of legal rules for future guidance. Only the latter is ordinarily worth the attention of the full court." Church of Scientology of California v. Internal Revenue Service, 792 F.2d 153, 155 n. 1 (D.C.Cir.1986) (en banc ). The purpose for holding an en banc hearing--to establish legal rules for future guidance--has been forsaken by the majority in favor of a mere reversal of the panel opinion, in derogation of the rule that "[t]he function of en banc hearings is not to review alleged errors for the benefit of losing litigants." United States v. Rosciano, 499 F.2d 173, 174 (7th Cir.1974) (per curiam ).
 
 
 238
 Rather than addressing the important First Amendment question presented by this case, the majority instead rejects entirely plausible (if not inevitable) interpretations of the article and then, by considering only a small fraction of the defamation charged, holds the jury's verdict was invalid under what are alleged to be traditional judgment n.o.v. standards. In determining whether to grant judgment n.o.v., a reviewing court is "required to draw all inferences favorable to the plaintiff." Carter v. Duncan-Huggins, Ltd., 727 F.2d 1225, 1234 (D.C.Cir.1984) (emphasis in original). "The weighing of conflicting evidence and the evaluation of witness credibility is exclusively within the jury's province." Id. See U.S. Industries v. Blake Construction Co., 671 F.2d 539, 550 (D.C.Cir.1982); Vander Zee v. Karabatsos, 589 F.2d 723, 726 (D.C.Cir.1978), cert. denied, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979). After asserting that its review of the evidence in this case is made under "traditional j.n.o.v. standards," the majority discards those traditional standards and proceeds to make its own assessment of witness credibility and to disregard controlling reasonable inferences in favor of the verdict.[1] Thus, although the majority insists that it is conducting a traditional j.n.o.v. analysis, it in fact reweighs the evidence, overrides obvious jury determinations on credibility of witnesses, generally goes only about half-way in giving plaintiff the benefit of the inferences to which he is entitled, and thus refuses to find the underlying facts, as required, in the manner most favorable to the jury verdict.[2]
 
 
 239
 I respectfully dissent because I believe that the majority, in proceeding as above set forth, has denied plaintiff his constitutional right to a jury trial and has improperly failed to conform to the First Amendment independent fact review as established by Bose Corp. v. Consumers Union of the United States, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984).
 
 I. COUNTERSTATEMENT OF FACTS
 
 240
 This is an unusual libel case and a unique majority opinion. When The Washington Post article at issue is read as a whole with all its innuendo, as it must be, it charges that William Tavoulareas (hereafter also "William"), as president of Mobil Oil Corporation, violated his fiduciary duty to the shareholders of the corporation by causing Mobil's assets and personnel to be used with intent to benefit his son, Peter, to the detriment of Mobil. The case thus largely turns on whether Tavoulareas established the falsity of that charge. A jury has already determined that William has sustained the burden of proving the falsity of the Post article; and an appellate court under j.n.o.v. standards may only overturn that determination if it finds that no reasonable person could have believed that William proved the falsity of the article. The facts which follow must be read with this principle in mind.
 
 
 241
 The business relationships that gave rise to this case began in early 1974, when Mobil, after an earlier decision to do so in 1973, bought a 30 percent interest in the Saudi Arabian Maritime Company ("Samarco"), a joint venture that had been formed a short time before by members of a powerful Saudi Arabian family, the Alirezas, and Fairfield-Maxwell Ltd., a Japanese company that managed ships (RE 2470). The Saudis were the majority shareholders in Samarco. After first refusing an offer to join Samarco, Mobil decided to buy a minority interest after strong indications arose that the Saudi government was going to give oil shipping preferences to Saudi-owned ships. It anticipated transferring operation of its fleet of oil tankers to Samarco in order to qualify for the expected shipping preference.[3] Ultimately, however, these preferences were never created by the Saudi government.
 
 
 242
 The Samarco partners[4] agreed to hire an outside independent firm to manage the ships that Samarco would operate because of the possible conflict of interest that might arise between Fairfield-Maxwell and Mobil over the selection of ships for transporting oil. A Saudi preference would also seem difficult to claim if Mobil was managing its own ships. Mobil suggested Atlas Maritime Company, a new venture being formed by Greek shipping executive George Comnas. Comnas had previously worked for a premier Greek maritime firm, C.M. Lemos & Co., where Peter Tavoulareas, a 24-year-old graduate with a Masters Degree in Business Administration from Columbia University, was also employed as a junior executive trainee in maritime operations. Peter had first approached Lemos in August, 1972 and on January 1, 1973, Peter began working there (Tr. 2385, 2387, 2451).
 
 
 243
 In the operating arrangement with the Saudis, Mobil agreed to "bareboat charter" its ships to Samarco (i.e., charter the ships empty and unstaffed), and Samarco would in turn "time charter" them (i.e., charter the vessels complete with crews and provisions) back to Mobil.[5] Crews and provisions for the ships would thus be obtained through Samarco.[6] In admiralty law, Samarco, "for many, if not most, purposes [as] the bareboat charterer is to be treated as the owner" of the chartered vessel. Reed v. The Yaka, 373 U.S. 410, 412, 83 S.Ct. 1349, 1352, 10 L.Ed.2d 448 (1963). Thus, the contractual arrangement placed considerable responsibility upon Samarco for Mobil's ships. Samarco, for its part, arranged to obtain crews and provisions through its management firm, Atlas. As explained in a Mobil letter to Tyler of the Post, the "savings" to Mobil in the cost of operating its tankers "permitted Samarco to pay the management fee [to Atlas] without any cost to Mobil" (RE 2345).
 
 
 244
 Comnas, in setting up Atlas, asked two young coworkers at Lemos, Peter Tavoulareas and Ares Emmanuel, to join him as partners.[7] When Comnas told William in January 1974 that he was leaving Lemos and might ask Peter to join him later, William immediately notified Mobil's top executives and its Conflict of Interest Committee (Tr. 1515-21). Meanwhile William, Mobil's longtime Saudi oil expert, with Comnas as a consultant, proceeded to carry out Mobil's decision to join Samarco in the joint venture. When Peter left Lemos to join Comnas in August, 1974, William immediately took the steps required by Mobil's Conflict of Interest Committee and formally removed himself from making decisions regarding Atlas.[8] Such recusal conformed to the instructions of the Mobil Conflict of Interest Committee and was also fully disclosed to the Mobil Board of Directors.
 
 
 245
 Mobil, with the Samarco partners concurring, decided a year later, in 1975, after first giving Comnas an opportunity to improve his performance (Tr. 2266-67, 2325-26), to remove him from Atlas because of self-dealing, fraudulent practices, and dissatisfaction with his competence and performance (RE 1990-94). Emmanuel testified, based on firsthand knowledge, to facts that completely justified the termination of Comnas.[9] The Samarco partners heard that Comnas was corrupt, that he had been implicated in a fraud scandal in Italy while he was with Exxon (RE 1990-91), and that as head of Atlas he had solicited a bribe from the Japanese during negotiations for Samarco's purchase of tankers from Japan Lines (Tr. 3187, 4152-53). Both Fairfield-Maxwell and the Saudis believed Comnas to be incompetent (Tr. 3184-85). In addition, the Saudi partners were particularly incensed by Comnas' racist attitudes towards Saudi workers (RE 1991-94, Tr. 1326-44). Following his dismissal from Atlas, Comnas was placed on Mobil's payroll as a consultant for three years, and Atlas reimbursed Mobil for his salary (Tr. 2270). He also obtained a consultancy with Atlas (Tr. 2270, 2308, 2337-38). Mobil sent Harmon Hoffmann,[10] an experienced Mobil shipping executive, to head up Atlas. Hoffmann was offered Comnas' share of Atlas stock (RE 2345, Tr. 4151), but turned down this offer to become the controlling equity partner, and after six months returned to Mobil, saying "he wouldn't make any money in Atlas" (RE 1353). Upon leaving Atlas, Hoffmann stated that Peter and Emmanuel were competent to run the operation (Tr. 1878). Peter Tavoulareas and Emmanuel then assumed the management duties of Atlas, which, despite the boxcar figures bandied about in the article, did not make a profit for the period from 1974 to 1979 (Tr. 2274). By 1979 Atlas was operating 17 ships, including 7 for Samarco, only 4 of which were Mobil's.
 
 
 246
 The Mobil-Samarco-Atlas relationship, and the Tavoulareas-Atlas connection particularly, were explained to Mobil shareholders in a 1976 letter. At about the same time, a party or parties sent anonymous letters to a number of newspapers, alleging that the arrangement violated the United States securities laws. One of those letters went to reporter Robert Woodward of The Washington Post. Woodward and reporters for several other newspapers investigated the anonymous charges; none of them apparently found any wrongdoing and no stories were published. The Securities and Exchange Commission, which obtained a copy of one of the letters, conducted an informal investigation and called upon William Tavoulareas to testify in non-public proceedings. The SEC also found no impropriety.
 
 
 247
 Evidence presented by the plaintiffs at trial showed that Mobil did not exert control over Samarco, in which Mobil was a 30% minority shareholder, and that all of the decisions relating to Atlas were approved by the controlling Saudi partners. The arrangement was fully disclosed to Mobil's Conflict of Interest Committee, Mobil's Board of Directors, and the company's shareholders.[11] Evidence indicates that Mobil and its shareholders benefitted from the Samarco-Atlas arrangement because Atlas operated the Mobil ships more cheaply than Mobil could have.
 
 
 248
 The Post article had its genesis five years after the creation of Atlas and three years after disclosure to the shareholders. The article was investigated and written by Patrick Tyler, who had previously written an article on the nation's oil crisis for which he was criticized by Mobil for misstating information given him by Mobil. Shortly after Mobil's criticism of the Post for its earlier story by Tyler, Woodward gave Tyler his old file on Tavoulareas.
 
 
 249
 In October 1979, Samuel "Sandy" Golden, a reporter for a suburban newspaper, The Montgomery [Maryland] Journal, met Philip Piro, a physician who was married to William Tavoulareas' daughter. Piro was in the midst of a less-than-amicable divorce proceeding. Piro told Golden about the Atlas transactions. Golden testified that Piro told him that Mobil's President William Tavoulareas had set up his son Peter in the business, making Peter an "overnight millionaire" (Tr. 166). Piro mentioned that Woodward had previously investigated the story.
 
 
 250
 Golden, who had been angling for a job at the Post for some time, sensed a story. He unsuccessfully called Woodward several times and finally left a message that he "had a story about the president of Mobil setting up his son to become an overnight millionaire" (Tr. 169). Woodward, by then an editor at the Post, assigned reporter Patrick Tyler to return Golden's call. Golden told Tyler that he had a hot source for the Tavoulareas story. Tyler, who already had Woodward's file on the Tavoulareases, agreed that if Golden's source led to a big story, Golden would share a Post byline.[12] The two reporters met at The Owl restaurant in Baltimore, where they jointly interviewed Piro. Tyler apparently from the very outset treated Piro's story as completely true, despite Piro's obvious antagonism toward the Tavoulareases. On leaving the restaurant, Tyler remarked that it's "not every day you knock off one of the seven sisters"[13] (RE 789).
 
 
 251
 At this point, the two reporters began following separate trails. Golden concentrated on getting more information from Piro and conducted several telephone interviews with him. Although Golden repeatedly assured Piro that he was not recording their telephone conversations, he taped several of them. Golden also began seeking "possible enem[ies]" of Tavoulareas (Tr. 202). In his search, he met Peter Stockton, an investigator for Rep. John Dingell, Chairman of the House of Representatives Subcommittee on Energy and Power. Golden believed that Stockton, who had something of a reputation as a crusader, "hate[d] people with money" (Tr. 223). Golden played the Piro tapes for Stockton, who at some point relayed Golden's information to Congressman Dingell. Stockton later contacted Tyler and passed other information to him. Dingell wrote to the SEC seeking an investigation of Tavoulareas.
 
 
 252
 Tyler, meanwhile, tracked down Comnas and met with him in New York. Comnas, who initially requested anonymity, allegedly told Tyler about the Atlas arrangements. The Post contends that Comnas was the principal source for its stories. (Despite being listed as a witness by the Post, Comnas did not testify at trial, nor was his deposition introduced. Because Tyler does not use tape recorders, only Tyler's account of these important conversations with Comnas is available--a fact that severely weakens the Post's defense.) Tyler also talked to John Kousi, an executive of Fairfield-Maxwell, one of the Samarco partners. Parts of Kousi's deposition were admitted into evidence. Tyler requested personal interviews with William Tavoulareas and other Mobil executives, but generally was rebuffed because in his earlier story on the oil shortage he had misrepresented statements made to him by Mobil executives. Tavoulareas did, however, give written answers to questions that Tyler submitted in writing (RE 2343-46).
 
 
 253
 Tyler wrote the story, and the Post submitted it to its editing process. During editing, parts that were favorable to Mobil and Tavoulareas were deleted--chiefly opinions of various persons in and out of Mobil that (1) the Atlas arrangement had benefitted the company, and (2) William Tavoulareas had not been directly involved in Atlas after its formation. The Post copy editor assigned to the story, Christine Peterson, read the Tyler story (as it was ultimately published), considered its implications, and wrote a memorandum to other editors stating in effect that she found it "impossible to believe" that William Tavoulareas had arranged the entire Samarco-Atlas venture in order to benefit his son.[14] Tyler did not question this analysis and responded with a memo in which he acknowledged that "a good editor might say that part of our case against Tavoulareas seems tenuous " (emphasis added), and noted that a couple of "key points" were based on a single source--presumably Comnas. Neither the Post editors nor Tyler altered the story in response to Peterson's memo, and after clearance from the lawyers, Tyler's story as written was published in 600,000 issues of The Washington Post and sent over The Los Angeles Times-Washington Post News Service that is carried abroad and in every major city in the United States except Birmingham, Alabama--thus potentially reaching many millions of readers (Tr. 4015).
 
 
 254
 The first article appeared on November 30, 1979.[15] It bore the headline "Mobil Chief Sets Up Son in Venture," and its essential theme is made clear from its beginning:
 
 
 255
 Mobil Oil Corp. president William P. Tavoulareas set up his son five years ago as a partner in a London-based shipping management firm that has since done millions of dollars in business operating Mobil-owned ships under exclusive, no-bid contracts.
 
 
 256
 The article detailed the transactions that led to the creation of Samarco and Atlas and when read as a whole, as it must be, implied that William Tavoulareas misused his corporate position as president and breached his fiduciary duties to Mobil to benefit Peter.
 
 
 257
 William and Peter Tavoulareas brought two actions: one for libel against The Washington Post Company[16] and several individuals including Tyler, Golden, and Woodward (collectively, the "Post defendants") (No. 83-1605),[17] and one for slander and republication libel against Piro (No. 83-1604). The Tavoulareases contended that the article was false and defamatory in implying that William breached his fiduciary duties to Mobil to benefit his son. After trial, the verdicts indicated the jury necessarily determined that:
 
 
 258
 1. In the November 30 article the Post defendants defamed William Tavoulareas. The premise of the article was false and was published with knowledge or reckless disregard of its falsity. (The jury awarded Tavoulareas $250,000 in compensatory damages and $1,800,000 in punitive damages against the Post defendants.)
 
 
 259
 2. The Post defendants did not defame Peter Tavoulareas.
 
 
 260
 3. Piro defamed both William and Peter Tavoulareas. (The jury awarded compensatory damages of $5,000 to William and $1,000 to Peter.)
 
 
 261
 After receipt of the verdicts, the district court set aside the jury verdict for William Tavoulareas and granted judgments n.o.v. for the Post defendants and for Piro. The trial judge ruled that Tavoulareas was a limited-purpose public figure and that there was no proof the defendants had acted in reckless disregard of the truth. While recognizing that "[t]he article in question falls far short of being a model of fair, unbiased, investigative journalism" the trial court concluded that "[t]here is no evidence in the record ... to show that it contained knowing lies or statements made in reckless disregard of the truth." 567 F.Supp. at 654. The district court affirmed the jury verdict in favor of Peter Tavoulareas against Piro. On appeal the court reinstated the verdict, 759 F.2d 90 (D.C.Cir.1985), one judge dissenting.[18]
 
 II. THE STANDARD OF REVIEW
 
 262
 The constitutional standard of liability for public figures[19] has been established by the Supreme Court in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In addition to showing publication of a false defamatory statement, a public figure must show "actual malice," somewhat of a misnomer since it is defined as "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." Gertz, 418 U.S. at 342, 94 S.Ct. at 3008 (emphasis added).
 
 
 263
 Under Rule 50(b) of the Federal Rules of Civil Procedure, a motion for judgment n.o.v. is essentially a motion for a directed verdict made after the jury has returned its verdict. Consequently, "the standard for awarding a judgment n.o.v. is the same as that applied when ruling on a motion for a directed verdict." Vander Zee v. Karabatsos, 589 F.2d 723, 726 (D.C.Cir.1978), cert. denied, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979). Thus,
 
 
 264
 [u]nless the evidence, along with all inferences reasonably to be drawn therefrom, when viewed in the light most favorable to the plaintiff is such that reasonable jurors in fair and impartial exercise of their judgment could not reasonably disagree in finding for the defendant, the motion must be denied.
 
 
 265
 Alden v. Providence Hospital, 382 F.2d 163, 165 (D.C.Cir.1967) (emphasis added) (footnote omitted). In considering a motion for judgment n.o.v., the court ordinarily must abstain from weighing the evidence and assessing the credibility of witnesses. Morelock v. NCR Corp., 586 F.2d 1096, 1104 (6th Cir.1978), cert. denied, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979); 5A J. Moore, Moore's Federal Practice p 50.07 (2d ed. 1986).
 
 
 266
 This deferential standard for reviewing jury determinations does not fully apply, however, in First Amendment defamation cases. In addition to the requirement that actual malice be proven with clear and convincing evidence, the Supreme Court held in New York Times that courts reviewing public figure defamation verdicts "must 'make an independent examination of the whole record,' ... so as to assure [themselves] that the judgment does not constitute a forbidden intrusion on the field of free expression." 376 U.S. at 285, 84 S.Ct. at 729 (quoting Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)) (emphasis added); see also Bose Corp. v. Consumers Union of United States, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). As the original panel opinion noted, it is necessary to reconcile the Supreme Court's instruction to review the evidence in a First Amendment defamation case independently with the well-settled standard, reiterated in Anderson v. Liberty Lobby, --- U.S. ----, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (a limited-purpose public figure defamation case), that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." --- U.S. at ----, 106 S.Ct. at 2513. Cf. Crane v. Kentucky, --- U.S. ----, ---- - ----, 106 S.Ct. 2142, 2145-46, 90 L.Ed.2d 636 (1986). I remain of the view that this reconciliation is to be achieved by limiting appellate courts' independent review to the question of ultimate constitutional fact--i.e., whether, assuming the most favorable facts and "legitimate inferences" that could reasonably have been found by the jury, the constitutional threshold of clear and convincing proof of actual malice was passed. Since, as has already been noted, the en banc majority does not address this legal question, I will not belabor it here, referring the reader to the discussion contained in the panel opinion, Tavoulareas v. Piro, 759 F.2d 90, 106-09 (D.C.Cir.1985).[20] Upon reviewing the factual questions (other than the ultimate constitutional fact)--as the majority purports to do--on the basis of normal j.n.o.v. standards; and then, in addition--as the majority does not do--subjecting the ultimate question of clear and convincing proof of actual malice to independent review in the manner just described, I find it utterly impossible to conclude that this jury verdict can lawfully be set aside.
 
 III. DEFAMATION AND FALSITY
 A. Defamatory Meaning
 
 267
 To constitute actionable defamation, a published statement must be shown to be both defamatory and false. As the district court instructed the jury, a communication is considered defamatory if it "tends to injure [the] plaintiff in his trade, profession, or community standing, or lower him in the estimation of the community or subject him to scorn, ridicule, shame, contempt or embarassment" (Tr. 4548). See Afro-American Publishing Co. v. Jaffe, 366 F.2d 649, 654 (D.C.Cir.1966) (en banc ). In determining the meaning of an allegedly defamatory communication, the " 'publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.' " Washington Post Co. v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 448, 63 L.Ed. 987 (1919) (citation omitted).
 
 
 268
 The respective roles of judge and jury are as follows: It is for the court to determine whether a particular communication is capable of bearing a defamatory meaning. " 'It is only when the court can say that the publication is not reasonably capable of any defamatory meaning, and cannot reasonably be understood in any defamatory sense, that the court can rule as a matter of law, that the publication is not libellous.' " Gariepy v. Pearson, 207 F.2d 15, 16 (D.C.Cir.) (citation omitted) (emphasis added), cert. denied, 346 U.S. 909, 74 S.Ct. 241, 98 L.Ed. 407 (1953); McBride v. Merrell Dow & Pharmaceuticals, 717 F.2d 1460, 1465 (D.C.Cir.1983). It is thus for the jury to decide whether a communication, found capable of a defamatory meaning by the court, was in fact so understood by its recipient. Restatement (Second) of Torts Sec. 614 (1977).
 
 
 269
 The majority goes about its task of determining whether the Post article is capable of any defamatory meaning by understating and separately considering each of only three allegedly libelous statements taken out of context and by completely ignoring the basic theme of the article. The majority considers the defamatory implication of the "set up" charge in the Post article in an unreasonably narrow fashion, asserting that "[t]he statement that 'a father set up his son in business' would ordinarily mean to a reasonable reader that the father provided the son with [a business opportunity]." Maj. Op. at 780. In so defining "set up," the majority ignores the full meaning of those words in the article.[21] With respect to the "[personally] dispatched" charge, the majority concludes that although capable of a defamatory meaning (that Tavoulareas did not remove himself from dealings with Atlas), this statement carried no defamatory "impact" in light of Tavoulareas' other personal contacts with Atlas. Maj. Op. at 788. Finally, the majority concedes that the statement that William "personally urged" Comnas to include Peter in Atlas was defamatory (though ultimately not actionable because not uttered with actual malice). Maj. Op. at 788.
 
 
 270
 Such analysis by the majority of the defamatory meaning of the Post article is flawed both factually and as a matter of law. As a matter of law, the majority's analysis violates the cardinal principle of defamation law that "words must be read in the context of the entire communication as a whole." R. Sack, Libel, Slander, and Related Problems 52 (1980) (emphasis added). See Pierce v. Capital Cities Communications, 576 F.2d 495, 502 (3d Cir.), cert. denied, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978) ("a court should not scrutinize simply the literal references of the language in question, but also should weigh the words 'together with their context,' Restatement, Second, Torts Sec. 563, Comment (d)"); Curtis Publishing Co. v. Vaughan, 278 F.2d 23, 26 (D.C.Cir.), cert. denied, 364 U.S. 822, 81 S.Ct. 57, 5 L.Ed.2d 51 (1960); Williams v. Anti-Defamation League of B'nai B'rith, 185 F.2d 1005, 1007 (D.C.Cir.1950). Gariepy, 207 F.2d at 16; Thomson v. Cash, 119 N.H. 371, 402 A.2d 651, 653 (1979); James v. Gannett Co., 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 838 (1976); H.O. Merren Co. v. A.H. Bel. Corp., 228 F.Supp. 515, 518 (N.D.Tex.1964), aff'd, 346 F.2d 568 (5th Cir.1965); Westby v. Madison Newspapers, Inc., 81 Wis.2d 1, 6, 259 N.W.2d 691, 693 (1977). Cf. Ollman v. Evans, 750 F.2d 970, 982 (D.C.Cir.1984) (en banc ) (a proper reading of an allegedly defamatory article "depends upon the article or column, taken as a whole, of which the statement is a part") (emphasis added). A court should not isolate particular words or sentences and determine whether, considered alone, they are defamatory. To be sure, the words used must be considered--but they must be considered in their context. Words that standing alone may be understood to be defamatory may be so explained by their context as to negate any defamatory meaning. Conversely, words that standing alone convey no defamatory meaning may, when read in context, be understood to be defamatory. The charges in this article were published in context and it is error for the court not to determine their meaning in that context. The court's task is to determine whether the publication taken as a whole is defamatory. See Hoffman v. Washington Post Co., 433 F.Supp. 600, 602 (D.D.C.1977), aff'd, 578 F.2d 442 (D.C.Cir.1978); Joseph v. Xerox Corp., 594 F.Supp. 330, 332 (D.D.C.1984).
 
 
 271
 In addressing whether the article is capable of bearing a defamatory meaning, the majority creates an easy task for itself. In analyzing only a few of the defamatory statements and those out of context, the majority escapes confronting the basic defamatory theme of the article--that William Tavoulareas violated his fiduciary duty as president of Mobil and misused Mobil assets, personnel, property, and financing to advance the career of his son Peter.
 
 
 272
 The headline and lead sentence of the November 30, 1979 Post article charges that William Tavoulareas "set up" his son. The majority admits that the "set up" allegation is defamatory in accusing "Tavoulareas with nepotism--furthering his son's business career." Maj. Op. at 780. By reading narrowly the defamatory character of the "set up" charge and of the article as a whole, the majority finds that the defamatory "set up" allegation is true.[22] Maj. Op. at 783.
 
 
 273
 To construe the defamatory accusation as being limited to simple "nepotism" is farcical. The "set up" charge cannot be read in isolation to simply accuse a father of furthering his son's career. The defamation is far more extensive. Read in the context here where the father's ability to "set up" his son stems solely from his position as president of a large corporation, the term "set up" further connotes that the father exercised his powers as president to use corporate assets with intent to benefit his son in breach of his fiduciary duties to the corporation's shareholders.
 
 
 274
 The majority effectively reads Mobil out of the article, notwithstanding the fact that the article mentions Mobil over one hundred times and identifies William Tavoulareas acting as president of Mobil ten times. Without the Mobil involvement the article would not have been a page 1 story. There are numerous statements in the article that can only be interpreted as intending to convey to the readers that William clearly violated his fiduciary duty as president of Mobil, by making possible Peter's partnership in Atlas and thereafter using Mobil assets and personnel to ensure the financial success of Atlas. According to the article, William Tavoulareas used Mobil assets and personnel to give Atlas "millions of dollars in business operating Mobil-owned ships under exclusive, no-bid contracts," (Paragraph 1); to "provide[ ] Atlas with office space," (Paragraph 4); to "create work for Atlas at a time when the shipping industry was severely depressed," (Paragraph 5) and when "Mobil could have managed the Samarco fleet itself," (Paragraph 63); and then to "intervene[ ]" (Paragraph 79) by personally "forcing the resignation" (Paragraph 24) of Comnas and by "dispatch[ing]" Hoffmann, an officer from Mobil, to help run Atlas for six months (Paragraph 82), thus securing for Peter control of the company (Paragraph 76). Moreover, the article specifically attributes Peter's partnership in Atlas to "the help of Mobil" (Paragraph 2). The Post story therefore does not merely accuse a father of nepotism, but charges that the father, as president of Mobil, accomplished the nepotism through breach of his fiduciary duties to Mobil.[23] The district court included this interpretation in its charge and instructed the jury to find whether, as William Tavoulareas' complaint contended, the articles reasonably implied:
 
 
 275
 That [William Tavoulareas] breached his fiduciary duties to Mobil. That he wasted and misused assets of Mobil. That he wrongfully diverted such assets to Peter Tavoulareas for his benefit, and four, that he committed criminal acts.
 
 
 276
 (Tr. 4550).
 
 
 277
 By ignoring the article's defamatory implication that Tavoulareas misused Mobil assets and his position as president to advance Peter in Atlas, the majority quickly disposes of the defamatory allegation that Tavoulareas "dispatched one of his senior shipping executives, Herman [sic] F. Hoffmann, to London to help run Atlas" (Paragraph 82). The majority admits that the "dispatch" allegation might be false, but attempts to obviate its defamatory effect by concluding that the statement adds no further defamatory implication to the charge that Tavoulareas set Peter up in Atlas, a charge the majority declares is true. Maj. Op. at 788. The allegation that Tavoulareas "personally dispatched" Hoffmann, however, is defamatory in its implication that Tavoulareas misused corporate personnel to insure the success of Peter's business venture.[24] The majority's handling of the "dispatched" allegation illustrates the complete refusal of the majority to reflect on the background of corporate involvement that is painted into the article as a whole by the numerous references to Mobil and William's position with Mobil, and the many suggestions that Mobil's assets and personnel were misused in the venture to benefit Peter.[25]
 
 
 278
 It is instructive to compare the refusal of the en banc majority to acknowledge that the Post article can reasonably be given this interpretation with this court's opinion in McBride v. Merrell Dow & Pharmaceuticals, 717 F.2d 1460 (D.C.Cir.1983). In that case Dr. McBride, who had been an expert witness in a Florida lawsuit, brought a suit claiming that he was libeled by an article containing the following language: "McBride ... was paid $5,000 a day to testify in Orlando. In contrast, Richardson-Merrell pays witnesses $250 to $500 a day, and the most it has ever paid is $1,000 a day." Id. at 1462. Dr. McBride contended that this language was defamatory because it implied that he was " 'willing to prostitute his professional expertise and testify on behalf of the highest bidder.' " Id. at 1463 (quoting Dr. McBride's Complaint). The district court agreed with the defendant that this language was not defamatory, concluding that standing alone it suggested, if anything, that Dr. McBride possessed a high degree of professional accomplishment, and that it was "improbable" that anyone would draw defamatory inference from this language. McBride v. Merrell Dow & Pharmaceuticals, 540 F.Supp. 1252, 1255 (D.D.C.1982). We reversed. Stressing the fact that, "[u]nder District of Columbia defamation law, a court's power to hold as a matter of law that a statement is not defamatory is very limited," 717 F.2d at 1465, we concluded that the language could reasonably have been understood to imply that Dr. McBride's testimony was for sale.
 
 
 279
 It seems to me impossible to reconcile the approach of the en banc majority in this case with McBride. Surely the distance between the simple statement that one expert witness was paid significantly more than other witnesses and the inference that that witness' testimony was for sale is far greater than the distance between the statement that the president of a corporation set his son up in a business with which the corporation then did substantial business and the inference that the president thereby misused corporate assets and breached his fiduciary duties to the corporation's shareholders.[26] Moreover, the Post article, unlike the article at issue in McBride, contains other language likely to induce a reader to make the defamatory inference.
 
 
 280
 While ignoring the article's defamatory implication that William Tavoulareas abused his position as president and violated his fiduciary duties to Mobil in prodding Peter's fortunes in Atlas, the majority eliminates another aspect of the article's central theme that Tavoulareas abused his corporate position, concluding "as a matter of law" that the article is incapable of bearing the defamatory "interpretation that Tavoulareas 'set up' the entire Mobil-Samarco-Atlas relationship to benefit Peter." Maj. Op. at 780.[27] Failing to consider the article as a whole, the majority rejects this interpretation because nothing in the article specifically alleges that Tavoulareas "set up" the entire arrangement for Peter's benefit and because the article discusses Mobil's business reasons for participating in Samarco. Maj. Op. at 780-81.
 
 
 281
 The entire discussion of the legitimate business reasons in the Post article is pejorative, however, suggesting that although they were asserted by Mobil, these business reasons fail to explain the Mobil-Samarco-Atlas arrangement.[28] For example, although it quotes Mobil's statement that Samarco was formed in anticipation of the Saudi flag preference regulations, the article throws cold water on the argument that this was the real reason by asserting that the "creation of Atlas was a marked departure from Mobil's historical practice of managing its own fleet of crude oil tankers through its shipping and transportation division." (Paragraph 8). In the same vein, without recognizing that the essence of the Samarco-Atlas plan was conceived by Mobil before Comnas ever came into the picture and was beneficial to Mobil, the article charges that the real purpose of the plan was a "make-work" scheme for Peter's benefit to "create[ ] work for Atlas [while Peter had an equity interest] at a time when the shipping industry was severely depressed." (Paragraph 5). Similarly, after quoting Mobil's statement that selection of a ship management company depends more on safety than on price, the article notes that Atlas had recently lost a ship in a fire accident, as if to suggest that some unstated reason other than safety must have been the real reason why Atlas was selected (Paragraphs 67, 68). In fact, the ship was in dry-dock at the time, outside Atlas' control. Thus, the article throughout implies that Mobil suffered from the Samarco-Atlas transaction--an assertion for which there is not a bit of evidence. In fact, Mobil benefited.
 
 
 282
 When read in the context of the article as a whole, the "set up" accusation could reasonably be read to suggest that William engineered the entire Mobil-Samarco-Atlas arrangement to benefit Peter. For example, the article comments that Mobil was originally not interested in participating in Samarco, but only later became interested (Paragraphs 50-51). The article then notes that Comnas, one of the negotiators sent by Mobil "to push Mobil as a partner" in Samarco, was also "recruited personally by Tavoulareas to advise Mobil on how to set up an independent shipping concern." (Paragraph 51). The article further states that Tavoulareas recommended to the Samarco partners that Comnas run the management arm of Samarco. Tavoulareas is then said to have "personally urged that his son become a partner in Atlas." (Paragraph 52). These details in the article could reasonably be read to imply that Mobil's entry into Samarco was motivated by Tavoulareas' intention that Comnas, who would negotiate the Saudi deal for Mobil, would later run Samarco's management arm and offer Peter a partnership in the company. The majority, failing to recognize that the decision to enter Samarco was contemporaneous with the decision to establish a separate company to manage Samarco's ships, strips away an integral part of the defamatory meaning surrounding the "set up" allegation.
 
 
 283
 The majority's cavalier rejection of the article's defamatory meaning that Tavoulareas engineered the entire Mobil-Samarco-Atlas arrangement for Peter's benefit as a "matter of law" is at odds with the McBride rule that a court's power to hold as a matter of law that a statement is not defamatory is limited to those occasions where the " 'publication is not reasonably capable of any defamatory meaning and cannot be understood in any defamatory sense.' " 717 F.2d at 1465 (citations omitted). Given evidence that the article was in fact "understood in [the] defamatory sense," McBride, 717 F.2d at 1465, that William Tavoulareas' nepotistic intent prompted Mobil's entry into the Samarco-Atlas arrangement, the majority's conclusion as a matter of law that the article does not, and cannot, bear the defamatory meaning that Tavoulareas "set up" the entire Mobil-Samarco-Atlas relationship to benefit Peter is all the more unjustifiable.
 
 
 284
 For example, Christine Peterson, a copy editor at the Post, reviewed the article prior to publication. She sent a memorandum to assignment editor Peter Milius, which stated:
 
 
 285
 I've read the Mobil story several times, and while I'm impressed with the amount of work the reporter obviously did, I'm still left with an overwhelming sense of So What? Is there any way to give this story of high-level nepotism a dollars-and-cents angle? Did Mobil's shareholders lose anything? Mobil's customers?
 
 
 286
 Parts of Tyler's case against Tavoulareas seem tenuous, and the whole--a $680,000-a-year plaything for an indulged son, at worst--just seems like a withered peanut in an 84"' gilded shell.
 
 
 287
 A far more interesting angle, it seems to me, is Mobil's concern about Saudi preference shipping--a concern so profound that it led to the formation of an entire dummy corporation. It's impossible to believe that Tavoulareas alone could put together such a scheme for the sake of his son's business career, or that he would want to.
 
 
 288
 (RE 2486) (emphasis added). This indicates that Peterson interpreted the article as a whole to charge that William engineered the entire Mobil-Samarco-Atlas transaction as "a scheme for the sake of [Peter's] business career."
 
 
 289
 Moreover, Post trial counsel in his closing argument to the jury positively and extensively interpreted the article in a similar manner:I suppose, ladies and gentlemen, when you get right down to it the thing that Mr. Tavoulareas most vigorously complains of is the term "set up" in the headline and the lead of the story.
 
 
 290
 Well, lend me your ears for two or three minutes and let's talk about the headline and the lead.
 
 
 291
 By now, I dare say it is clear to everybody in the courtroom that what happened was that Mr. Tavoulareas, seeing a good business reason to go into the Samarco venture, and seeing a good business reason to have an independent ship management firm run those ships, took advantage of those good business reasons to see to it that his son, Peter, was set up for the rest of his life. That is what he did, and the mechanism, the device by which this was done was setting up Atlas, putting Comnas in charge, but with Peter with him as a partner, and then in three or four months seeing to it that Comnas is out of the picture, leaving Peter in there as the major partner with Ares Emmanuel as a minor partner. That is what he did.
 
 
 292
 He did, as I understood Mr. Tavoulareas' testimony, while he wouldn't like the words that I used as to each event that took place in sequence, there is no real dispute these are the things that happened.
 
 
 293
 Samarco was set up. Atlas was set up. There was an Atlas/Samarco contract. Comnas and Peter took on the Atlas operation, and in April of 1975 Comnas was induced to resign. Remember those consulting contracts and the rest of it?
 
 
 294
 Now, the question is: How do you describe all of this? How do you describe it so that someone coming to it for the first time understood it? What words do you use to make it clear and to make it interesting to the newspaper reader?
 
 
 295
 And the words that Pat Tyler settled upon were not unusual words, words that people use all the time. The words were "set up."
 
 
 296
 ....
 
 
 297
 I submit to you, ladies and gentlemen, that ["set up"] is a perfectly accurate way of describing the facts of the relationships among William Tavoulareas, Peter Tavoulareas, Mobil, Samarco and Atlas.
 
 
 298
 (Tr. 4491-94) (emphasis added). Here Post counsel repeatedly characterizes the article as alleging that William intended, when he "took advantage" of the situation and "set up" Samarco, Atlas, and the Samarco-Atlas contract, to have Peter "set up for the rest of his life."[29] This is the Post 's interpretation of its own article and the theory of its defense at trial. The majority now ignores this interpretation. For the Post and the en banc majority to assert that the article is incapable of the interpretation given it by Post counsel at trial violates the rule that a party on appeal is bound by its theory of the case argued below. See, e.g., Alexander v. Town & Country Estates, 535 F.2d 1081, 1082 (8th Cir.1976); Empire Life Insurance Co. v. Valdak Corp., 468 F.2d 330, 334 (5th Cir.1972).
 
 
 299
 The majority deems that this evidence of how the article was interpreted is irrelevant to its consideration of the article's defamatory meaning. Maj. Op. at 781. In so concluding, however, the majority ignores the principle that "[t]he meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." Restatement (Second) of Torts Sec. 563 (1977). That Christine Peterson and Post trial counsel understood the article to charge William Tavoulareas with setting up Samarco and Atlas for Peter's benefit makes unsupportable the majority's discarding of this interpretation "as a matter of law."
 
 
 300
 In avoiding the article's defamatory implications, the majority charges the dissent with a "tortured attempt to discern some dark, hidden meaning in the 'tone' of the article." Maj. Op. at 781. The article's implication that William Tavoulareas' nepotistic intent prompted Mobil's entry into the Samarco-Atlas arrangement is not, as the majority asserts, "hidden." The interpretation of the article offered by the dissent is that which Patrick Tyler himself ascribed to the story. In a telephone conversation prior to publication of the article, Tyler said to Peter Tavoulareas:
 
 
 301
 I will tell you what I think. I have read the files and am more familiar with this than anyone. I think your father set up Atlas and Samarco and that ... [Peter interrupts].
 
 
 302
 (Tr. 4369). Tyler's belief that William Tavoulareas "set up Atlas and Samarco" for Peter's benefit surfaced in his article. See supra at 821-22. Moreover, Tyler interpreted the meaning of the news article in a memorandum to his Post superiors. Responding before publication to Christine Peterson's critical comments, Tyler wrote:
 
 
 303
 Mobil undertook some incredibly fancy corporate footwork in the wake of the embargo to apparently accomplish two things: ingratiate itself with the Saudis ... and set up the son of Mobil's president in a shipping business when business was bad and the business therefore stood little chance of prospering without Mobil's help.
 
 
 304
 * * *
 
 
 305
 * * *
 
 
 306
 Our story does show that Mobil's decisions in this case were not made for the traditional business reasons, or for the reasons stated by Mobil.
 
 
 307
 * * *
 
 
 308
 * * *
 
 
 309
 It should not seem impossible that Mobil--which originally turned down a chance to join Samarco--changed its mind [on joining Samarco] after it dawned on Mobil's president that such a partnership would justify the creation of a small management firm at a time when Tavoulareas' son was aspiring to such a career and was already at work with one of the Greek shippers. Samarco can be seen as nothing more complicated than a slight diversion from Mobil in the way it moved its crude oil from point A to point B.
 
 
 310
 The question of "why " Mobil's president would want to orchestrate such a diversion [to Samarco ] when it would benefit his son's business career is begging things a little.
 
 
 311
 (RE 2488-90) (emphasis added). Thus, in addition to the interpretation of the article by the Post editor Peterson and the Post trial attorney, Tyler himself interpreted his article as attributing Mobil's entry into Samarco to Tavoulareas' nepotistic intent "to benefit his son's business career ... after [that idea] dawned on Mobil's president." Id. The article, Tyler states, answers the basic subjective question " 'why' Mobil's president would want to orchestrate [the] diversion [of Mobil's shipping to Samarco]," and the answer the article provides is that William Tavoulareas intended "[to] benefit his son's business career...." Id. The majority refers to the attention devoted in the article to Mobil's legitimate business reasons for creating Samarco, but even Tyler in his memorandum recognizes that the discussion of valid business reasons in the article was meant to disparage: "[O]ur story does show that Mobil's decisions in this case were not made for the traditional business reasons, or for the reasons stated by Mobil" (RE 2489) (emphasis added).
 
 
 312
 Tyler's contemporaneous interpretation of the article he had written is powerful evidence that the article is best understood as implying that Mobil's entry into the Samarco-Atlas arrangement was prompted by William Tavoulareas' nepotistic intent--it is virtually dispositive evidence that the article could reasonably be so understood. Nevertheless, the en banc majority asserts that Tyler's memo is irrelevant because "[n]othing in law or common sense supports saddling a libel defendant with civil liability for a defamatory implication nowhere to be found in the article itself." Maj. Op. at 781.
 
 
 313
 Such a myopic conclusion, however, ignores the principle that "defamatory imputation may be made by innuendo." Restatement (Second) of Torts Sec. 563(c). See McBride, 717 F.2d at 1465; Sellers v. Time, Inc., 423 F.2d 887 (3rd Cir.), cert. denied, 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970); Marcone v. Penthouse International, 533 F.Supp. 353 (E.D.Pa.1982); Mihalik v. Duprey, 11 Mass.App. 602, 417 N.E.2d 1238, 1239 (1981); Thomson v. Cash, 119 N.H. 371, 402 A.2d 651, 654 (1979). Only by blinding itself to the defamatory implications Tyler himself ascribed to the article, and the clear innuendo of the article, can the majority conclude that the article did not charge Tavoulareas with setting up the Mobil-Samarco-Atlas scheme for Peter's benefit.[30] The majority's rejection of this defamatory interpretation as a matter of law rests on mere assertion and is contradicted by the article itself and the evidence referred to.[31]
 
 
 314
 The defamatory meaning that the en banc majority does recognize is in a narrowly construed "set up" charge. The majority characterizes the "set up" charge as a defamatory accusation "that Tavoulareas made it possible for Peter to become a partner in Atlas and then helped to ensure that the business would prosper because Peter was his son." Maj. Op. at 780.
 
 
 315
 Consistent with its strategy to interpret the defamatory meaning of the article in an unreasonably narrow manner, the en banc majority insists that the article's false defamatory statement that "Tavoulareas personally urged that his son be included as an equity partner in Atlas"[32] is unrelated to the "set up" allegation. Maj. Op. at 779 n. 17. The majority's isolation of the "personally urged" statement from the "set up" statement cannot be supported by the plain language of the article and illustrates the majority's refusal to consider the article as a whole.[33] In context, the two statements are part of the same allegation[34]--in the majority's words, that "Tavoulareas made it possible for Peter to become a partner in Atlas." Even if the "set up" allegation is divorced from the "personally urged" statement, however, there remains ample cause for a reasonable jury to find this narrowly construed "set up" allegation false.
 
 B. Falsity
 
 316
 To conclude that the "set up" charge is true, the majority claims reliance on "undisputed evidence of Tavoulareas' personal involvement in the establishment and operation of Atlas to Peter's manifest benefit." Maj. Op. at 786. The evidence upon which the majority relies, however, does not establish the truth of the "set up" charge as interpreted by the majority--i.e., that "Tavoulareas made it possible for Peter to become a partner in Atlas and then helped to ensure that the business would prosper because Peter was his son." Maj. Op. at 780. For example, the majority claims that "the undisputed fact that Tavoulareas personally recruited Comnas to manage Samarco's ships ... shortly after learning that Peter had an outstanding offer from Comnas goes far toward justifying the charge that Tavoulareas 'set up' his son in Atlas." Maj. Op. at 784 (emphasis in original).
 
 
 317
 In reaching this conclusion, however, the majority ignores the following crucial evidence:
 
 
 318
 Rawleigh Warner, Chairman of Mobil, testified that when Comnas came to New York in January 1974, seeking to charter a ship to Mobil, Warner remarked that "George Comnas would be an absolute natural" to manage the partnership's tankers in the event Mobil entered an agreement with the Saudis and Fairfield-Maxwell (Tr. 1515). Thus, by the time Tavoulareas and Walter MacDonald, then regional director of Mobil's Middle East Department, asked Comnas in the spring of 1974 whether he was interested in managing Samarco's ships (RE 2444), there was a consensus at Mobil with Warner's earlier observation that Comnas was a good choice for the task. The majority's assertion that Tavoulareas "personally recruited Comnas," Maj. Op. at 784 (emphasis in original), simply does not prove anything beyond the fact that Tavoulareas acted on Mobil's behalf when he later visited Comnas.[35]
 
 
 319
 Before Rawleigh Warner suggested Comnas as "an absolute natural" to manage the ships, he was fully informed by Tavoulareas that Comnas was going to ask Ares Emmanuel and Peter to come to work for him. Peter, however, had not accepted a position in Comnas' company. Aware that Comnas might try to curry favor with Mobil, Warner and Tavoulareas both talked to the chairman of Mobil's Conflict of Interest Committee about Peter's possible affiliation with a company that might be doing business with Samarco. An arrangement was set up that would avoid a conflict of interest if Peter decided to accept Comnas' offer (Tr. 1515-18).
 
 
 320
 . . William Tavoulareas counselled Peter against leaving Lemos to join Comnas' new company (Tr. 1297, RE 2426).
 
 
 321
 . Warner testified that "Tav did nothing personally to further the affairs of Peter in [Atlas]." (Tr. 1539).
 
 
 322
 Given the abundant evidence of Mobil's interest in an independent shipping concern to manage Samarco's ships, and in one headed by Comnas in particular, the fact that Tavoulareas asked Comnas if he was interested in managing Samarco's ships does not establish the truth of the charge that "Tavoulareas made it possible for Peter to become a partner in Atlas." Maj. Op. at 780. To the contrary, the evidence shows that Tavoulareas acted to carry out a decision made by Mobil for its benefit, and with great care to avoid possible conflicts of interest in the event that Peter, against his father's advice, decided to join Comnas. In sum, the evidence is far from undisputed and does not support the accusation that William Tavoulareas "made it possible for Peter to become a partner in Atlas."
 
 
 323
 The majority further attempts to support the truth of the "set up" allegation by citing evidence for the charge that Tavoulareas "helped to ensure that [Atlas] would prosper because Peter was his son." Maj. Op. at 780. Relying on evidence that Tavoulareas helped Atlas to "secure its management agreement with Samarco," Maj. Op. at 785, and to "survive [and] prosper after Comnas left," Maj. Op. at 786, the majority determines that the "set up" allegation is true. The majority, however, fails to acknowledge that due to Mobil's and Fairfield-Maxwell's possible conflicts of interest and the Saudi's inexperience in ship management, Mobil was soundly committed to having an independent company manage Samarco's ships (Tr. 1515, 1518). Moreover, it was in Mobil's interests for Atlas and Samarco to reach agreement quickly (Tr. 1311). Thus, to the extent Tavoulareas "helped Atlas secure its management agreement with Samarco," he was acting in Mobil's interests to implement a Mobil decision.
 
 
 324
 Furthermore, the majority mischaracterizes William Tavoulareas' involvement with Atlas. After Peter decided in July 1974 to join Comnas, William formally removed himself from decisionmaking regarding Atlas (Tr. 1521, 1525). Although the majority cites meetings between Tavoulareas and the Alirezas as evidence of the truth of the "set up" allegation, Maj. Op. at 785, these meetings were fully consistent with the decision of the Conflict of Interest Committee and Rawleigh Warner that "Tav could involve himself in activities up to the decision level but he could not make that decision" (Tr. 1521). Of course, as president of Mobil and its longtime expert on Saudi affairs, Tavoulareas' ability to carry out decisions made by the company was not required to be completely lost. He was free to negotiate on Mobil's behalf (Tr. 4159). The jury could reasonably have concluded that Tavoulareas' forthright communication to Mobil's Conflict of Interest Committee immediately after he first acquired knowledge of a possible conflict of interest, his formal removal from decisionmaking months later when Peter joined Comnas, and the absence of any evidence showing that William made any decisions regarding Atlas after formally removing himself, negated the charge that he was acting on Peter's behalf.
 
 
 325
 Finally, the majority offers Tavoulareas' involvement in the events surrounding Comnas' departure from Atlas as establishing the truth of the "set up" charge. Maj. Op. at 785-86. Again the majority refuses to recognize that Tavoulareas complied with Mobil's conflict of interest guidelines and did not make any decisions concerning Atlas and Samarco after Peter joined Comnas. Paul Wolfe testified that it was he who recommended to Mobil Chairman Rawleigh Warner (in the presence of William Tavoulareas) that Comnas be replaced (Tr. 1069, 1070, 1098, 1186). Warner in turn made the decision that, for justifiable reasons, Comnas should be removed from Atlas (Tr. 1070, 1326, 1531-34). The other Samarco partners were also dissatisfied with Comnas. See supra at 812-13. Moreover, Warner suggested that Tavoulareas meet with Comnas in London to express Mobil's disappointment in Comnas' performance (Tr. 1070, 1333). In London, Harmon Hoffmann and Walter MacDonald negotiated in the morning with Comnas over the terms for his departure from Atlas. Tavoulareas met with Comnas, Hoffmann, and MacDonald at lunch, but the morning's negotiations were not discussed (Tr. 3349). After reading the written agreement drafted by Hoffmann and MacDonald detailing the terms for Comnas' departure, Tavoulareas deferred the decision on the proposed contract "to top management in New York" (Tr. 1339). These facts establish that Tavoulareas made no decisions concerning Comnas' departure from Atlas.[36] Moreover, to the extent Tavoulareas was "involved in persuading the Alirezas to retain Atlas as Samarco's independent management firm upon Comnas' departure," Maj. Op. at 786, he was "involved" only to keep management of Samarco's ships independent--a result desired by high-ranking officials at Mobil (Tr. 3296, 3300-01).
 
 
 326
 Thus, the majority offers no evidence establishing the truth of the charge that "Tavoulareas made it possible for Peter to become a partner in Atlas and then helped to ensure that the business would prosper because Peter was his son." What the majority does submit is evidence that Mobil officials decided that it was in the best interests of Mobil that an independent company should manage Samarco's ships and that the best candidate for the job was a company headed by George Comnas. That Peter Tavoulareas might incidentally benefit from this arrangement because of his later association with Comnas was understood by Mobil officials but considered acceptable in light of William Tavoulareas' removal from decisionmaking regarding Atlas and Samarco. The majority torturously converts this evidence establishing that Mobil wanted Atlas to independently manage Samarco's ships into evidence proving William Tavoulareas "set up" Peter.
 
 
 327
 The majority has not explained why, in the face of overwhelming evidence that Mobil officials decided to have Atlas manage Samarco's ships, Tavoulareas' "personal involvement in the establishment and operation of Atlas," Maj. Op. at 786, should be interpreted to be for "Peter's manifest benefit." Id. Given the evidence that William Tavoulareas complied with Mobil's conflict of interest rules by removing himself from decisionmaking regarding Atlas and Samarco; that Mobil officials, independently of Tavoulareas, decided for good business reasons that Atlas should manage Samarco's ships, and continued to do so after Comnas departed; and that the benefit redounding to Peter from this arrangement was incidental and not engineered by William, a reasonable jury could find that the "set up" charge was false.[37] For the majority to conclude otherwise, while at the same time baldly asserting that it "considered all the evidence in the light most favorable to Tavoulareas," Maj. Op. at 776,[38] is baffling and unsupported. The majority simply fails to meet the standard for judgment n.o.v., for it has not persuasively demonstrated that "the evidence [for the "set up" charge], together with all inferences that can reasonably be drawn therefrom[,] is so one-sided [in favor of the Post] that reasonable men could not disagree on the verdict." Vander Zee v. Karabatsos, 589 F.2d 723, 726 (D.C.Cir.1978), cert. denied, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979).
 
 
 328
 Because the evidence in the record demonstrates that a jury could reasonably have concluded that the Post article was both defamatory and false,[39] the Post 's liability under present law depends upon whether the article was published with reckless disregard for its truth or falsity.
 
 
 329
 IV. RECKLESS DISREGARD FOR THE TRUTH--ACTUAL MALICE
 
 
 330
 As noted in part II above, the duty of an appellate court in reviewing a defamation verdict is to decide, after viewing the evidence and all legitimate inferences in the light most favorable to the verdict, whether the ultimate constitutional conclusion was sufficiently proven at trial--i.e., in this case whether the evidence adduced at trial amounted to "clear and convincing" proof of reckless disregard for the truth. Although the Post argues that evidence may not be cumulated to establish a defendant's reckless disregard for truth or falsity, The Washington Post Petition for Rehearing and Suggestion for Rehearing En Banc at 7, the majority admits that a defendant's reckless disregard for the truth can be proven both through direct evidence and through the cumulation of circumstantial evidence. Maj. Op. at 788-89. See Herbert v. Lando, 441 U.S. 153, 160, 99 S.Ct. 1635, 1640-41, 60 L.Ed.2d 115 (1979); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 55, 91 S.Ct. 1811, 1825, 29 L.Ed.2d 296 (1971); Bose Corp. v. Consumers Union of United States, 692 F.2d 189, 196 (1st Cir.1982), aff'd 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); Goldwater v. Ginzburg, 414 F.2d 324, 342 (2d Cir.1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970); see also Tavoulareas v. Piro, 763 F.2d 1472, 1477-78 (D.C.Cir.1985) (panel opinion denying rehearing). What follows is a discussion of the evidence of reckless disregard for the truth that was developed at trial, along with the reasonable inferences that could be drawn from it. Based thereon, it is submitted that the evidence adduced at trial constitutes clear and convincing proof that the Post article was published with reckless disregard of its truth or falsity, and that the jury's verdict should be reinstated.
 
 
 331
 A. The Christine Peterson Memorandum and Tyler's Response
 
 
 332
 Christine Peterson's memorandum to her superiors at the Post stated that Tyler's article was "impossible to believe." See supra at 822-23. At trial, during which Peterson was still in the Post 's employ, Peterson testified that in using the phrase "impossible to believe," she really did not mean what she said, and instead meant that "the focus of the story should have been the formation of Samarco in anticipation of preference shipping" (RE 1837).[40] Tavoulareas contends, on the other hand, that the memorandum is to be given its ordinary meaning and that the jury was entitled to find "that an editor of the Post charged with the final review of the story before publication had indeed found ... the story's theme 'impossible to believe' " and that Peterson's memorandum " 'brought home' the requisite doubt" to those Post officials responsible for the article's publication. Appellant's Brief at 35. Peterson's memorandum ultimately reached Milius, Bill Greider, who is another Post editor, and Tyler. Tyler's memorandum in response, see supra at 824, acknowledged that "a good editor might say that part of our case against Tavoulareas seems tenuous " (RE 2489) (emphasis added), yet no substantive changes were made to the article.
 
 
 333
 In considering all this evidence, our duty as an appellate court reviewing a jury's verdict is to view the legitimate inferences from the evidence in the light most favorable to the verdict. We are "required to draw all inferences favorable to the [verdict]," Carter v. Duncan-Huggins, Ltd., 727 F.2d 1225, 1234 (D.C.Cir.1984) (emphasis in original). The inferences to be credited are not a matter for our judgment except to assure that they are legitimate; only the ultimate constitutional issue may be independently assessed. Thus, as to the Peterson memorandum we are required to assume: (1) The jury considered Peterson's attempt to alter the obvious interpretation of her memorandum to be influenced by self-interest in her position at the Post and understood the memorandum to mean (what it said) that in her opinion the story was "impossible to believe," and (2) the reasonable effect of Peterson's communication of these doubts to those at the Post responsible for the publication was to raise in their minds subjective doubts as to the accuracy of the story. Indeed, the Peterson memorandum suggests that the central theme of the story is inherently improbable, and, as the Supreme Court stated in St. Amant v. Thompson, a jury may find actual malice where "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation." 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968) (emphasis added). Ultimately, it is for the appellate court to independently decide whether the legitimate inferences from all the evidence constitute clear and convincing proof of recklessness.
 
 
 334
 The en banc majority rejects the Peterson memorandum as evidence of actual malice, claiming that the plaintiffs did not connect Peterson's "impossible to believe" language to a false defamatory statement in the article.[41] The majority reads the memorandum as capable of either of two interpretations--that Peterson "found the story impossible to believe because the story states or suggests that Tavoulareas' primary motivation in establishing the entire Mobil-Samarco-Atlas arrangement was to benefit his son" or that Peterson could not believe "that Tavoulareas set up Peter in Atlas." Maj. Op. at 794. Having held that the article cannot bear the interpretation that Tavoulareas arranged the Mobil-Samarco-Atlas arrangement for Peter's benefit and having found the "set up" allegation to be true, the majority concludes that the Peterson memorandum provides no evidence of actual malice. Because it is submitted that the article can be read to falsely charge William Tavoulareas with using his office as president of Mobil to engineer the Mobil-Samarco-Atlas scheme for Peter's benefit, see supra at 820-26, and because in my opinion there is substantial evidence proving false even the allegation (as narrowly read by the majority) that Tavoulareas "set up" Peter, see supra at 826-29, I would hold that the "serious doubts" raised by the Peterson memorandum are connected to false and defamatory meanings present in the article.
 
 
 335
 Even if the majority is correct in rejecting the article's broader defamatory meaning as a matter of law and in holding the "set up" allegation true, its dismissal of the Peterson memorandum remains faulty. Although admitting the memorandum can be read to express Peterson's "disbelief that Tavoulareas 'set up' Peter," the majority makes no mention of the effect of the Peterson memorandum on the false defamatory statement that William Tavoulareas "personally urged" Comnas to make Peter a partner in Atlas. Certainly, if Peterson doubted the truth of the story's charge that Tavoulareas "set up" Peter, her doubts would encompass the "personally urged" allegation as well, since, as the majority recognizes, "the personally urged allegation goes beyond the general charge that Tavoulareas 'set up' his son and suggests that Tavoulareas actively pressured Comnas to hire Peter rather than merely rewarded Comnas for doing Peter a favor." Maj. Op. at 788.[42]
 
 
 336
 Thus, contrary to the majority's suggestions otherwise, there is no basis to disregard the "serious doubts" raised by the Peterson memorandum. The memorandum and Patrick Tyler's response admitting that "a good editor might say that part of our case against Tavolareas seems tenuous" therefore provide evidence that the Post acted with reckless disregard for truth or falsity in publishing the article.
 
 B. The Reliability of the Sources
 
 337
 The Supreme Court has held that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." St. Amant, 390 U.S. at 732, 88 S.Ct. at 1326. Considerable evidence was introduced at trial tending to show that Tyler had reason to doubt the veracity of the two principal sources he relied on for the article--Comnas and Piro.
 
 1. Comnas
 
 338
 Comnas, according to the Post, was the principal source for the story, as the chief source for both the "set up" allegation and the "personally urged" charge and other details recounted in the story. Conflicting evidence was introduced at trial regarding Comnas' reliability. On one hand, Piro testified he told Tyler that "George Comnas had been caught in some fraud involving Atlas, that he was forced to withdraw [from Atlas] and that if Comnas ever gave Peter and Atlas any trouble Comnas would be reported to the tax authorities" (RE 1857-58). See also supra at 812 n. 9. On the other hand, the Post contended that Comnas was reliable due to (1) his "Who's Who" listing, indicating that he was an experienced shipping executive; (2) William's SEC testimony, which "never hinted at any improprieties," and stated "that Mobil 'had every confidence in the world' in Comnas;" and (3) some independent corroboration of much of what Comnas told the Post. Again, the evidence suggests that the Post knew of facts suggesting that Comnas was an unreliable source. The Post 's failure to call him as a witness or to use his deposition, especially after listing him as a witness for trial, points to the glaring weakness of the Post 's defense.[43]
 
 
 339
 The majority opinion also places entirely too much emphasis on the fact that Tyler corroborated some of the information supplied by Comnas. Maj. Op. at 790.[44] Citing St. Amant for the proposition that verification of part of a source's information is indicative of a lack of actual malice, the majority concludes that the evidence in the record fails to show that Tyler acted recklessly in relying on Comnas. But the majority's reliance on St. Amant is misplaced. A distinguishing feature of St. Amant is that "there was no evidence in the record of [the source's] reputation for veracity." 390 U.S. at 733, 88 S.Ct. at 1326. But in the instant case, the defendants knew that Comnas was not trustworthy--Piro had told Tyler of previous fraudulent scandals in which Comnas was involved and Tyler knew that one of the reasons Comnas was dismissed from Atlas was because of fraudulent dealing.
 
 2. Piro
 
 340
 The evidence developed at trial regarding the Post 's reliance on Piro demonstrated that the Post was aware that Piro was engaged in a less-than-amicable divorce with William's daughter and that Piro was admittedly ignorant of the companies and the complicated business relationships involved in the Mobil-Samarco-Atlas arrangement (Tr. 2899, 2901, 2908, 2910). The latter fact alone would have been sufficient grounds for a reasonable reporter to question Piro's conclusions. Nevertheless, the Post, while denying it now, did rely on Piro for several parts of its story. Piro was solely responsible for two of the statements in the article: (1) that William "[gave] Peter a little nudge to get him along" in the shipping business,[45] and (2) that William "[personally] dispatched [Hoffmann] to help run Atlas."
 
 
 341
 At trial, the defendants testified that they really did not rely on Piro in writing the article, even though he was cited and quoted several times. Under the circumstances, the jury was entitled to disbelieve this testimony, especially in light of the fact that Piro was the sole source for the two statements above. In viewing this evidence in the light most favorable to the verdict, one can only conclude that the jury found that the Post, in relying on Piro, relied on a source admittedly unknowledgeable in the details of the business transactions for which he was quoted.
 
 
 342
 C. Defendants' State of Mind For Knowing or Reckless Falsehood
 
 
 343
 Because it provides a motive for knowing or reckless falsehood, evidence that a newspaper or a reporter followed a sensationalistic policy, or possessed ill-will toward the plaintiff, is evidence of actual malice. See, e.g., Curtis Publishing Co. v. Butts, 388 U.S. 130, 169, 87 S.Ct. 1975, 1998-99, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring) (defendant had adopted a "program of 'sophisticated muckraking,' designed to 'provoke people, make them mad' ") (footnote omitted); Goldwater v. Ginzburg, 414 F.2d 324, 342 (2d Cir.1969) ("evidence of ... motive and intent" may help establish actual malice), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970); Bose Corp. v. Consumers Union of United States, 692 F.2d 189, 196 (1st Cir.1982) (same), aff'd, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); Cochran v. Indianapolis Newspapers, 175 Ind.App. 548, 560, 372 N.E.2d 1211, 1220 (1978) (desire to "get" plaintiff is "relevant and admissible as evidence in the determination of whether defendant possessed a state of mind highly conducive to reckless disregard of falsity") (emphasis in original); R. Sack, supra, at 214 n. 168 ("Although common law actual malice--spite or ill-will--is not equivalent to or sufficient to prove constitutional 'actual malice,' evidence as to the former is admissible to prove the latter."). As the Supreme Court of West Virginia explained:
 
 
 344
 [W]hen [Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) ] and Curtis are read together, they still stand for the proposition that personal motives on the part of a newspaper, or participation by a newspaper in a plan or scheme to injure, is evidence of recklessness and willful disregard for truth which may be considered along with other evidence on the question of actual malice.
 
 
 345
 Sprouse v. Clay Communication, 158 W.Va. 427, 211 S.E.2d 674, 688, cert. denied, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975) (emphasis added). Cf. C. Mollenhoff, Investigative Reporting 358 (Macmillan Pub. Co. 1981).
 
 
 346
 In this case, there is abundant evidence in the record demonstrating defendants' state of mind for knowing or reckless falsehood.
 
 
 347
 1. Tyler's Desire to "Knock Off" Mobil and "Build a Case" against Tavoulareas
 
 
 348
 Immediately after he first heard Piro's story, Tyler seemingly accepted its truth and remarked to Golden: "It's not every day you knock off one of the seven sisters." (RE 789). Taking the evidence in the light most favorable to the plaintiff, this demonstrates an ambition at the very outset to "bring down" Mobil which could cause--and may properly be considered evidence tending to prove--a reckless disregard of the truth. The same antagonistic mind-set is reflected in Tyler's reference, in his memorandum responding to Peterson's criticism, to "our case against Tavoulareas" (RE 2489).
 
 
 349
 The majority is playing with words when it says that these statements merely reveal that Tyler had adopted "an adversarial stance," which is not indicative of reckless disregard of the truth. Taking an adversarial stance means treating someone like an opponent rather than impartially. While this may not conclusively demonstrate reckless disregard of the truth (any single piece of evidence rarely does), it unquestionably points in that direction. See Cochran v. Indianapolis Newspapers, 175 Ind.App. 548, 560, 372 N.E.2d 1211, 1220 (1978). An opponent is more likely to distort the facts than an impartial or objective reporter. I am surprised by the majority's refusal to acknowledge the probative character of this evidence, since even the Post did not contest its relevance at trial.
 
 
 350
 2. Tyler's Willingness to Resort to Unlawful Means
 
 
 351
 Tyler's desire to "bring down" Mobil and "make a case" against Tavoulareas is particularly strong evidence of reckless disregard for truth or falsity when it is combined with evidence of Tyler's willingness to use unethical, and indeed unlawful, means to achieve his ends. Taking the evidence in the light most favorable to plaintiffs, we must assume that Tyler inquired of Piro, with serious intent, whether Piro "knew of a family member who would rifle [Tavoulareas'] safe and [x]erox documents" (Tr. 179). Tyler's willingness to resort to such felonious methods is consistent with a state of mind that would act recklessly in stretching the facts to "make a case."
 
 3. The Post's Pressure On Its Reporters
 
 352
 One of the three issues the en banc court requested the parties to brief was "[w]hether managerial pressure upon reporters to produce sensationalistic stories is a factor that may be considered in the determination of actual malice?" The majority, apparently unconcerned by the fact that counsel for the Post conceded that evidence of such pressure was "relevant," see Transcript of Oral Argument at 28-29 (October 3, 1985), concludes to the contrary. The majority does not dispute that Woodward instructed his reporters to produce "holy shit" stories--presumably stories so startling that they cause the reader to exclaim in this fashion. The majority attempts to discredit this evidence by replying that it does not indicate that the Post was unconcerned with the truth of its stories. Quite so, but totally irrelevant. The issue is not whether the Post subjectively desired false stories but whether extra-heavy pressure to produce sensationalistic stories could motivate reporters to stretch the truth. Of course it could, as any reasonable person, including the Post itself,[46] would agree. As the court reasoned in Curtis Publishing Co. v. Butts:
 
 
 353
 The Saturday Evening Post was anxious to change its image by instituting a policy of "sophisticated muckraking," and the pressure to produce a successful expose might have induced a stretching of standards. In short, the evidence is ample to support a finding of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.
 
 
 354
 388 U.S. at 158, 87 S.Ct. at 1993 (emphasis added). See also id. at 162, 169, 87 S.Ct. at 1995, 1998-99 (Warren, C.J. concurring).[47]
 
 
 355
 As to the effect of the Post 's pressure, that was for the jury to weigh. It is of course not inevitable that extreme pressure for sensationalistic stories will lead to distortion of the truth. And I cannot imagine that such pressure alone, without more, would support a finding of actual malice.[48] But pressure of a certain degree, as in Butts, can assuredly be probative--and whether the pressure existed, whether it was excessive, and whether it affected the reporting or editorial judgment, are, within the bounds of what the evidence will sustain, questions for the jury. Faced with a choice between conflicting reasonable inferences that can be drawn from the evidence, we as a reviewing court are required to draw the legitimate inferences favorable to the jury's verdict and then independently review the constitutional sufficiency of such facts. On that basis, it can only be concluded that the "holy shit" exhortation is some evidence of the reckless publication of the defamatory falsehoods against Tavoulareas.
 
 
 356
 D. Erroneous Recording of Interviewees' Statements
 
 
 357
 The record reveals that Tyler misstated in his notes and in the article responses by individuals whom he interviewed. For example, Tyler called Everett Checket, a Mobil vice-president, to inquire whether William Tavoulareas told Checket that he had sent Hoffmann to Atlas. Tyler wrote in his notes that Checket said the conversation sounded "somewhat familiar" (RE 2493). Checket testified, however, that he did not tell Tyler that the conversation sounded familiar. Indeed, Checket denied that the conversation ever occurred (Tr. 1844-48). The jury could reasonably have concluded from this evidence that Tyler either carelessly or intentionally misstated the contents of his interview with Checket.
 
 
 358
 There is also evidence that Tyler failed to record accurately the statements of Peter Tavoulareas. Peter's notes of his conversation with Tyler show that Peter stated "[a ]side from our management we have nothing to do with the Arabs or with Mobil" (RE 2550) (emphasis added). Tyler wrote in his notes "nothing to do with Samarco, nothing to do with Mobil" (RE 2518) and quoted Peter in the article as stating "Atlas has nothing to do with Mobil, it has nothing to do with Samarco and it has nothing to do with the Saudis" (Paragraph 33).[49] Again, a reasonable jury could determine from this that Tyler either accidently or deliberately misconstrued Peter's statements.
 
 
 359
 Thus, the record supports a conclusion that, at best, Tyler was negligent in erroneously recording the contents of interviews. Although evidence of negligence does not alone support a finding of actual malice, such evidence can be probative of a reckless disregard for truth or falsity. Bose Corp. v. Consumers Union, 692 F.2d 189, 196 (1st Cir.1982), aff'd 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); Goldwater v. Ginzburg, 414 F.2d 324, 343 (2d Cir.1969) ("[New York Times v. Sullivan ] does not hold that evidence of negligence is inadmissible"), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970).
 
 
 360
 E. Resolution of Inferences Adverse to the Plaintiff
 
 
 361
 It is well settled that in a situation where the facts are ambiguous, the mere selection of the most damaging inference by the reporter does not, alone, indicate reckless disregard for the truth. In Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), the Court held that Time magazine's resolution of one such ambiguity in the light most damaging to the plaintiff did not amount to actual malice:
 
 
 362
 Time's omission of the word "alleged" amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under New York Times.
 
 
 363
 Id. at 290, 91 S.Ct. at 639. This holding makes obvious sense; since the focus of the malice inquiry is subjective, not objective, the mere selection of a single damaging inference is ordinarily not sufficient to prove actual malice.
 
 
 364
 The defendants argue from Pape that the consistent selection of the inferences most damaging to the Tavoulareases would be irrelevant to the issue of actual malice. Appellee's Brief at 62. This assertion, however, is entirely inconsistent with the subjective nature of the malice inquiry and goes far beyond the holding in Pape. A defendant's single, or even occasional, selection of the most disparaging inference from among a number of possibilities is not evidence that it acted with malice. But a defendant's consistent rejection of favorable inferences in favor of the most damaging inferences--inferences that in fact are false--does suggest a determination to incorrectly describe the plaintiff and place him in the most damaging light, and thus can demonstrate a reckless disregard for the truth.[50]
 
 
 365
 In this article the Post did not simply resolve a single ambiguity adversely to Tavoulareas. In building its "case against Tavoulareas," it resolved practically all ambiguities against him, consistently accepting the most damaging statements from obviously biased and impeachable sources. It is absurd to suggest, as the majority does, Maj. Op. at 797, that this is not a basis for an inference of reckless disregard for the truth.
 
 
 366
 F. Suppression of Information Favorable to the Plaintiff
 
 
 367
 Evidence demonstrating the suppression of information favorable to the plaintiffs is closely related to evidence of the adoption of inferences adverse to the plaintiffs. Clearly, a writer who knowingly and consistently suppresses information favorable to the plaintiffs is more likely to have entertained subjective doubts as to the accuracy of his story. See, e.g., Time, Inc. v. Ragano, 427 F.2d 219, 221 (5th Cir.1970) (failure to include fact that plaintiff was attorney is evidence of actual malice when implication of article would lead people to believe he was organized crime figure); Wasserman v. Time, Inc., 424 F.2d 920, 922 (D.C.Cir.) (same), cert. denied, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970); Montandon v. Triangle Publications, Inc., 45 Cal.App.3d 938, 943-44, 120 Cal.Rptr. 186, 189 (omission of key fact in otherwise truthful statement held evidence of reckless disregard of truth), cert. denied, 423 U.S. 893, 96 S.Ct. 193, 46 L.Ed.2d 126 (1975); Indianapolis Newspapers v. Fields, 254 Ind. 219, 259 N.E.2d 651, 662 (time discrepancy known to reporter and witnesses' repudiation of key fact mentioned only once during series of articles held evidence of actual malice), cert. denied, 400 U.S. 930, 91 S.Ct. 187, 27 L.Ed.2d 190 (1970).
 
 
 368
 Evidence abounds in this record showing that the Post suppressed information favorable to the Tavoulareases. The district court examined several of these pieces of information which were known to Tyler but which were not included in the story:
 
 
 369
 1. Lewis Lapham, an outside director of Mobil, told Tyler that the Mobil board had "consistently reviewed the relationship between Mobil and Atlas and ... was completely satisfied with all aspects of it." 567 F.Supp. at 658 (emphasis added).
 
 
 370
 2. Lapham told Tyler "that he did not believe that plaintiff [William Tavoulareas] played a personal role in Atlas and that at key board meetings plaintiff would leave the room to facilitate the opportunity for more open discussion of the subject." Id.
 
 
 371
 3. There was considerable evidence that "Mobil profited significantly from [the Samarco-Atlas] relationship and that Atlas was not merely a fly-by-night organization set up solely for Peter's benefit." Id. at 659. Both John Kousi, a Samarco director, and Comnas, the defendants' main source for the Post article, told Tyler that Atlas could run Mobil's ships more cheaply than the oil company could.
 
 
 372
 Early drafts of the story did contain some of this information, but it was eliminated from the final version during the editing process. One early draft, for example, stated:
 
 
 373
 During these briefings [on Atlas-Samarco dealings] by Warner, Lapham said, Tavoulareas would leave the room. Lapham said he still believes Warner's account of events and rejects any suggestion that Tavoulareas took a personal role in Atlas.
 
 
 374
 "There's nothing to any of that," Lapham said. "It was explained to the satisfaction of the board."
 
 
 375
 (RE 2528). The defendants argue that while Lapham's specific words were cut out, the point he made was not. But proof of the point was placed on weaker grounds. As a substitute for Lapham's specific statement that Tavoulareas went so far as to leave the room during board discussions of Atlas, and his assurance that there was "nothing to [the suggestion that Tavoulareas took a personal role in Atlas]," the defendants point to the following passage from the article:
 
 
 376
 Mobil chairman Warner says he assured directors in board meetings that Tavoulareas "does not participate in any decisions" relating to Mobil's business with Atlas.
 
 
 377
 Thus, the article substituted an "assurance" by Warner (an inside director) for a more concrete and expansive statement by Lapham (an outside director)--a substitution that considerably weakens the point, particularly when an underlying theme of the Post article was that Tavoulareas' mere position as president constituted internal corporate influence that implicitly affected the Atlas operation.
 
 
 378
 Next, in place of Lapham's direct statement that the Mobil board "was completely satisfied" with the Samarco-Atlas relationship, the article stated:
 
 
 379
 The Mobil board of directors was told from the outset about the Atlas arrangement but was assured that company president Tavoulareas was not involved in his son's venture in any way.
 
 
 380
 Thus, instead of a direct assertion of an unimpeached outside director that the Board had investigated and was "completely satisfied," the article states merely that the directors were simply "assured" by an unidentified "someone" that there was no impropriety. This grossly understates the force of the information provided by Lapham and operates to the disadvantage of Tavoulareas. Lapham's statements that the Board had "consistently reviewed" the Atlas arrangements and that he was convinced that William Tavoulareas had played no personal role in Atlas were simply ignored and never printed.
 
 
 381
 The Post article also disregarded other evidence in its possession that tended to describe the arrangement in a light more favorable to the plaintiffs and to Mobil. In evaluating the economic impact of the arrangement, for example, the Post ignored the information supplied by Kousi (whose favorable comments were deleted during the editing process) and even the comment furnished by its principal source, Comnas, that the Atlas arrangement saved Mobil money (RE 2501). The defendants alluded instead to "millions of dollars in business" and "exclusive, no-bid contracts," which strongly implied that Mobil was being greatly exploited and gouged by an irregular arrangement in which Tavoulareas had "set up" his son. Similarly, the story failed to include or refer to two internal Mobil memoranda prepared at the time the Samarco-Atlas arrangement was created and which Tyler had in his possession. One memorandum instructed Mobil personnel that all business dealings with Atlas were to be conducted at "arm's length; " the other, written by William Tavoulareas, specifically directed Vice-President Wolfe to bypass Tavoulareas and report directly to Chairman Warner on any Samarco-Atlas matters.
 
 
 382
 From this evidence, two reasonable conflicting factual inferences could be drawn--i.e., that Mobil was being gouged or that the Samarco-Atlas venture was financially beneficial to Mobil. But we are required to draw the legitimate inferences most favorable to the verdict. This evidence of the suppression of information favorable to the plaintiffs was directly probative of Tyler's reckless disregard for the truth or falsity of the article.
 
 G. Conclusion
 
 383
 The evidence in the record viewed in the light most favorable to the verdict establishes the following:
 
 
 384
 . Subjective doubts regarding the article's truth were entertained by one person responsible for the publication (Peterson) and were brought by her to the attention of others responsible for the publication, who proceeded in disregard of her cautionary memorandum.
 
 
 385
 . The article relied on patently unreliable sources for its central allegations.
 
 
 386
 . Tyler wanted to "bring down" Mobil and "make a case" against Tavoulareas.
 
 
 387
 . Tyler was willing to resort to unethical, and indeed unlawful, means for that purpose.
 
 
 388
 . The reporting and editorial judgments made in connection with the article were affected by heavy managerial pressure to produce sensationalistic stories.
 
 
 389
 . Tyler either negligently or deliberately misstated remarks made by interviewees.
 
 
 390
 . The article regularly drew inferences adverse to the Tavoulareases where favorable inferences were equally available and justifiable.
 
 
 391
 . The article suppressed important information favorable to the Tavoulareases.
 
 
 392
 In my view, this evidence establishes clearly and convincingly that the false statements and implications in the subject article were put forth with reckless disregard for their truth or falsity. The fact that Tyler faced no deadline pressure, and thus had plenty of time to reflect upon the story's implausibility and conduct further investigation, buttresses this conclusion.
 
 
 393
 The affirmative indications of good faith introduced by the defendants (which, under j.n.o.v. standards must be regarded in the least favorable light) are insubstantial and do not alter the conclusion. Primary among these is the fact that Tyler devoted a considerable amount of research to the story, working on it over a thirty-day period. Extensive efforts to get at the truth can be persuasive of good faith in some circumstances, but not when, as discussed above, the products of those efforts favorable to the plaintiff are systematically disregarded or excluded from the story, and adverse inferences systematically drawn. When such distortion of research appears, protracted investigation evidences only a dogged and thorough attempt to "get" the subject.
 
 
 394
 The systematic suppression of favorable evidence likewise reduces to insignificance the potential probative effect of the defendants' attempts to interview William Tavoulareas. The defendants were already aware that Tavoulareas had denied the substance of the charges, and there is no reason to believe that his exculpating statements with regard to any of the details would have been treated any more sympathetically than the exculpating statements Tyler received from more impartial sources such as Lapham--which, as we have seen above, were suppressed or altered. The Post did at least record Tavoulareas' denial. The proof of malice would have been even more clear and convincing if the Post had not done so, but that minimal concession to fairness falls far short of redeeming a pattern of behavior that displays, clearly and convincingly, a reckless disregard for truth or falsity.
 
 
 395
 Chief Judge Wald asserts that the foregoing analysis does not constitute an independent review of the evidence of actual malice. Concurring Op. at 805-06. To the contrary, the review employed here conforms with recent Supreme Court pronouncements on actual malice, which stress that "[t]he independent review function is not equivalent to a 'de novo ' review of the ultimate judgment itself," Bose Corp. v. Consumers Union of the United States, 466 U.S. 485, 514 n. 31, 104 S.Ct. 1949, 1967 n. 31, 80 L.Ed.2d 502 (1984) and that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson v. Liberty Lobby, --- U.S. ----, ----, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Judge Wald's proposal that the court "independently review inferences that the jury may be presumed to have drawn," Concurring Op. at 805 contradicts the Supreme Court's recent reaffirmation in Anderson that even when actual malice must be established (with clear and convincing proof), the drawing of legitimate inferences remains the function of the jury. Id. Independent review instead necessitates that the court evaluate the sufficiency of the facts in the record and the legitimacy of the inferences necessarily drawn by the jury from those facts in assessing whether the constitutional requirement of clear and convincing evidence of actual malice has been met. In such manner, the reviewing court respects both the right to jury trial under the Seventh Amendment[51] and the protections afforded the press by the First Amendment.
 
 
 396
 The foregoing independent assessment of "those portions of the record which relate to the actual-malice determination," Bose, 466 U.S. at 514 n. 31, 104 S.Ct. at 1967 n. 31, leads to the conclusion that the facts and the reasonable inferences drawn therefrom constitute clear and convincing proof that The Washington Post acted with actual malice when it published the November 30, 1979 article. The jury's verdict should thus stand.
 
 V. PIRO
 
 397
 The plaintiffs sued Dr. Piro for slander and its foreseeable republication with respect to, among other things, his statement that William had "set up" Peter as a partner in Atlas. Complaint, Tavoulareas v. Piro, Civ. No. 80-2387 (D.D.C. Sept. 19, 1980) (RE 89, 90). The jury returned a verdict in favor of both plaintiffs, but the district court granted judgment n.o.v. in favor of Piro against William (although the court affirmed the jury verdict in favor of Peter). From the analysis set forth above, it is clear that a jury in William's case could reasonably have found that this allegation by Piro was false and defamatory. The question then is whether it was uttered with reckless disregard for its truth or falsity.[52]
 
 
 398
 At trial and in his brief to this court, Piro admitted that he did not comprehend the details of the business arrangements involving Mobil, Samarco and Atlas. See Brief for Appellee Piro at 10; Piro's testimony at Tr. 2899-2928. Indeed, he testified that he had "never heard of Samarco" (Tr. 2899). Since knowledge of those details was obviously crucial to the judgment whether William Tavoulareas breached his fiduciary obligation, Piro's acknowledgment of ignorance was tantamount to an admission that in making that charge he acted recklessly. When that is combined with Piro's hostility to the Tavoulareases resulting from his pending divorce, there was clear and convincing proof of Piro's reckless disregard for truth or falsity.
 
 VI. CONCLUSION
 
 399
 Great national issues are raised by the methods the majority employs to justify its reversal of the jury verdict in this case. By distorting the standards for applying j.n.o.v., the majority produces an opinion based on truncated facts and incomplete law. The outlandish refusal of the majority to consider the article as a whole surfaces throughout its discussion of defamatory meaning, falsity and actual malice. The majority goes to great lengths to avoid imposition of any liability on the Post--it whittles down the defamatory meaning of the article, stacks selective facts in an attempt to establish the truth of a stripped-down version of the "set up" charge and fails to acknowledge the clear and convincing evidence that the Post published the article with reckless disregard for its truth or falsity. In what it terms an "independent examination of the whole record," the majority ignores very substantial amounts of testimony by credible witnesses, disregards facts contradicting its conclusion and in effect substitutes its own factual determinations for those obviously found by the jury. Such methods greatly exceed a court's proper role in independently reviewing libel judgments under the First Amendment. If the majority's analysis is to be upheld in the name of "independent review," the Seventh Amendment right to a jury trial and reexamination of facts according to the rules of the common law will be obliterated. Is such evasive analysis to be upheld as the standard for the future?
 
 
 400
 The proper course for a reviewing court is to defer to the jury's factual findings and credibility determinations and reevaluate only the legitimacy of the inferences the jury necessarily drew in finding actual malice. The court then must determine whether the facts and reasonable inferences therefrom amount to clear and convincing evidence of reckless disregard for truth or falsity. This is the independent review required by Bose and the independent review conducted by this opinion. The jury's verdict should be reinstated.[53] I therefore respectfully dissent.
 
 
 
 *
 Judge Scalia joined in the panel opinion and participated in the argument and conference en banc. He subsequently became a Justice of the Supreme Court and as such, is not authorized to continue participation in an en banc case. See 28 U.S.C. Sec. 46(c)
 
 
 **
 This listing of judges reflects only those active and senior circuit judges who were members of the Court eligible to sit and not recused at the time these cases were argued before the Court, sitting en banc. Judges Buckley and Williams participated in the consideration of a suggestion by appellant for further rehearing en banc, which the court denied by order dated November 12, 1986. Judges Bork and Silberman have not participated in any aspect of this case
 
 
 [1]
 The group also included an inactive member, Crown Prince Fahd's son, Mohammed
 
 
 [2]
 We observe, however, that this belief was not universally shared. John Kousi, a lawyer who served as a Fairfield-Maxwell executive and as a director of Samarco, called it a "phony argument," and stated that Mobil had the same access to inexpensive Greek crews and the like as Atlas. Transcript (Tr.) at 3081
 
 
 [3]
 Tavoulareas had arranged for Peter to receive training from Mobil for a short period prior to beginning his duties at Lemos
 
 
 [4]
 Peter was given a 25 percent share in Atlas when he joined and that interest was increased to 38 percent a few months later. Emmanuel received a five percent share
 
 
 [5]
 At trial, however, Mr. Warner explained the policy somewhat differently: "[W]e then isolated Tav from the decisionmaking. Tav could involve himself in activities up to the decision level but he could not make that decision...." Record Excerpts (RE) at 1464; see also Tr. at 1553-55, 4136, 4161-62
 
 
 [6]
 Peter's and Emmanuel's testimony at trial strongly suggested that they offered (or intended to offer) Hoffmann a minority equity interest in Atlas. Peter testified that 25 percent of Atlas' equity "was to be used to bring in people like Hoffman." Tr. at 2602-03. Emmanuel testified that Peter and he "offered Harmon Hoffmann a permanent position ... and also an equity participation in our company." Tr. at 2272 (emphasis added). Tavoulareas himself indicated at trial that Atlas became Emmanuel's and Peter's company upon Comnas' departure, Tr. at 1835, but he also testified that Hoffmann had been offered Comnas' share of Atlas stock, Tr. at 4151; see also RE at 2436. At any rate, it is undisputed that Hoffmann rejected any offer to become a part owner of Atlas and returned to Mobil after six months. Tr. at 2273; see also RE at 2345 ("We [at Mobil] made H.F. Hoffmann ... available as an interim manager of Atlas.") (emphasis added)
 
 
 [7]
 Later, when Golden's inquiries threatened to interfere with the development of the Post story, Tyler offered Golden credit as a "special correspondent" if Golden would forego his independent activities. Golden accepted, but took no further part in reporting or preparing the Post story. Because of Golden's limited involvement in the ultimate publication, the original panel in this case affirmed the j.n.o.v. for Golden. 759 F.2d at 136-37, 165. The panel's opinion with respect to Golden was upheld by this court en banc. 763 F.2d at 1481
 
 
 [8]
 Post Chairman of the Board Katherine Graham was also named in the complaint, but the District Court dismissed her from the action prior to trial, and the plaintiffs did not contest that ruling
 
 
 [9]
 Cf. Hutchinson v. Proxmire, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) (noting that Hutchison, held to be a private figure, never participated in debate about public expenditures); Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 168, 99 S.Ct. 2701, 2707-08, 61 L.Ed.2d 450 (1979) (noting that Wolston, a private figure, never participated in debate about Soviet espionage)
 
 
 [10]
 Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976)
 
 
 [11]
 According to Tavoulareas, anonymous notes concerning Samarco and Atlas had been circulated to journalists and government officials. Tr. at 1344-46
 
 
 [12]
 Tavoulareas believed that Mobil was under no legal obligation to disclose this information. Tr. at 1882-83; cf. Firestone, 424 U.S. at 455, 96 S.Ct. at 966
 
 
 [13]
 Admittedly, the Post was the first general circulation publication to discuss the most controversial aspect of the Mobil-Samarco-Atlas deal--Peter's participation. We recognize that publications cannot "create their own defense by making the claimant a public figure," Hutchinson, 443 U.S. at 135, 99 S.Ct. at 2688, and that everything that is "newsworthy" is not necessarily a public controversy, Wolston, 443 U.S. at 167, 99 S.Ct. at 2707. But no precedent requires that the first newspaper to report on a pre-existing public dispute be held more strictly liable than less resourceful periodicals that hold back and follow its lead. We decline to create such a precedent, which has nothing in law or logic to commend it
 
 
 [14]
 The law of the District of Columbia prescribes substantially the same standard for granting a motion for judgment notwithstanding the verdict. See, e.g., Washington Welfare Ass'n v. Poindexter, 479 A.2d 313, 315 (D.C.1984)
 
 
 [15]
 We note preliminarily that, in his testimony at trial, Tavoulareas indicated that the "set up" allegation was defamatory and false because it wrongly suggested that his admitted involvement in Atlas matters was improper. Tr. at 4235-39, 5158-62; see also Brief for Appellant at 4. He testified, and the jury reasonably could have found, that Mobil's conflict of interest rules permitted Tavoulareas to "make recommendations" and "negotiate" regarding Atlas so long as he abstained from "mak[ing] decisions." Tr. at 4136, 4162. But, regardless of whether Tavoulareas' conduct squared with Mobil's ethical norms at the time, the First Amendment grants the Post the absolute right to express its opinion about the propriety of Tavoulareas' involvement in Atlas' matters. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40, 94 S.Ct. 2997, 3006-07, 41 L.Ed.2d 789 (1973); Ollman v. Evans, 750 F.2d 970, 974-75 (D.C.Cir.1984) (en banc), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985)
 
 
 [16]
 The Post contends that Tavoulareas' "complaint did not allege such an implication, [that] no such implication was before the jury, and this Court should therefore disregard it." Brief for Appellee at 49. We need not dwell on this threshold argument in light of our conclusion, as discussed below, that the proffered interpretation is unreasonable as a matter of law
 The dissent would go even further and advance a different defamatory meaning, namely that "Tavoulareas misused Mobil assets and his position as president to advance Peter in Atlas." Dissent at 819. To a point, this position seems but a reformulation of Tavoulareas' charge that the article is properly interpreted as suggesting Tavoulareas "set up" the entire arrangement for Peter, a charge necessarily implicating a misuse of corporate assets.
 But beyond this, the dissent now appears to be suggesting that the article alleges a breach of fiduciary duty and misuse of corporate assets even accepting that the "set up" charge is limited to setting up Peter in Atlas. See Dissent at 820 n. 27 (characterizing "entire arrangement" as "separately defamatory"). This reading is infected with several fatal problems. For one, this view, which the dissent trumpets as the "central defamatory meaning" of the article, has not been pressed on appeal by Tavoulareas. Rather, as we have noted in text, Tavoulareas urges the "entire arrangement" view. We should have thought it beyond peradventure that an appellate court in a defamation action should refrain from embracing a defamatory interpretation of the underlying article that has not been pursued by the allegedly defamed individual. But even if we address the merits of this argument, we both doubt the plausibility of the new interpretation and, more importantly, quite frankly fail to see what it adds. As to plausibility, we point to the Peterson memorandum, which the dissent champions as a strong, if not definitive, statement of the article's "true" meaning. Peterson, it will be recalled, complained that the story lacked "a dollar-and-cents angle" and asked if "Mobil's shareholders los[t] anything." RE at 2486. Thus, Peterson certainly missed what the dissent views as the article's "central defamatory theme."
 Moreover, characterizing Tavoulareas' underlying conduct as misuse of corporate assets, as the dissent would have us do, rather than as nepotism, would seem to change nothing. Both labels refer to the same nucleus of alleged facts, and, as we hold below, those facts are true. Tavoulareas did "set up" Peter in Atlas, and whether one characterizes his activities toward that end as misuse of corporate assets or nepotism is of no consequence. Indeed, the passage of the original panel opinion quoted by the dissent equates misuse of assets with nepotism. See Dissent at 820 n. 27 (quoting 759 F.2d at 111). As far as we can discern, the dissent's real complaint is that Tavoulareas' actions, although nepotistic, were taken with the intent to benefit Mobil and therefore were not an abuse of corporate position. See Dissent at 819 n. 23. But as we have already noted, the Post has the absolute right to express its opinion on the propriety of Tavoulareas' involvement in Atlas' affairs. See supra note 15. Accordingly, because we find no independent substance to the dissent's "central defamatory meaning," we will treat this case as it has been litigated by the parties, see Brief of Appellant at 26; Brief of Appellees at 49-51, namely, that the alleged wrongdoing lay in engineering the entire corporate arrangement for Peter's benefit. Therefore, to the extent that specific items from the record are employed by the dissent to buttress its "central defamatory meaning" theory, we will treat them as if they were employed to support Tavoulareas' theory of the case.
 
 
 [17]
 We similarly reject Tavoulareas' other interpretation of the "set up" allegation. Specifically, he claims that "[t]he article was quite explicit about what it meant by the 'set up' charge--that plaintiff had personally urged Comnas to bring in his son." Reply Brief for Appellant at 13 n. 12; see Brief for Appellant at 20. Tavoulareas fails to explain why a reasonable reader would conflate the "set up" allegation with the "personally urged" allegation also contained in the article. The phrase "set up" appears as the key language in both the story's headline and lead sentence; it succinctly expresses the nepotism theme contained in the entire article. In contrast, the "personally urged" allegation first makes its appearance well into the article, in the twenty-third paragraph, along with a number of other factual allegations supporting the general averment that Tavoulareas "was involved personally in several key decisions and actions relating to Atlas." p 20. The article expressly relates--indeed in the very next sentence--that the "personally urged" allegation was denied by Tavoulareas, whereas all the other supporting facts were reported as undisputed. Moreover, Tavoulareas concedes that the truth of the nepotism charge does not depend on whether he had expressly asked Comnas to take Peter in as a partner in Atlas. Tavoulareas and his witnesses testified at trial that his position as president and chief operating officer of Mobil may have inspired Comnas to offer Peter a position in Atlas in the hope that such a favor might secure business from Mobil. See Tr. at 1295-96, 1455, 1516, 1648; cf. Brief for Appellant at 20. It would be unreasonable, we believe, for a reader to mistake the story's central and unequivocal "set up" allegation for the secondary and expressly equivocal allegation that Tavoulareas "personally urged" Comnas to hire Peter
 The dissent suggests that we have embraced a "divide and conquer" strategy in this respect, urging in particular that the "personally urged" statement may have been published with actual malice. Dissent at 825-26 & n. 33. For the reasons already stated, we find it impossible under the circumstances here to conclude that, even if false, the statement was published with actual malice where, among other things, Tavoulareas' denial of the charge appeared in the very next sentence. Under the well-settled standards described in the text, see infra pp. 789-90, this statement falls woefully short of the daunting requirements of actual malice.
 
 
 [18]
 See also p 4 (Mobil "provided Atlas with office space"); p 5 (Mobil "creat[ed] work for Atlas at a time when the shipping industry was severely depressed"); p 79 (Tavoulareas "intervened" in Atlas after Comnas and Peter had disputes); p 82 ("Tavoulareas dispatched one of his senior shipping executives, Herman [sic] F. Hoffmann, to London to help run Atlas")
 
 
 [19]
 See Washington Post v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 448, 63 L.Ed. 987 (1919) ("A publication claimed to be defamatory must be read and construed in the sense in which the reader to whom it is addressed would ordinarily understand it."); W.P. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on The Law of Torts, Sec. 111, at 780, 782-83 (5th ed. 1984) ("No mere claim of the plaintiff can add a defamatory meaning where none is apparent from the publication itself ... and it remains a question for the court whether the meaning claimed might reasonably be conveyed.") (footnote omitted); L. Eldredge, The Law of Defamation, Sec. 9, at 4-45 (1978)
 
 
 [20]
 The article itself repeatedly refers only to Atlas when discussing Tavoulareas' role: "provide[ ] Atlas with office space," p 4; "create work for Atlas at a time when the shipping industry was severely depressed," p 5; "force[ ] the resignation in 1975 of ... Comnas, who had been recruited a year earlier by Tavoulareas to set up Atlas," p 24; "Tavoulareas dispatched ... Hoffman to London to help run Atlas," p 82. Passages such as these, focused only on Atlas, in no way suggest that Samarco was created to benefit Peter. When the article does turn to the formation of Samarco, it offers the following discussion:
 "The initial invitation from the Saudis was turned down ... consistent with our normal policy of providing our own transportation and not permitting preference shipping," Mobil said last week.
 But Mobil officials said they subsequently perceived a greater threat from preference shipping. Sources said Mobil then dispatched two negotiators to Jeddah in Saudi Arabia to push Mobil as a partner. One of the negotiators was Mobil's Mideast agent, W. Jack Butler, and the other was the Greek shipping executive, Comnas, who was recruited personally by Tavoulareas to advise Mobil on how to set up an independent shipping concern.
 paragraphs 50-51. Surely the reporting of Mobil's own explanation for its entry into Samarco, along with the names of Mobil's negotiators with the Saudis, provides not the slightest support for an interpretation that the entire Mobil-Samarco-Atlas arrangement was "set up" for Peter.
 
 
 [21]
 The dissent maintains that the words of the article suggest by "innuendo" that the entire Samarco arrangement was crafted by Tavoulareas for Peter's benefit. Dissent at 825. "Innuendo," however, is a common law term of art that refers only to defamatory implications that depend upon the recipient reading in an extraneous fact (the "inducement"). See Restatement (Second) of Torts Sec. 563(f). What the dissent really means, it seems, is not that the article's defamatory meaning depends on extrinsic circumstances, but rather that the juxtaposition of facts, nondefamatory and true in themselves, gives rise to the broader defamatory meaning urged by Tavoulareas. While it cannot be gainsaid that defamation can be subtly implied as well as directly stated, that sensible proposition lacks force where, as here, the charge is direct and straightforward, trumpeted in the opening paragraph ("Mobil Oil Corp. president William P. Tavoulareas set up his son five years ago as a partner in a London-based shipping management firm.") and featured in the story's headline ("Mobil Chief Sets Up Son In Venture"). The thrust of the piece is that Peter was young and inexperienced in the shipping business, and that his meteoric rise to partnership in Atlas was an act of favoritism. That theme appears throughout the article, in chronicling Peter's becoming "an overnight success" and maintaining "a highly affluent lifestyle," p 6; in reporting that the SEC has reopened its investigation into the role Mobil's president played in his son's partnership in Atlas, p 18; in recounting the specific factual allegations of Tavoulareas' personal involvement in matters pertaining to Atlas, paragraphs 20-26; in recounting Kousi's observation that "[a]t his age, [Peter] wasn't a genius, nor was he terribly experienced in shipping," p 28; in recounting Dr. Piro's comment that Tavoulareas "expressed his interest ... as 'giving Peter a little nudge to get him along,' " p 29; and in describing Peter's educational and work experience, paragraphs 30-31. Indeed, the dissent's charge of defamation by "implication," in the face of the straightforward charge of nepotism unabashedly pursued throughout the article, falls prey to the dissent's own oft-repeated criticism of "failing to consider the article as a whole." See, e.g., Dissent at 820
 
 
 [22]
 Even if the cited memoranda were relevant to the pure legal question of whether the article can reasonably be read to convey the alleged implication, we would find them inherently ambiguous and of little probative value. For example, Tavoulareas makes much of Tyler's statement that "[o]ur story does show that Mobil's decisions in this case were not made for the traditional business reasons, or for the reasons stated by Mobil." RE at 2489. But Tavoulareas fails to note that Tyler also wrote the following: "[T]he story doesn't say that the formation of Atlas and Samarco was a bad business decision that cost Mobil's shareholders money. It doesn't need to say that in order to be a good story.... [W]e have essentially said that it was not a big surprise that in the wake of the embargo there would be fear in the oil industry that the Saudis would extend their influence to shipping." RE at 2489-90. It is entirely possible that Tyler's views in the memorandum--expressed in reaction to criticism from another Post employee--reflected his own personal views, but not the facts that made it into the November 30 article. Cf. RE at 2490 ("[H]opefully we will learn more about all this after we get our initial effort into paper.")
 
 
 [23]
 The dissent also contends that our ruling is at war with this court's decision in McBride v. Merrell Dow and Pharmaceuticals, Inc., 717 F.2d 1460 (D.C.Cir.1983). Not true. McBride was a defamation action brought by a doctor who served as an expert witness in a tort suit against a magazine that reported on the trial. In that case, we accepted the contention that one of three allegedly defamatory statements could possibly bear a defamatory meaning; at the same time, we rejected the contention that two others had any defamatory import at all. McBride thus concerned the question whether the very different statements at issue in that case could support any defamatory meaning at all. The dissent's comparison of McBride to the instant case is, in consequence, unhelpful. In this case, we have found the "set up" charge to be defamatory; the dispute is over the sweep of the statement. We reiterate: Let there be not the slightest doubt that we accept the proposition that the "set up" statement defames Tavoulareas by charging him with nepotism. The dissent, in contrast, insists that the statement sweeps more broadly, charging Tavoulareas with setting up the entire Mobil-Samarco-Atlas arrangement solely for Peter's benefit. Thus, the specific holding of McBride--that one of three statements could bear some defamatory meaning--does not bear upon, much less resolve, which of two defamatory meanings the statement in our case bears
 Moreover, it would twist McBride unconscionably to suggest that it stands for the remarkable proposition that courts must always find a defamatory meaning or, more precisely, embrace the most sweeping defamatory meaning in a challenged statement. Indeed, in accepting the possible defamatory meaning of one of three statements in that case, the court warned that it was "troubled" by such libel suits and did not want its holding to be construed as "license to harass." Id. at 1461. We therefore suggested that the District Court "proceed upon remand in a manner that will minimize, so far as practicable, the burden a possibly meritless claim is capable of imposing upon free and vigorous journalism." Id. at 1461-62. Thus, both the specific holding and the "general tone," as it were, of McBride provide slim support indeed for the dissent's sweeping interpretation of the "set up" charge.
 
 
 [24]
 First, the dissent cites a cartoon from the Service Union Reporter "depicting William as an indulgent father giving some Mobil ships to Peter 'to play with.' " Dissent at 819 n. 25. Although this cartoon clearly suggests that Peter's position in shipping management was nepotistic, it indicates nothing about Samarco. Indeed, it is entirely consistent with the interpretation which we hold to be legally correct. Moreover, this cartoon was accompanied by an article. See Plaintiff's Trial Exhibit 551. This Service Union article essentially recounts the substance of the two Post stories, noting that "William Tavoulareas set up his son five years ago as partner in a London-based shipping-management firm." The Service Union Reporter thus clearly supports our interpretation of the November 30 article
 The dissent also points to the trial testimony of a former Commissioner of the Internal Revenue Service. Dissent at 819 n. 25. However, nothing in this testimony suggests that the former Commissioner embraced the view that the entire Mobil-Samarco-Atlas arrangement was "set up" for Peter; indeed, nothing in any way indicates he adopted any particular interpretation of the article. The use of the term "corporate incest" adds nothing. The dissent cannot in good conscience twist such a general descriptive phrase into an endorsement of a particular view.
 
 
 [25]
 The very portion of the Post 's closing argument that the dissent quotes specifically states that Tavoulareas had a "good business reason to go into the Samarco venture"; saw "a good business reason to have an independent ship management firm"; and "took advantage of those good business reasons to see to it that his son, Peter, was set up for the rest of his life." Dissent at 822-23 (quoting Tr. 4491-92). This passage certainly seems to be reading the article to say that Peter was set up in Atlas, not that the entire Mobil-Samarco-Atlas arrangement was set up for Peter. The fact that the Post 's counsel, in the heat of closing argument, later utters the words "Samarco was set up" in describing the series of transactions that led to the entire arrangement in no way indicates that Samarco was set up for Peter. Indeed, in the very same passage, the Post 's counsel acknowledges there were "good business reasons to go into the Samarco venture." Id. There is thus no departure by the Post from its theory of the case at trial, as the dissent would have it. See Dissent at 822
 
 
 [26]
 The follow-up story published by the Post characterizes the article that is the focus of this lawsuit as "describing the involvement of Mobil's president in setting up his son as a partner in Atlas Maritime Co. and thereafter participating in several key decisions that enhanced his son's position and ensured the firm's success." Wash. Post, Dec. 1, 1979, at A3, reprinted in Supplemental Brief for Appellees, App. at 14. This same interpretation--that Tavoulareas "set up" Peter in Atlas--has consistently been advanced by the Post throughout this litigation. See, e.g., Tr. 133-36 (opening argument); Transcript of Oral Argument at 27 (Feb. 10, 1984) (argument before original panel)
 
 
 [27]
 We also reject Tavoulareas' suggestion that the SEC's decision not to take enforcement action against him precludes us from considering record evidence of the truth of the Post story. Brief for Appellant at 17a-17b. The lack of SEC enforcement action does not suggest, much less prove, that the SEC sanctioned his conduct. Cf. Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). For example, the SEC may have let the matter drop only because SEC officials disagreed over whether the Commission's then-existing rules unambiguously required full disclosure of relationships involving children not living in the same household. See Securities Laws and Corporate Disclosure Regulations, 1982: Hearings Before the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, 97th Cong., 2d Sess. 261-62 (1982) (testimony of Stanley Sporkin, former Director of SEC Enforcement Division)
 
 
 [28]
 Tavoulareas also testified that he spoke across the Atlantic by telephone to Peter virtually every day. Tr. at 1463, 1608
 
 
 [29]
 Specifically, the dissent enumerates four items of "crucial" evidence that we are charged with omitting. The first body of evidence is employed to suggest that Mobil in the abstract, with Tavoulareas merely executing Mobil's will, was responsible for recruiting Comnas. The dissent reaches this idealized but baseless vision of corporate life at Mobil utterly without regard to Tavoulareas' own testimony. By Tavoulareas' account, it was he, Tavoulareas, Mobil's Mr. Inside and architect of the Saudi strategy, who recruited Comnas, not Mobil's Mr. Outside, Rawleigh Warner, or one of Tavoulareas' underlings. Moreover, the context of the specific statement cited by the dissent, Warner's "absolute natural" exclamation, makes it clear that Warner was merely reacting to Tavoulareas' statement that Mobil was soon to join Samarco and that Comnas was likely to be tapped to manage Samarco's ships, not making a decision on behalf of Mobil to employ Comnas. See Tr. at 1514-15. Second, while we credit Warner's general testimony that Tavoulareas did nothing to further Peter's career in Atlas, we also, not surprisingly, accept Tavoulareas' own lengthy testimony as to his own, specific activities on behalf of Atlas, which we recount in the text that follows. See also supra p. 784 (quoting Tr. at 1534). In crediting Tavoulareas' own statements we are not, as the dissent accuses, Dissent at 826 n. 35, invading the jury's function because we also accept Warner's testimony, which does not contradict Tavoulareas'. Indeed, the four-thousand page transcript admits of one and only one reading--during his tenure at Mobil, Tavoulareas was firmly in control of the affairs of day-to-day management, including the Samarco-Atlas arrangement. The record is crystal clear that Tavoulareas took credit for recruiting Comnas, and not one shred of evidence is to the contrary. As to the third item of evidence, Tavoulareas' testimony that he counselled Peter not to leave Lemos, this fact, which we credit, obviously says nothing about what Tavoulareas did with respect to Peter's future once his 24-year old son, fresh from business school, decided to embark on the venture with George Comnas. There is nothing in logic or common sense to suggest that a dutiful father would not assist his son in a venture even if the son had been counselled not to leave his then-present post. Fourth, the dissent's plaudits concerning Tavoulareas' abiding by Mobil's conflict of interest policies are of dubious validity inasmuch as it is undisputed that Mobil's board was informed that Tavoulareas would not be involved at all with Atlas matters, a representation that was not borne out by subsequent events, as we discuss in due course
 
 
 [30]
 We observe that it was in March 1975 (one month before his Mobil-engineered departure) that Comnas was first informed of Mobil's dissatisfaction with his performance. That visit to the woodshed occurred in a meeting with Tavoulareas and Paul Wolfe. The meeting was held in Tavoulareas' office. Tr. at 1329; cf. 567 F.Supp. at 658 (testimony of Lewis Lapham, an outside director of Mobil, that "he did not believe that [Tavoulareas] played a personal role in Atlas")
 
 
 [31]
 Although Mr. Warner took the ultimate responsibility for the decision to encourage Comnas to depart, a point emphasized by the dissent, Dissent at 826-28. Warner testified without contradiction that at that April meeting in Tavoulareas' office "every one of us simultaneously and individually reached [the] conclusion [that Comnas had to be removed]." Tr. at 1534. A decision made in Tavoulareas' office with Tavoulareas participating can scarcely be characterized, as the dissent would, Dissent at 827, as non-involvement by Mobil's president in Atlas-related decisionmaking
 
 
 [32]
 Atlas later reimbursed Mobil for Comnas' salary pursuant to Tavoulareas' decision that Atlas would have to pick up the tab if Comnas failed to perform satisfactorily for Mobil. Tr. at 1340
 
 
 [33]
 The dissent does not realistically draw the foregoing facts into question. Rather, our colleague basically resorts to name-calling, accusing us of "mischaracter[izing]" Tavoulareas' undisputed, detailed involvement in Atlas. See Dissent at 827. The gravamen of the dissent's complaint in this respect seems to be that Tavoulareas' hands-on approach vis-a-vis Atlas was consistent, as the dissent sees it, with Mobil's conflict of interest policy. But that is neither here nor there; the question is whether the Post reported the truth when it laid the "set up" charge at Tavoulareas' feet, regardless of whether his multifarious activities concerning Atlas comported with Mobil's internal code of conduct. See also supra note 15
 We note that, because plaintiff's proof of falsity was inadequate to sustain a favorable jury verdict under a preponderance of the evidence standard, we need not decide whether public figures are required to show falsity by clear and convincing proof. Compare Firestone v. Time, Inc., 460 F.2d 712, 722-23 (5th Cir.) (Bell, J., specially concurring) (expressing view that clear and convincing proof standard applies to issue of falsity vel non ), cert. denied, 409 U.S. 875, 93 S.Ct. 120, 34 L.Ed.2d 122 (1972) with Goldwater v. Ginzburg, 414 F.2d 324, 341 (2d Cir.1969) (expressing contrary view), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970).
 
 
 [34]
 Tavoulareas also points to allegations in the Post article regarding possible SEC violations as false and defamatory. But, as the original panel unanimously concluded, those allegations are not properly before us as a basis of liability because they were not specifically pleaded as libelous. 759 F.2d at 127, 150 n. 8
 
 
 [35]
 Even if Tavoulareas were falsely defamed by the "dispatch" allegation, the evidence in the record supporting that allegation clearly precludes any inference of actual malice. It was uncontroverted at trial, and not disputed on appeal, that Dr. Piro told Tyler that he had personally heard Tavoulareas tell Mobil vice president Everett Checket "that he had sent Hoffmann over to Atlas after Comnas had left to kind of get it in shape." Tr. at 3720-21. But cf. infra note 54 (discussing Checket's failure to recall such a conversation). Tyler was skeptical of Piro as a source in light of his estrangement from the Tavoulareas family, but the article clearly noted both that Piro was a source for the "dispatch" allegation and that he was estranged from the Tavoulareas family. Moreover, Tyler did not rely solely upon Piro; indeed, Mobil itself gave the Post reason to believe Piro's eyewitness account of Tavoulareas' alleged statement to Checket. Mobil's prepublication letter to Tyler admitted that "Mr. Tavoulareas played a personal role in arranging [Comnas'] departure" and suggested that Tavoulareas was similarly involved in the ensuing decision to send Hoffmann to Atlas. RE at 2341, 2345. And, as we have noted, Tyler had abundant evidence before him that Tavoulareas often played a prominent role in Atlas matters. There can be no doubt that the Post 's description of Hoffman's dispatch was " 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer." Bose, 466 U.S. at 512, 104 S.Ct. at 1966 (quoting Time, Inc. v. Pape, 401 U.S. 279, 290, 91 S.Ct. 633, 639, 28 L.Ed.2d 45 (1971) )
 
 
 [36]
 We examine the reasonableness of the jury verdict in light of the "serious doubt" test, which imposes a less onerous burden on defamation plaintiffs than the other, disjunctive prong of the actual malice standard, knowledge of falsity
 
 
 [37]
 Contrary to Chief Judge Wald's charge in her concurring opinion, see Concurring Opinion at 805-06, we conduct the requisite independent review in this case without relying on Bose to permit a greater intrusion into the jury function than would ordinarily be permissible under traditional j.n.o.v. standards in defamation cases. The "rigorous scrutiny" that Chief Judge Wald detects in our analysis, see id. at 804, derives not from an application of some possible additional and more intrusive form of independent review sanctioned by Bose, but from an application of both the settled and universally accepted principle of careful appellate review in defamation cases, see Sullivan, 376 U.S. 254, 84 S.Ct. 710, St. Amant, 390 U.S. 727, 88 S.Ct. 1323, and the exacting requirement of clear and convincing evidence. Thus, the rigorous scrutiny we have used, derived as it is from Sullivan itself, as well as St. Amant, existed long before Bose and the ensuing dispute over its interpretation. We have been careful throughout to unswervingly apply the Sullivan-St. Amant standard, nothing more, nothing less
 
 
 [38]
 At trial, plaintiffs attacked Tyler for crediting the Subcommittee staff interview since Comnas was not placed under oath. But there is not a shred of evidence that that factor gave Tyler or the Post editors any pause, nor can we divine why a reasonable jury would infer that it did. Cf. Tr. at 3958; 18 U.S.C. Sec. 1001 (generally prohibiting false statements to the Government). Plaintiffs had every opportunity to cross-examine Stockton and took advantage of that opportunity, but did not even attempt to establish that the procedure of conducting an interview sans oath was unorthodox or inconsistent with the Subcommittee's customary procedures
 
 
 [39]
 Kousi testified that he once heard a "reference" to Comnas "having been involved in a scandal in Italy" concerning overpricing for crude oil when Comnas worked for Exxon, but he could not remember who made the "reference" or what Comnas was alleged to have done. Tr. at 3176, 3177. Moreover, Kousi never testified that he told Tyler of this rumor
 
 
 [40]
 Although Tyler had been told by Kousi that Comnas' management of Atlas "wasn't as good as [his] credentials said he would be" and that Comnas turned out to be a "mistake," Tr. at 850, he was also aware that Comnas had been retained by Mobil as a consultant after he left Atlas
 
 
 [41]
 The dissent argues that the Post "knew that Comnas was not trustworthy" because "Piro had told Tyler of previous fraudulent scandals in which Comnas was involved." Dissent at 828 (emphasis in original). But in virtually the next breath, the dissent concludes that Piro is "unknowledgeable" and "ignorant." Id. at 832-33. We cannot help observing that the dissent thus places itself in the anomalous position of contending that it was indicative of actual malice for the Post not to rely on an "unknowledgeable" source. The dissent compounds its error by blithely ignoring the specific indicia of Comnas' reliability--based on uncontroverted evidence in the record--which were before Tyler in preparing the article, not the least of which was Tavoulareas' own testimony before the SEC. See supra pp. 790-92. The dissent also chooses to ignore Mobil's own prepublication silence about the supposedly dark character of Comnas, which is all the more odd in light of Mobil--through Tavoulareas--and Comnas having been business bedfellows after Comnas' Exxon contretemps
 
 
 [42]
 Both Tavoulareas and the dissent, in complaining about the Post 's failure to introduce Comnas' deposition, refuse to acknowledge that at trial Tavoulareas took the position that Comnas' deposition should be excluded from evidence because it was incomplete due to objections interposed by Congressional counsel. Tr. at 3729
 
 
 [43]
 We recognize that each individual piece of evidence cannot fairly be judged individually against the standard of clear and convincing evidence. Plaintiffs are entitled to an aggregate consideration of all their evidence to determine if their burden has been met. Even upon consideration and aggregation of all of Tavoulareas' asserted evidence of actual malice, see supra pp. 790-93, infra pp. 795-98, however, we conclude that he has failed to surmount the "clear and convincing" evidentiary obstacle
 
 
 [44]
 The dissent suggests that the Peterson memorandum could logically encompass the "personally urged" allegation. Dissent at 830-31. This, in our view, is an unreasonably strained interpretation of the memorandum. The "impossible to believe" passage expressly relates to the "scheme" being set up by Tavoulareas, which we believe could only mean the entire Samarco-Atlas arrangement or, more naturally, the setting up of Peter in the arrangement. Nothing in the broad, impressionistic memorandum authored by an editor unsteeped in the facts of this complex corporate arrangement suggests any doubt about the accuracy of a specific event chronicled in the article. And we again note that the "personally urged" statement in the piece itself was coupled with a statement of Mobil's written denial of that charge, an even-handed approach that scarcely bespeaks the presence of actual malice
 
 
 [45]
 The danger of admitting ill-will or bad-motive evidence is that the jury will mistakenly hold the defendant liable for his attitude toward the plaintiff rather than his attitude toward the veracity of his statements concerning the plaintiff. If the trial judge nonetheless determines in his or her sound discretion that such evidence should be admitted under Federal Rule of Evidence 403, the judge must seek to minimize the danger of unfair prejudice. Cf. Westmoreland v. CBS, Inc., 596 F.Supp. 1170, 1172 n. 1, 1178 (S.D.N.Y.1984)
 
 
 [46]
 "Seven Sisters" is a colloquial term to describe the seven largest oil companies
 
 
 [47]
 Cf. In re Network Coverage of the Democratic National Convention, 16 F.C.C.2d 650, 658 (1969) ("[W]e [the FCC] are not passing judgment on the quality of the networks' coverage. It is the role of the public, critics, and students of the mass media, either to comment or be critical with regard to such matters.")
 
 
 [48]
 Woodward testified that he used the term "holy shit story" to describe a kind of story he was looking for from his reporters. According to Woodward, the term "came from coverage of the Watergate story" and his own reaction to hearing the courtroom admission of one of the defendants charged with the Watergate break-in that he had previously worked for the CIA. Tr. at 3952
 
 
 [49]
 In reaching this holding we remain well within the parameters of review that we marked out at the beginning of this analysis. See supra pp. 775-78. Under traditional j.n.o.v. standards, we are required to credit all "permissible inferences" that may have been drawn in plaintiff's favor. See, e.g., Alioto v. Cowles Communications, Inc., 519 F.2d 777, 780 (9th Cir.), cert. denied, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975), quoted in Supplemental Brief for Appellant at 8. In our view, an inference of "reckless disregard" drawn from evidence of managerial pressure to produce high-impact stories is not permissible. As we state in the text, we believe such an inference is permissible only where there is evidence of distorting pressure--that is, some showing of pressure for high-impact stories without regard for accuracy
 
 
 [50]
 The dissent suggests that our position is at odds with the Post, contending that the Post conceded the point that pressure to produce high-impact stories is some evidence of the reckless publication of the defamatory falsehoods against Tavoulareas. Dissent at 54. Our reading of the Post 's position, however, suggests substantial alignment with our express holding. First, the Post argues that "evidence that a newspaper engages in investigative reporting, even 'high-impact' or 'hard-hitting' investigative reporting, is an entirely inappropriate consideration in imposing liability for defamation." Supplemental Brief for Appellees at 28 (footnote omitted). Next, the Post states that " 'excessive pressure' brought to bear upon a reporter to come up with a 'sensationalistic' story" may be a relevant consideration in determining "whether that reporter published a 'calculated falsehood.' " Id. Pressure that is "excessive," as we read the Post 's suggested standard, is not merely "heavy" or "intense" pressure to produce high-impact stories, but rather pressure to produce such stories without regard for their truth
 
 
 [51]
 For example, Tavoulareas asserted that the Post acted with constitutional malice in excluding from the article the favorable comments of Lewis Lapham, an outside director of Mobil, that "the Mobil board of directors consistently reviewed the relationship between Mobil and Atlas and the board was completely satisfied with all aspects of it" and that "he did not believe that plaintiff played a personal role in Atlas." 567 F.Supp. at 658; see Supplemental Brief for Appellant at 25; Brief for Appellant at 15, 42. As Judge Gasch observed, however, the article "did include at least three paragraphs that conveyed almost everything that Lapham had said." 567 F.Supp. at 658. More fundamentally, the Post had good reason to discredit Lapham's comments in light of the overwhelming evidence of Tavoulareas' actual role, known to the newspaper before publication but presumably unknown to Lapham. In light of Tavoulareas' admitted involvement in Atlas matters, it is remarkable that he would now invoke the statements of an outside director who, like Borch and Williams, was likely led to believe, erroneously, that Tavoulareas had entirely divorced himself from those matters. Tr. at 3550, 3588-89
 
 
 [52]
 Absence of deadline pressure has been found relevant in actual malice inquiries only to negate defendants' excuses for inadequate investigation of their stories. See, e.g., Goldwater v. Ginzburg, 414 F.2d at 339. No such situation is presented here
 
 
 [53]
 Tavoulareas does not contest and we assume, without deciding, that Piro, a nonmedia defendant, is protected by the Sullivan standard of actual malice when sued by a public figure
 
 
 [54]
 Piro told Tyler and Golden that he overheard Tavoulareas telling Everett Checket that he (Tavoulareas) had dispatched Hoffmann to Atlas. Tr. at 3720-21. Checket testified that he did not "recall" such a conversation. Tr. at 2847. (He did not flatly deny that the conversation had occurred, although his answer to the four preceding questions on other subjects had been an unequivocal, "Never." Tr. at 2846-47.). Even if Piro's testimony is disbelieved, there is no evidence that Piro knew that his statement was false or recklessly disregarded the probability that it was false
 
 
 [55]
 Moreover, even if the Lemos job allegation were defamatory, the record falls far short of providing clear and convincing evidence that the statement was made with actual malice. Indeed, Tavoulareas' own testimony before the SEC was that he had played no role in getting Peter the job but that "Lemos ... was a personal friend" and "must have known [Peter] was my son." RE at 2414
 
 
 [1]
 The majority states that it "conduct[s] the requisite independent review in this case, without relying on Bose...." Maj. op. at 789 n. 37 (emphasis in original). Under this pre-Bose form of independent review, the majority explains, reviewing courts in defamation cases have traditionally "carefully and independently reviewed findings of fact and rejected jury verdicts when all favorable inferences did not constitute clear and convincing evidence of actual malice." Maj. op. at 778
 
 
 [2]
 Although the issue in Bose was the standard of review to be applied to a trial court's determination that a statement was made with actual malice, the Court indicated that its holding applied to review of a jury verdict as well: "[T]he rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge." 466 U.S. at 501, 104 S.Ct. at 1959; see also id. at 508 n. 27, 104 S.Ct. at 1964 n. 27 (Court announced rule of independent review in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in which it was reviewing a state court judgment entered on a jury verdict)
 In his dissenting opinion in Bose, Justice Rehnquist argued that review of a jury verdict "presented the strongest case for independent fact-finding by this Court:"
 The fact-finding process engaged in by a jury rendering a general verdict is much less evident to the naked eye and thus more suspect than the fact-finding process engaged in by a trial judge who makes written findings as here. Justifying independent review of facts found by a jury is easier because of the absence of a distinct "yes" or "no" in a general jury verdict as to a particular factual inquiry....
 466 U.S. at 518 n. 2, 104 S.Ct. at 1953 n. 2 (Rehnquist, J., dissenting).
 
 
 [3]
 See Bose, 466 U.S. at 514 n. 31, 104 S.Ct. at 1967 n. 31 ("only those portions of the record which relate to the actual malice determination must be independently assessed")
 
 
 [4]
 According to a leading commentator, the Supreme Court held in Bose that
 [a]n appellate court cannot content itself with accepting the results of "reasonable" application of admittedly correct legal norms to the historical facts. The court's responsibility is to scrutinize the record and marshal the evidence to see if it yields the characterization put on it by the court below.
 Monaghan, Constitutional Fact Review, 85 Colum.L.Rev. 229, 242 (1985) (footnote omitted).
 
 
 [5]
 This reading of Bose is consistent with the Supreme Court's discussion of the evidence of actual malice in that case. The Court accepted the district court's finding that a statement in the review challenged as libelous was an inaccurate description of what the engineer who prepared the report on which the review was based had actually perceived, but it rejected the district court's inference from this evidence that the engineer "must have realized the statement was inaccurate at the time he wrote it." 466 U.S. at 512, 104 S.Ct. at 1966
 
 
 [1]
 I rely throughout on a concise paper prepared for the Federal Judicial Center describing why and how separate, seriatim verdicts were obtained from the jury in Sharon v. Time, Inc., No. 83-4660 (S.D.N.Y.) (Jan. 16, 1985: defamatory nature of publication), (Jan. 18, 1985: falsity), (Jan. 24, 1985: actual malice). See Sofaer, Jury Management in Sharon v. Time, Inc. (Sept. 15, 1985)
 
 
 [2]
 Some "instruction" might come from counsel rather than from the judge. In Westmoreland v. CBS, No. 82-7913 (S.D.N.Y., settled and dismissed Feb. 18, 1985), Judge Pierre N. Leval allowed counsel an opportunity to address the jury from time to time during the 62-day course of the trial. These "int-sums" were limited to a total of 120 minutes for each side. The lawyers had each used about 100 minutes in int-sums, averaging about two and a half minutes each, by the time the case was settled. Counsel used the int-sums to "explain the significance, strength, or weakness of proof; to point out confirmation or contradiction of other evidence; to introduce new themes; to respond to opposing arguments; and to challenge the adversary's ability to prove his contentions." Leval, From the Bench: Westmoreland v. CBS, 12 LITIGATION 7, 66 (1985). Although Judge Leval acknowledged that both the integrity of counsel and the vigilant control of the judge were necessary to prevent abuse of this system, see id. at 66, he found it a very useful way to keep the jury on track during the course of the long and complex Westmoreland trial. See id
 An additional technique adopted by Judge Leval in that case may also be useful in reducing jury confusion. The judge put a limit on the total number of hours each side could use to present its case, including both direct examination or introduction of evidence and cross-examination. This approach left the lawyers with complete control over how the time was allocated. See id. at 7-8. The lawyers in the Westmoreland case believed that they had "tried their case better as a result of the time limit, and that [trial time] was shorter by a half than it would have been." Id. at 8. And the jury was spared the burden of attending to and remembering an even greater quantity of evidence put in over a longer period of time.
 
 
 [3]
 See Parker, Free Expression and the Function of the Jury, 65 B.U.L. REV. 483, 550-56 (1985) (maintaining that "[c]ases involving free expression are precisely the type of cases that demand the use of general verdicts with interrogatories of rule 49(b)")
 Objections to special jury findings center on their use in run-of-the-mine cases in which strict application of the rules of law is widely viewed as inconsonant with popular conceptions of "substantial justice." See, e.g., 9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE Sec. 2503 (1971); James, Sufficiency of the Evidence and Jury-Control Devices Available Before Verdict, 47 VA.L.REV. 218, 246-48 (1961); cf. 374 U.S. 865, 867-68 (1963) (Justices Black and Douglas oppose Rule 49 because it allows judges "to weaken the constitutional power of juries"). Compare Morris v. Pennsylvania R.R., 187 F.2d 837, 840-41 (2d Cir.1951) (declaring that courts should use special verdicts only with "discrimination and foresight") with id. at 843 (Frank, J., concurring) (advocating frequent use of special verdicts contrary to the wishes of "those who appear to esteem the [jury] system, just because it gives rein to the passional element of our nature") (quoting Skidmore v. Baltimore & O.R.R., 167 F.2d 54 (2d Cir.1948) (Hand, J., concurring)).
 
 
 [4]
 The trial judge in Sharon v. Time, Inc., Abraham D. Sofaer, reported the cooperation of counsel in allowing the jury to have with them during their deliberations detailed instructions on the actual malice issue as well as a jury verdict form which "took the jury step by step through each of the theories on which plaintiff relied." Sofaer, supra note 1, at 2-3. In addition, the parties prepared a chart, at the judge's request, "list[ing] every exhibit in evidence, describ[ing] the exhibit in sufficient detail to enable the jur[ors] to identify the items they wished to see, and indicat[ing] the issue or issues on which each exhibit was admissible." Id. at 1-2
 
 
 [5]
 Judge Sofaer observed that the use of separate, seriatim verdicts in the Sharon case made it possible to avoid definitive rulings on unsettled questions of law, e.g., whether "public figure plaintiffs were required to prove falsity by clear and convincing evidence." Sofaer, supra note 1, at 3. He also noted his decision to bifurcate the trial so that evidence on reputation and damages would not influence the decision on liability. See id. at 4. While the structure he employed worked effectively in Sharon, Judge Sofaer suggested that other cases might call for a different ordering, for example, "the judge could have the jury pass on actual malice first, when that issue appears potentially dispositive and susceptible of decision without confusion." Id. at 5
 
 
 *
 Judges Bork and Silberman were recused; Judges Buckley, Williams and D.H. Ginsburg were sworn in after the case was argued; and the participation of Judge Scalia was terminated by his appointment to the Supreme Court. See ante at 766
 
 
 [1]
 Chief Judge Wald, concurring in the judgment of the en banc majority, agrees that the majority does not apply the judgment n.o.v. standard with integrity. Concurring Op. at 804-05
 
 
 [2]
 The majority's failure to disclose the principles guiding its review, moreover, is especially unfortunate in a case such as this, where
 the predictability of decisions, which is of crucial importance in an area of law touching upon First Amendment values, is enhanced when the determination is made according to announced legal standards and when a body of public case law furnishes published examples of the manner in which these standards are to be applied.
 Ollman v. Evans, 750 F.2d 970, 978 (D.C.Cir.1984) (en banc ), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).
 
 
 [3]
 "[S]ome 12 or 14 other [oil] companies [were] establishing similar organizations...." (Tr. 1090)
 
 
 [4]
 The ownership of Samarco was ultimately divided as follows: the Alirezas, 45%; Prince Fahd, 15%; Mobil, 30%; Fairfield-Maxwell, Ltd., 10%
 
 
 [5]
 One of the defendants' principal witnesses, a former director of the shipping concern of Fairfield-Maxwell, Ltd., John Kousi, stated that such circuitous leasing, in contemplation of Saudi preference laws, "was a commonly understood business idea at the time," devised as a means to capitalize on an opportunity to make substantial profits by using surplus tankers laid up by the world-wide depression in oil (Tr. 3220-23, 3263, 3167), and that Atlas could operate ships at less cost than Mobil (Tr. 3246)
 
 
 [6]
 Mobil stated that it wanted an independent shipping operation to avoid a conflict of interest between the shipping interests of Mobil and those of Fairfield-Maxwell, Ltd. (Tr. 3126). This point was well taken
 
 
 [7]
 The ownership of Atlas under Comnas was ultimately divided as follows: Comnas, 57%; Peter, 38%; Emmanuel, 5% (RE 2472-73)
 
 
 [8]
 In January, 1974, William Tavoulareas notified Mr. Warner, the Chairman of Mobil's Board of Directors, immediately after being so advised personally by Comnas on January 9, 1974 (Tr. 1277), that "there was a chance of [his son Peter] participating in some kind of a joint venture with Comnas" (Tr. 4135). At the time, Comnas was seeking to charter a vessel to Mobil (Tr. 1277). Shortly thereafter, the possibility of Peter joining Comnas was disclosed to George Birrell, Chairman of Mobil's Conflict of Interest Committee (RE 1458-61). The situation was subsequently discussed several times by the Conflict of Interest Committee and Chairman Warner. Procedures were approved under which William would be isolated from "decisionmaking," although, as was necessary given his responsibilities as president and his experience as Mobil's expert on Saudi affairs, "he could involve himself up to the decision level," and Warner so advised Comnas. The Post and the majority completely refuse to recognize this degree to which William was permitted to function and what was expected of him in this area (Tr. 1515-21). The organization of Atlas was completed in July, 1974 (Tr. 4427). "Peter joined Atlas [in] August 1974" (Tr. 4158). On August 2, 1974, William Tavoulareas wrote a letter stating, "I will not make decisions" (Tr. 4136). And on the same date Mr. Wolfe wrote a letter "notifying the people in the [Mobil] organization on a need to know basis of Peter's participation" (Tr. 4136)
 
 
 [9]
 According to Emmanuel's testimony, Comnas was not at Atlas offices for any length of time (Tr. 2240, 2243). Comnas was off pursuing grandiose visionary projects (Tr. 2241, 2245); he could not be reached as he was traveling (Tr. 2247); he felt he could "do whatever he wanted without any regard to anybody" (Tr. 2244); he took $130,000 for salary and increased that by "expenses which could not be substantiated" (Tr. 2244); he would have deprived Samarco of their 5% discount on ship repairs, "which would have gone to some other source " (Tr. 2264) (emphasis added); and despite a conflict of interest as a stockholder in IOTRON he urged Atlas to buy ship equipment manufactured by IOTRON (Tr. 2265). Comnas also negotiated a deal with Japan Lines that would have been detrimental for Atlas if approved (Tr. 2250). Samarco and Mobil forced Comnas to reject it (Tr. 2256). In other words, the Samarco partners were completely justified in terminating Comnas' employment
 
 
 [10]
 Hoffmann's name was incorrectly reported as Herman Hoffmann in the Post 's November 30 article
 
 
 [11]
 Although the majority asserts that "several of Mobil's outside directors raised objections to Peter's involvement in Atlas," Maj.Op. at 769, the record indicates that the one outside director who had originally expressed some reservations about the "appearance" of Peter's involvement in Atlas, Ambassador McGhee, questioned neither the business justifications nor the ethical validity of Mobil's entry into the Samarco-Atlas arrangement. Following the SEC investigation of William Tavoulareas that resulted in no charges of wrongdoing, McGhee stated: "Congratulations, Tav, I knew you'd be cleared." (Tr. 1813)
 
 
 [12]
 When the article appeared, Tyler was given sole byline credit for it, and Golden received credit as a "Special Correspondent" for the story
 
 
 [13]
 "Seven Sisters" is a colloquial term for the seven largest oil companies, one of which is Mobil
 
 
 [14]
 See infra at 778 for the text of Peterson's memo
 
 
 [15]
 A second article was published on December 1, but the jury found that it did not defame either of the plaintiffs
 
 
 [16]
 The Washington Post Company is a large multimedia corporation which has substantial broadcast holdings and publishes magazines and newspapers, including the Post
 
 
 [17]
 Also named in the complaint was Post President Katharine Graham, but during trial the district court dismissed the case against her, and the plaintiffs do not contest this. Accordingly, she is not a party to this appeal
 
 
 [18]
 The panel denied rehearing and filed an opinion, 763 F.2d 1472 (D.C.Cir.1985), but with Judges Tamm and Scalia voting to deny, the court ordered rehearing en banc
 
 
 [19]
 This opinion assumes, without deciding, that William Tavoulareas is a limited-purpose public figure
 
 
 [20]
 It might be added, however, that the reconciliation of independent review and deference to the fact-finder there set forth is in accordance with the reconciliation adopted by the Supreme Court in other First Amendment areas. For example, in Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), the Court conducted an independent review of the ultimate constitutional fact whether the appellant's words were "fighting words," so that the state could constitutionally punish their utterance. See id. at 592, 89 S.Ct. at 1365. In the process, however, the Court held that it must "consider[ ] [the evidence] in the light most favorable to the [verdict]." Id. at 590, 89 S.Ct. at 1365. See also Bose, 466 U.S. at 504-08, 104 S.Ct. at 1961-64
 
 
 [21]
 See, for example, the interpretation given the article by Post counsel at trial, infra at 822-23
 
 
 [22]
 As discussed infra at 782-85, the majority fails to credit all permissible inferences to Tavoulareas in holding the narrow "set up" allegation to be true--the jury could reasonably have found that Tavoulareas did not "set up" Peter in Atlas
 
 
 [23]
 As discussed infra at 782-85, evidence at trial established that William Tavoulareas did not "set up" Peter in Atlas but rather acted purely in Mobil's interests. The article's implication that William breached his fiduciary duties to Mobil and wasted and misused assets of Mobil for Peter's benefit could thus have been found false by a reasonable jury
 
 
 [24]
 Both William Tavoulareas and Paul Wolfe, the Mobil executive with decisionmaking authority after William surrendered such authority with respect to Mobil-Samarco-Atlas, testified that Tavoulareas did not personally send Hoffmann to Atlas (Tr. 1098, 1440). The jury could therefore have reasonably concluded the defamatory "personally dispatched" charge was false
 
 
 [25]
 That the article is capable of this defamatory meaning is established by the fact that the general public interpreted the article to charge William with abuse of his position as a corporate official. For example, the Service Union Reporter (a newspaper for unionized public employees) published a cartoon depicting William as an indulgent father giving some Mobil ships to Peter "to play with." In an article accompanying the cartoon, Peter's position in Atlas was directly attributed to "Daddy Tavoulareas ... pull[ing] more than a few strings to put his son in the captain's chair of a shipping empire." (RE 1560-66, 2542). One former Commissioner of Internal Revenue called the Post article a story of "corporate incest ... [meaning] the relationship between the corporation and family members, or other corporations controlled by family members" (Tr. 1875). That the Post 's readers interpreted the article to chronicle a corporate president's violation of his fiduciary duties simply cannot be denied
 
 
 [26]
 Seeking to distinguish McBride, the majority asserts that that decision "does not bear upon ... which of two defamatory meanings the [set up] statement in our case bears." Maj.Op. at 782 n. 23. The majority assumes that by finding that the " 'set up' statement defames Tavoulareas by charging him with nepotism," (a charge that the majority later finds is true), it can escape comparison to McBride. It is submitted, however, that McBride does illuminate the instant "dispute ... over the sweep of the [set up] statement." Maj.Op. at 782 n. 23. In McBride we did not narrowly interpret the article's fee comparison to merely accuse Dr. McBride of charging unreasonably high fees. Rather, we held that the article's statements on the expert witness fees were capable of a much broader defamatory meaning in that they could reasonably be read to imply that Dr. McBride's testimony was for sale to the highest bidder. It is consistent with our interpretation of the defamatory statement in McBride to read the "set up" allegation here as capable of bearing the defamatory meaning that Tavoulareas misused corporate assets and breached his fiduciary duties to the corporation's shareholders by "setting up" Peter in Atlas
 
 
 [27]
 Contrary to the majority's protestations otherwise, Maj.Op. at 778 n. 16, there is an obvious distinction between the article's accusation that Mobil joined Samarco once it occurred to William Tavoulareas that Mobil's entry into Samarco could ultimately benefit his son and the charge that, after Mobil decided to enter Samarco, William wasted and misused Mobil assets, financing and personnel to prod his son's fortunes in Atlas. While both are aspects of the article's central defamatory theme that William violated his fiduciary duties as president of Mobil to benefit Peter, the charges are separately defamatory. The article's charge that William's actions with respect to Atlas violated his fiduciary duties remains even if the majority's extreme contention were correct that the article cannot be read to attack Mobil's motives for entering Samarco
 The majority criticizes the foregoing analysis of the article's defamatory meaning as one not advanced by Tavoulareas. Id. The majority's attack completely ignores that the district court charged the jury to find whether, as "William Tavoulareas, in his complaint contend[ed] ... the articles reasonably imply ... [t]hat he breached his fiduciary duties to Mobil ... wasted and misused assets of Mobil ... [and] wrongfully diverted such assets to Peter for his benefit." (Tr. 4549-50) (emphasis added). Moreover, the district court, in its memorandum accompanying the order of judgment n.o.v., considered Tavoulareas' argument that the article implied that William "put together the Mobil-Atlas-Samarco arrangement solely for the sake of his son," 567 F.Supp. at 660, separately from Tavoulareas' argument that the "article impliedly accused him of misusing Mobil's assets." Id. Finally, in the decision reinstating the jury verdict, the panel wrote:
 the article could reasonably be read to suggest that William Tavoulareas became involved with Atlas-Samarco primarily to benefit his son.... At a minimum, the article implies that, irrespective of the motivation for creating the Mobil-Atlas-Samarco relationship, William misused Mobil assets and his position as president to advance his allegedly undeserving son--an act of corporate nepotism. Indeed, this interpretation of alleged nepotism was recognized by the district court as the basic theme of the article. 567 F.Supp. at 660.
 759 F.2d at 111 (emphasis added). Quite clearly, the defamation analysis employed here is not new.
 Also erroneous is the majority's contention that the defamatory implication that William Tavoulareas abused his fiduciary duties and misused corporate assets fails to add anything to the article's charge of nepotism. Even if one accepts, arguendo, the majority's conclusion that William Tavoulareas "made it possible for Peter to become a partner in Atlas and then helped to ensure that the business would prosper because Peter was his son," Maj.Op. at 780, the majority offers no evidence whatsoever that William Tavoulareas wasted Mobil assets, financing or personnel to the detriment of Mobil shareholders.
 Rather than conceding that Tavoulareas' actions were nepotistic, it is pointed out infra at 826-29 that the evidence is far from undisputed that William made it possible for Peter to become a partner in Atlas. Even less so is there evidence that William abused his corporate position and wasted Mobil resources in his dealings with Atlas. Not only does the majority fail to give this defamatory implication of the article the consideration it warrants, but the majority also dismisses evidence supporting this interpretation because the evidence does not sustain the separate defamatory implication that Tavoulareas engineered the entire Mobil-Samarco-Atlas venture to benefit Peter. See, e.g., Maj.Op. at 782 n. 24. The majority's odd tactic is, to say the least, unfair.
 
 
 [28]
 Indeed, Tyler himself so interpreted his article by stating in writing that "[o]ur story does show that Mobil's decisions in this case were not made for the traditional business reasons or for the reasons stated by Mobil." (RE 2489)
 
 
 [29]
 The majority seeks to avoid the conclusion that the article implies Samarco was "set up" for Peter by emphasizing the portion of the Post 's closing argument that acknowledges there were "good business reasons to go into the Samarco venture." Maj.Op. at 782 n. 25. While assuming that the article's mention of good business reasons for Mobil to enter Samarco precludes an inference from the article that Samarco was "set up" for Peter, the majority ironically concludes that Peter was "set up" in Atlas, despite evidence of good business reasons for Atlas to manage Samarco's ships. The majority cannot have it both ways--either the existence of "good business reasons" precludes a "set up" charge or it does not
 Moreover, the majority's attempt to excuse the language used by Post counsel as "a single passage," Maj.Op. at 782-83 and uttered in the "heat of closing argument," id. at 782 n. 25, carries little force given the tremendous importance and forethought associated with summation to the jury.
 
 
 [30]
 In attempting to justify its refusal to consider the defamatory implications of the article, the majority makes the remarkable suggestion that defamation by implication cannot exist in an article that contains explicit statements unfavorable to the libel plaintiff. See Maj.Op. at 781 n. 21. Although the majority quotes selectively from the article to illustrate what it considers the "thrust of the piece"--i.e., Peter's "meteoric rise to partnership in Atlas was an act of favoritism," see id.--the majority astonishingly ignores huge portions of the article that concern only Mobil's relationship with Samarco (Paragraphs 8-11, 39-52, 55-59). These portions of the article, read in the context of the whole story of "favoritism" (as the majority describes it), imply that William Tavoulareas reversed Mobil's original decision and set up the entire Mobil-Samarco-Atlas arrangement for Peter's benefit. This defamatory implication is undeniably present, in addition to and notwithstanding the explicit statements in the article addressing Peter's "meteoric rise."
 
 
 [31]
 In light of the evidence at trial establishing that William Tavoulareas' involvement in the Samarco-Atlas arrangement was in Mobil's interest and with the concurrence of other top Mobil officials, see infra at 826-29, a reasonable jury could have found false the article's defamatory implication that Tavoulareas engineered the Mobil-Samarco-Atlas scheme for Peter's benefit
 
 
 [32]
 William Tavoulareas denied ever urging that his son be included in Atlas (Tr. 1293-94, 1296-97, 1433)
 The majority concedes, as it must in viewing the evidence most favorably to Tavoulareas under j.n.o.v. standards, that a jury reasonably could have found the "personally urged" charge to be false. Maj.Op. at 788.
 
 
 [33]
 Why the majority attempts to have the two charges considered separately becomes evident in its discussion on actual malice. After finding the "set up" allegation to be defamatory but true and the "personally urged" statement to be defamatory and possibly false, the majority assumes arguendo that Christine Peterson's "memorandum is evidence of 'serious doubt' or actual malice." Maj.Op. at 794. The majority concludes, however, that Tavoulareas could not "connect Peterson's disbelief to a false and defamatory meaning present in the article" because the "set up" allegation was found true. Of course, if the "personally urged" statement had been properly read as part of the "set up" charge that "Tavoulareas made it possible for Peter to become a partner in Atlas," the majority would have been confronted with a false defamation that was published with actual malice. See Maj.Op. at 794 ("the [Peterson] memorandum could be interpreted ... to express disbelief that Tavoulareas "set up" Peter in Atlas"). By declaring the "personally urged" and "set up" allegations unrelated, the majority attempts to sidestep an actionable libel. The article, however, must be interpreted as a whole
 
 
 [34]
 The district court recognized that the two statements are related. In concluding that the "set up" allegation was not a lie, the trial judge relied on Comnas' statement that Tavoulareas had urged Comnas to bring Peter into Atlas. 567 F.Supp. at 659
 
 
 [35]
 Twisting the evidence that William Tavoulareas had told Warner that Mobil was seriously considering joining Samarco and that Comnas was going to ask Peter Tavoulareas and Ares Emmanuel to join his new venture (Tr. 1514-15), the majority torturously concludes that William stated "Comnas was likely to be tapped to manage Samarco's ships." Maj.Op. at 784 n. 29. The majority then attempts to discount Warner's testimony that he thought of asking Comnas to manage Samarco's ships, claiming that "Warner was merely reacting to Tavoulareas' statement"--a statement which Tavoulareas never uttered. Of course, the assessment of what Warner meant by his "absolute natural" statement is a determination to be made by the jury and not by a court claiming to review the verdict under judgment n.o.v. standards
 
 
 [36]
 Tyler's article stated that "[t]he elder Tavoulareas played a personal role in forcing the resignation ... of Comnas" (Paragraph 24), implying that William had caused Peter's advancement in Atlas by forcing Comnas' resignation. However, it is undisputed that Comnas' removal was based on his unsatisfactory performance and was therefore justified. Thus, there is no ground for the article to suggest that William caused Peter's rise in Atlas. Peter's increased ownership resulted from Comnas' justifiable removal and Hoffmann's later decisions to refuse the offered equity interest in Atlas and to return to Mobil after he had determined that Peter and Emmanuel were qualified to manage Atlas
 
 
 [37]
 The majority claims that the abundant evidence the dissent cites for the proposition that a reasonable jury could find the "set up" charge to be false is in reality only evidence that Tavoulareas complied with Mobil's conflict of interest guidelines. Maj.Op. at 786 n. 33. To the contrary, the cited evidence also indicates that the benefit accruing to Peter from the Mobil-Samarco-Atlas arrangement simply was not contrived by William. In sum, the evidence is far from "undisputed" that William "set up" Peter
 
 
 [38]
 See also Maj.Op. at 778
 
 
 [39]
 To be sure, portions of the non-defamatory statements in the Post 's article were true. "[T]he defamer may be the more successful when he baits the hook with truth." Afro-American Publishing Co. v. Jaffee, 366 F.2d 649, 655 (D.C.Cir.1966) (en banc ). But a jury could readily have found false the defamatory implications of the article as a whole, as well as the specific allegations that "Tavoulareas set up his son," "Tavoulareas personally urged that his son be included as an equity partner in Atlas" and "Tavoulareas dispatched ... Hoffmann to London to help run Atlas."
 
 
 [40]
 This attempted qualification does not withstand analysis. Tyler wrote in response to Peterson's memorandum that "a good editor might say that part of our case against Tavoulareas seems tenuous" (RE 2489) (emphasis added). Tyler thus recognized that Peterson's memorandum interpreted the article to accuse William with organizing the Mobil-Samarco-Atlas "scheme for the sake of his son's business career" and did not merely suggest a change in the "focus of the story."
 
 
 [41]
 Without citation to any precedent, the majority asserts that "defamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice in conjunction with a false defamatory statement." Maj.Op. at 794 (emphasis in original). The majority's treatment of the evidence of actual malice demonstrates once again the failure of the majority to address the article as a whole
 
 
 [42]
 The majority insists that because the Post included Tavoulareas' denial of the "personally urged" charge in the article, the statement could not have been published with actual malice. Maj.Op. at 779 n. 17 & 794 n. 44. It is noteworthy that in Mobil's written response to Tyler's questions, Tavoulareas did not only deny that he had, in April 1974, personally urged Comnas to take in Peter, but also affirmatively asserted that it was Comnas who had said he wanted Peter to join him in Atlas (RE 2344). Tyler's failure to check with Comnas about the truth of Tavoulareas' statement (which runs counter to Comnas' claim that William originated the idea of Peter joining Comnas' new venture) indicates a reckless disregard for truth or falsity
 The fact that Tyler published Tavoulareas' denial of the "personally urged" allegation does not in any way vitiate the value of the evidence that Tyler published the charge with reckless disregard for truth or falsity. If the majority's logic were followed, a newspaper that reported a man committed murder, knowing the report to be false or having serious doubts as to its truth, would be absolved from liability if the newspaper had also included the man's denial of the charge. Surely the First Amendment does not prevent a finding of actual malice whenever a defendant publishes false defamatory statements accompanied by denials.
 
 
 [43]
 In view of the Post 's listing of Comnas as a witness (RE 2294) and then neither calling him nor introducing his deposition, the jury was left to evaluate the Post 's defense without the testimony of the Post 's principal source for the story. These circumstances must be taken into consideration in evaluating the credibility and inference determinations that the jury could legitimately draw from all the evidence
 The fact that the Post neither introduced Comnas' deposition nor called Comnas to testify is worthy of note even if reliance on a "missing witness" presumption would be inappropriate. That decision by the Post left its defense and the jury without any direct testimony from the principal source for the Post story. Comnas was the principal source for the story, and in place of Comnas' direct testimony, or his deposition, the jury was left to consider primarily the repetition of his statements by Tyler whose credibility was weakened by obvious self interest, his questionable recording of conversations and other factors. See supra at 813-15, infra at 835.
 Moreover, it is far from clear that application of a missing witness instruction with respect to Comnas' deposition testimony would be inappropriate in these circumstances. As we pointed out in United States v. Young, 463 F.2d 934, 942-43 (D.C.Cir.1972), the propriety of applying a missing witness presumption often turns on the missing witness' "relationship to the parties." In this case Comnas must be considered as a witness favorable to the Post defendants. They relied upon him in the article. They listed him as one of their trial witnesses. At trial they relied upon his statements as repeated or allegedly recorded by others. Comnas' statements were the very core of the Post 's defense; that defense was tremendously weakened by its unexplained reliance on second-hand evidence which resulted from the failure of the Post to call Comnas after listing him, or to use any part of his deposition. One must search far to find a weaker defense in a libel case. The true rule applicable to the situation presented here was set forth by Learned Hand, J., in United States v. Cotter, 60 F.2d 689, 692 (2d Cir.), cert. denied, 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932) and takes cognizance of the "relationship of the parties":
 When both sides fail to call a witness who knows something of the facts, their conduct, like anything else they do, is a circumstance which a jury may use. If both can call him and he is impartial, ordinarily it will have little weight; if it appear that he would naturally side with one party, it is reasonable to expect that he does not use him for good reason; and that is fair argument for the other.
 (Emphasis added). The jury was perfectly free to come to a similar conclusion and no court should be required to rescue a defendant from such folly.
 
 
 [44]
 The majority stresses that Tyler received independent confirmation of Comnas' charge from John Kousi. It is noteworthy that Tyler felt a greater need to obtain this "confirmation" after publication of the article than before. Tyler spoke with Kousi two or three times before the story appeared in print; ten to fifteen times afterwards (Tr. 3194). A more extensive interrogation of Kousi and others might have brought Tyler closer to the truth and given him a better understanding of the whole Mobil-Samarco-Atlas venture
 
 
 [45]
 There is no basis in the record for concluding that this statement referred (as the article applied it) to William's support for Peter's joining Atlas and not to William's support for Peter's originally entering the shipping business with Lemos & Co
 
 
 [46]
 The Post reached this precise conclusion in its published self-criticism following the so-called "Jimmy's World" hoax, a Pulitzer Prize winning story published by the Post on September 28, 1980 concerning an alleged 8-year-old heroin addict. The story proved to be a complete fabrication. Following the public exposure of the story as false, the Post conducted an extensive internal investigation and, inter alia, published its finding regarding the effect of the pressure it placed upon its reporters. A part of that finding was as follows:
 The troubling question is whether pressure on the staff distorts the news published in the paper....
 Lewis Simons of Metro says: "Pressures are so great to produce, to go beyond excellence to the 'holy s--' story. Everyone knows that's what the editors want: The pressure is to get the incredible story, the extraordinary story.
 "People want to succeed. They bust their ass to succeed here.... It can result in overselling a story...."
 [S]ome reporters said they felt strongly that the "system" at the Post has editors making demands on reporters that cannot be met. That reporters are made to feel they are failures when they cannot meet those demands....
 Editors are somewhat infected too.
 The Washington Post, Apr. 19, 1981, at A15.
 
 
 [47]
 The nature of the libel charged in the Butts and Tavoulareas stories have many similarities. The media defendants in both cases misrepresented the intent with which those defamed acted. In Butts all facts were construed to support a conclusion that the reason Butts, the Athletic Director at Georgia, and Bear Bryant, football coach at Alabama, were trading information was due to their "conspiring" (intent) "to fix" the upcoming Georgia-Alabama football game; in the Post article the alleged reason that Tavoulareas "set up " the Mobil-Samarco-Atlas venture (or just the "Atlas venture" as the majority would limit the charge) was because he intended to benefit Peter. In Butts, after denials by the plaintiff, it was thus for the jury to determine whether he had proved that he did not intend "to fix" the game as charged in the article. And here, after Tavoulareas' denials, it was for the jury to determine whether he had "set up" and implemented the Mobil-Samarco-Atlas enterprise (or just the Atlas venture) with intent that violated his fiduciary duty to Mobil. In both cases, the basic facts--i.e., the existence of a phone conversation in Butts and the entry by Mobil into the Samarco-Atlas venture--were true. The false defamation existed in the articles' charges of corrupt intent
 
 
 [48]
 Contrary to the majority's characterization, I do not argue that a question of actual malice arises "whenever a libel plaintiff introduces evidence that the newspaper vigorously pursues high-impact stories of alleged wrongdoing." Maj.Op. at 797. Rather, it is submitted that evidence of extreme pressure for sensationalistic stories may be probative of the issue whether a reporter was thereby motivated to deal recklessly with the facts
 
 
 [49]
 The difference between Peter's and Tyler's versions is significant because the latter implies that Peter denied the management connection between Atlas and Samarco
 
 
 [50]
 As Judge Gasch correctly charged the jury:
 In the course of your deliberations on the actual malice question, you [may consider] whether the Post defendants chose to resolve uncertainty in contradictions or ambiguities in their information concerning the plaintiff in a way most harmful to the plaintiff.
 (Tr. 4555).
 
 
 [51]
 The Seventh Amendment provides:
 In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.
 U.S. Const. Amend. VII.
 
 
 [52]
 Tavoulareas does not contest, and this opinion, along with the majority's, see Maj.Op. at 798 n. 53, assumes without deciding that Piro, although a non-media defendant, is nevertheless protected by the New York Times v. Sullivan requirement of proof of actual malice by clear and convincing evidence. This assumption also means that the court must exercise its independent judgment in determining whether the facts support a conclusion that the constitutional threshold of clear and convincing proof of actual malice has been met
 
 
 [53]
 The jury awarded William Tavoulareas $250,000 in compensatory damages and $1,800,000 in punitive damages against the Post. Post revenues in 1979 from circulation and advertising were over $240 million (Tr. 4017). Post-trial motions were made by the defendants in the district court, including motions for a new trial and motions to have the amount of compensatory damages reduced and the award of punitive damages set aside, or in the alternative, reduced. These motions were denied without prejudice when the judgments n.o.v. were granted. Those rulings are not before this court, and there is no occasion to pass on them at this time. However, I would reinstate the jury verdict against the Post defendants and Dr. Piro, and in that event the district court on remand would be required to reconsider these related motions. At this time no opinion is expressed on the issues raised by those motions